# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## CENTRAL DIVISION
## FRANKFORT

JUDICIAL WATCH, INC.,

     Plaintiff,

UNITED STATES OF AMERICA,

     Plaintiff–Intervenor,

     v.

ALISON LUNDERGAN GRIMES, et al.,

     Defendants.

Civil No. 3:17-cv-00094-GFVT

## PLAINTIFF JUDICIAL WATCH'S MOTION TO
## MODIFY AND ENFORCE THE CONSENT JUDGMENT

Plaintiff Judicial Watch, Inc. hereby submits its Motion to Modify and Enforce the Consent Judgment. Defendants, in particular Defendant Secretary of State Alison Lundergan Grimes, have breached the terms of the agreed Consent Judgment and threaten to do so by misinterpreting its provisions. These violations of the Consent Judgment have deprived Plaintiff Judicial Watch of the court-ordered relief that the parties previously agreed to in order to resolve serious violations of the National Voter Registration Act of 1993 ("NVRA").

## I.    BACKGROUND FACTS.

### A.    Statutory Background.

Congress enacted the NVRA pursuant to U.S. Const. Art. I, §4, cl. 1 ("Elections Clause"). *Harkless v. Brunner*, 545 F.3d 445, 454 (6th Cir. 2008), citing *ACORN v. Miller*, 129 F.3d 833, 836 (6th Cir. 1997). It was enacted for two stated purposes: first, to "increase the number of eligible

citizens who register to vote" and "enhance[]" their "participation . . . as voters in elections for Federal office"; and second, "to protect the integrity of the electoral process" and "ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b).

This second goal is embodied in Section 8 of the NVRA, 52 U.S.C. § 20507. It provides that registrants may be removed from the voter rolls "at the request of the registrant," on account of a registrant's death or change of residence, or under a state law concerning a disqualifying "criminal conviction or mental incapacity." *Id.*, § 20507(a)(3). It also requires each state to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of . . . the death of the registrant; or . . . a change in the residence of the registrant." *Id.*, § 20507(a)(4).

With respect to voters who may have changed residence, Section 8(d) provides that a voter's registration may only be removed from the voter rolls in two ways. First, a registrant who confirms a change of address in writing may be removed from the rolls. 52 U.S.C. § 20507(d)(1)(A). Second, if a registrant is sent a "postage prepaid and pre-addressed return card" by forwardable mail requesting address confirmation (the "Confirmation Notice"), "has failed to respond to [that] notice," and "has not voted or appeared to vote" for the next two general federal elections—basically, from two to four years—that registrant is removed from the rolls. *Id.*, § 20507(d)(1)(B), (d)(2), (d)(3).

Where a voter has failed to respond to a Confirmation Notice and the statutory waiting period of two general federal elections has commenced, that voter's registration is referred to as "inactive." *See* 11 CFR § 9428.2(d) ("Inactive voters means registrants who have been sent but have not responded to a confirmation mailing sent in accordance with [52 U.S.C. 20507(d)]); and

KY. REV. STAT. § 116.112(5) (establishing an inactive voter list and implementing Section 8's removal process).

**B.      The Claims in This Action.**

Judicial Watch initiated this action against Defendants Secretary Grimes and the Executive Director and members of the Kentucky State Board of Elections on November 14, 2017.  ECF 1. Judicial Watch alleged that "Defendants have failed to fulfill Kentucky's obligations under Section 8(a)(4) of the NVRA to conduct a general program that makes a reasonable effort to cancel the registrations of registrants who are ineligible to vote in Kentucky elections."  *Id.*, ¶ 59.  Judicial Watch compared the number of voter registrations in Kentucky and its counties to the number of citizens who were old enough to register to vote.  *Id.*, ¶ 15.  This analysis showed that Kentucky had 48 counties where the number of voter registrations exceeded the number of resident citizens who were old enough to register.  *Id.*, ¶ 16.  In other words, 40% of all Kentucky counties had registration rates exceeding 100% of their age-eligible citizenry.  *Id.*  The entire Commonwealth, moreover, had more registered voters than age-eligible citizens.  *Id.*, ¶ 18.

These impossible registration numbers told only part of the story.  Federal regulations require states to report various kinds of registration data to the federal Election Assistance Commission for use in its biennial report to Congress.  ECF 1, ¶ 20.  This data is supposed to include the number of inactive registrations and the number of Confirmation Notices sent during a two-year period.  *Id.*, ¶ 30; citing 11 C.F.R. § 9428.7(b)(1), (2), (8).  Yet, in the previous two-year reporting period, Kentucky had failed to report either the number of inactive registrations or the number of Confirmation Notices sent.  *Id.*, ¶¶ 22, 31.

Facts learned in discovery confirmed the allegations in the complaint.  In interrogatories, Judicial Watch asked how many voters were placed on the inactive list under state law from 2012

through 2017 by the State Board of Elections. In their sworn responses, Defendants stated: "Zero (0) voters were placed on an inactive list of the kind described in KRS 116.112(5) during the period from November 14, 2012 to November 14, 2017 by the State Board of Elections." Popper Decl., Ex. 1 at 2 (Interrogatory 2). In response to Judicial Watch's interrogatory regarding the number of Confirmation Notices sent under a state law concerning those who may have moved within the same county, Defendants responded: "Zero (0) notices of the kind described in KRS 116.112(2) were sent" during that five-year period. *Id.* (Interrogatory 3). In response to Judicial Watch's interrogatory regarding the number of Confirmation Notices sent to those who may have moved outside of a county, Defendants responded that "Four Hundred, Ninety-Seven (497) notices of the kind described in KRS 116.112(3) were sent" during that period. *Id.* (Interrogatory 1).

In sum, Defendants' own testimony confirmed allegations in the complaint and established that, at least for the five preceding years, Kentucky had wholly abandoned its federally mandated NVRA list maintenance responsibilities.

### C. The Parties' Agreement and the Consent Judgment Resolving the Claims.

The parties consented to the intervention of the United States of America on June 12, 2018. ECF 32. That same day, the parties filed a proposed Agreed Order for this Court's approval. ECF 33-1. In it, Defendants admitted that no Confirmation Notices have been mailed to Kentucky registrants since 2009 and no registrants have become ineligible by reason of the NVRA's Section 8(d) change of address procedures since 2015. ECF 33-1, ¶ 28. Defendants' agreed that "practices currently in place in Kentucky do not comply with the NVRA's requirement" to have a general program making reasonable efforts "to remove ineligible persons from the voter rolls due to a change in residence outside of the jurisdiction." *Id.*, ¶ 29; 52 U.S.C. § 20507(a)(4)(B).

To become compliant with NVRA Section 8, Defendants agreed to adopt a list maintenance program for change of address and to prepare a Comprehensive Plan for the parties to review. ECF 33-1, ¶ 32. The Comprehensive Plan "shall include a detailed description of all procedures to be followed by the Kentucky State Board of Elections" to maintain an accurate and current voter registration list, including the "expected timeframe and frequency" of such procedures. *Id.*, ¶ 34. Defendants' procedures must include an initial canvass mailing consisting of a non-forwardable notice to all Kentucky registrants who may have unreported change in residences since 2009. *Id.*, ¶ 34(c). If the initial mailing is returned undeliverable, with or without a returned address, and information indicates the registrant may have an unreported move outside of Kentucky, then Defendants were required to send "the specific forwardable [Confirmation] notice described in section 8(d)(2) of the NVRA to confirm the registrants' changes in residence" and wait the statutorily required two federal elections prior to removal. *Id.*, ¶ 34(c)-(d)(ii). Critically, the Defendants were to provide the "expected date(s) *between May 23 and August 8, 2018* when notices will be sent under sections 8(c)(1)(B)(i) or 8(d)(2) of the NVRA and updates carried out under section 8(f) of the NVRA." *Id.*, ¶ 34(e) (emphasis added).

On July 3, 2018, this Court entered a Consent Judgment incorporating verbatim all of the terms of the parties' agreement, as an "appropriate resolution" of this action. ECF 39 at 1. The Consent Judgment expires on October 31, 2023, "unless the parties mutually agree to extend it or the Court determines that the Defendants have not achieved substantial compliance with its terms." *Id.*, ¶ 41. The Court retained jurisdiction through that date "to enter such further relief as may be necessary for the effectuation of [its] terms." ECF 39, ¶ 42. The Consent Judgment requires the parties to employ their best efforts to defend it against any legal challenge by non-parties and

required the parties to work cooperatively to ensure compliance with both the terms of the Order and the NVRA. *Id.*, ¶¶ 38-39.

Following the entry of the Consent Judgment, there has been no further litigation while the parties worked on implementing its terms.

### D. Defendants' Breaches of the Consent Judgment.

Almost as soon as this Court issued its Consent Judgment, problems arose regarding Defendants' compliance. This motion is based on the following three breaches of the Court's Consent Judgment.

### 1. Defendants Failed to Send Confirmation Notices Prior to the 2018 Federal Elections.

The Consent Judgment envisioned two mailings to voters. The first was a "nonforwardable canvass mailing to identify registrants through mail returned as undeliverable who may have unreported moves since 2009." ECF 39, ¶ 34(c) (page 11). This mailing was not formally required by the NVRA. Its purpose was simply to identify Kentucky registrants who may have moved. This mailing took place in May 2018. Popper Decl., Ex. 5 at 1 ("The SBE sent initial postcards [to] 617,005 registered voters in May 2018 . . .").

The second mailing, which is the subject of the breach alleged here, concerned the forwardable Confirmation Notices described in Section 8(d)(2), 52 U.S.C. § 20507(d). These are the formal notices required by the NVRA. The registrations of voters who fail to respond to them are removed from the voter rolls after two general federal elections. Pursuant to the Consent Judgment, Defendants were to include in any compliance plan "[t]he expected date(s) between May 23 and August 8, 2018 when notices will be sent under . . . 8(d)(2) of the NVRA." ECF 39, ¶ 34(e) (page 12).

Defendants admit, however, that they did "not send[] a follow-up mailer before August 8" 2018. Popper Decl., Ex. 5 at 1. Because the NVRA has a 90-day "freeze" period prior to any federal election, during which state officials must pause "any program the purpose of which is to systematically remove" ineligible registrations, the effect of Defendants' failure to send Confirmation Notices before August 8 was that such notices were simply not sent prior to the November 2018 elections. 52 U.S.C. § 20507(c)(2)(A).

As discussed below, this failure is deliberate and unjustified, and has major ramifications in terms of the effectiveness of this Court's Consent Judgment. Under the NVRA, a voter who fails to respond to a Confirmation Notice is removed after two general federal elections. By letting the November 2018 elections pass without sending Confirmation Notices, the opportunity to remove perhaps hundreds of thousands of outdated registrations has been postponed for two years, and the opportunity to process other outdated registrations in the meantime may be postponed as well.

Both Plaintiffs objected to this failure in writing in and suggested at that time that a proper remedy would involve extending the term of the Consent Judgment. Popper Decl., Ex. 3 at 4 & Ex. 6 at 1. The parties have continued to discuss this possibility ever since. Most recently, on September 4, 2019, representatives of both Plaintiffs met in Lexington, Kentucky with Defendants' counsel, specifically to discuss extending the term of the Consent Judgment for another general federal election. No agreement was reached at that meeting. Popper Decl., ¶ 3.

To remedy the fact that Defendants caused this material postponement, Judicial Watch seeks by this motion to extend the operation of the Consent Judgment through and after the 2024 general federal election.

2. **Defendant Grimes Is Interpreting the Statutory Treatment of Inactive Registrations in a Way That Is Contrary to the NVRA.**

Pursuant to regulations passed under Section 9 of the NVRA, "[i]nactive voters" are "registrants who have been sent but have not responded to" a Confirmation Notice. 11 CFR § 9428.2(d). Kentucky law similarly provides:

> The State Board of Elections shall establish an inactive list of all voters who fail to respond to the notice described in subsection (3) of this section [regarding out-of-county moves] and do not vote or appear to vote in an election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice.

KY. REV. STAT. § 116.112(5). This plainly says that the inactive list is to contain the names of all voters who have not responded to a notice and have not voted during the statutory period of two general federal elections. Naturally, if any voters whose registrations were on that list did vote during that period, their registrations would be removed from the inactive list.

In May 2019, some of Defendants' counsel suggested for the first time in a series of emails that that provision of Kentucky law could be read in an entirely novel way. They argued that the conditions described in KY. REV. STAT. § 116.112(5)—failing to respond to a notice and not voting for two general federal elections—must all occur *before* a voter is placed on the inactive list. Stated differently, by this account, the inactive list is not where a registration is placed *during* the pendency of the statutory period. It is instead where a registration goes *after* the statutory period has run. *See* Popper Decl., Ex. 7 (email from Defendants' counsel Kenyon Meyer on May 29, 2019 at 4:24 p.m.).

This reading (hereafter, "Secretary Grimes' interpretation") inverts the plain language of the relevant statute. Putting aside the question of whether it accurately states Kentucky law, however, the requirement that two general federal elections must transpire before a voter is placed on the inactive list cannot be harmonized with the NVRA. As the parties recognized in their

contemporaneous email exchanges, there are two alternative ways to approach Secretary Grimes' interpretation. Both conflict with the list maintenance provisions of the NVRA.

First, Secretary Grimes' interpretation might mean that a voter who has failed to respond to a Confirmation Notice and vote for two general federal elections is *simultaneously* (1) placed on the inactive list, and (2) removed from the voter rolls. *See* Popper Decl., Ex. 7 (email from Robert Popper on June 3, 2019 at 5:18 p.m.) (under this reading "a voter registration that became inactive . . . would also be subject to immediate removal under federal law"). This approach effectively abolishes the inactive period prescribed by the NVRA, during which a voter who is believed by state officials to reside elsewhere must affirm his or her current residence in order to vote. *See* 52 U.S.C. § 20507(d)(2)(A) & (e)(3).

Second, Secretary Grimes' interpretation might be taken to suggest that a voter's registration is only removed after a Confirmation Notice and *four* general federal elections—two elections before being placed on the inactive list, and then two more before being removed from the rolls. Counting the necessary years, this mandates a minimum of six years and a maximum of eight years prior to removal. *See* Popper Decl., Ex. 7 (email from Jennifer Scutchfield on May 28 at 4:10 p.m.) (objecting that "[f]or these voters to ultimately have their names removed from the registration database, it will be a full 8 years since they have had activity"). The duration of the Consent Judgment is only a little over five years, from July 3, 2018, through October 31, 2023. By this reckoning, the Consent Judgment will expire before a single registration is removed. This interpretation would destroy the value of the Consent Judgment and suspend enforcement of the NVRA in Kentucky for up to four additional years.

Following the May-June 2019 email communications, a phone conference was held to clarify these specific issues, and its results were memorialized by email. Popper Decl., Ex. 7 (email

from Robert Popper on June 3 at 5:18 p.m.). "Without agreeing on the technically correct way to interpret KRS 116.112(5)," the parties "did agree" that "[r]egardless of what the time period was called under State law, once an 8(d)(2) notice is sent and two consecutive general federal elections take place without voter activity, a voter registration becomes subject to immediate cancellation." *Id*. It was also agreed that a "tag be placed on voters' computer records to allow the State to track whether they vote or update their records after being sent an 8(d)(2) notice . . . [and] to indicate whether a voter needs to affirm an address prior to voting" and "when two general federal elections have elapsed so that a registration becomes subject to cancellation." *Id*. The parties were asked whether "anyone disagrees with these two points." *Id*. No one ever did. Popper Decl., ¶ 12.[1]

About three months later, on September 16, 2019, the Kentucky Democratic Party (KDP) sent a letter to Defendants demanding that the State Board of Elections (SBE) immediately reverse its efforts to implement the terms of the Consent Judgment, wrongly accusing the SBE and its staff of "improperly" placing voters on an "inactive list." Popper Decl., Ex. 9 at 1. Although the Consent Judgment had been public record since it was entered July 3, 2018, the KDP claimed that the SBE "deactivated" "more than 150,000" voters "behind closed doors with no public notice." *Id*.

In this letter, the KDP espoused the same interpretation of state law that Judicial Watch first heard from counsel for Defendants:

> According to KRS 116.112(5), registered Kentucky voters are not eligible to be placed on an "inactive list" until "after the date of the second general election for Federal office that occurs after the date of the notice." . . .

---

[1]     A related issue arose a few days later when some counsel for Defendants suggested that the text of a Confirmation Notice might not inaccurately describe state law regarding the inactive list. *See* Popper Decl., Ex. 8. Another phone conference was held, at which it was noted that, while the parties "do not all agree there was any error," the parties did agree that any error was "harmless." *Id*. (email from Robert Popper on June 14 at 3:25 p.m.). Accordingly, "[n]o party object[ed] to the postcards being mailed in their current form." *Id*.

The earliest date that state law would permit these voters to be moved to an "inactive list" pursuant to KRS 116. 112(5) would be November 2022.

The creation and maintenance of a list of "inactive" voters, and removal of voters from official voter registration statistics, who have not yet met the two federal election threshold is a violation of KRS 116.112(5).

*Id.* at 2. The KDP demanded that Defendants "immediately reactivate voter registrations" of those on the inactive list. *Id.* at 3. The letter threatened legal action regarding this issue. *Id.*

The SBE met the following morning. After that meeting, Defendant Secretary Grimes wrote a letter to the Chair of the SBE agreeing with the KDP's interpretation: "At the September 17, 2019 SBE meeting, I informed the Board of the credibility of the KDP claims and my concern that thousands of voters' records had been unlawfully and unilaterally altered by SBE staff in contravention of the law and without authority of myself and/or the Board."[2] Popper Decl., Ex. 10 at 1. Defendant Secretary Grimes made clear that she sought to reverse actions taken by SBE staff. *Id.* ("Over my strong objection, no action was taken by the Board to reverse staff actions."). She added that "[t]he threat of litigation therefore remains imminent." *Id.*

As set forth below, Secretary Grimes' interpretation is contrary to the NVRA, to Supreme Court precedent, to the terms of the Consent Judgment she agreed to, and even to positions Defendants were taking last year. Accordingly, Judicial Watch respectfully seeks an order declaring (1) that a registration must be immediately cancelled after a Confirmation Notice is not responded to and two consecutive general federal elections have taken place without voter activity, (2) that a voter who does not respond to a Confirmation Notice must affirm an address prior to

---

[2]     Secretary Grimes reiterated this position on Twitter. Popper Decl., Ex. 11 (Twitter entry from October 1, 2019 at 2:54) ("The KY State Board of Elections, in the sole hands of the Governor (who is running for re-election!) has illegally and without voter's knowledge marked 175,000 KY voters 'inactive' ahead of this November election."). In fact, neither the conduct of the SBE nor the relief ordered by this Court is illegal.

voting in subsequent elections, and (3) that Defendants must keep track of voters who are sent a Confirmation Notice in order to enforce the foregoing rules regarding removals and affirmation of addresses.

      **3.       Defendant Grimes Is Not Processing the Registrations of Those Who Simply Fail to Respond at All to Confirmation Notices.**

In conversations with counsel for Defendants, Judicial Watch has been informed that Secretary Grimes has directed that Confirmation Notices sent to voters and returned by the Post Office marked as "undeliverable" are to be treated differently than Confirmation Notices that are simply never returned. Specifically, Secretary Grimes has directed that Confirmation Notices that are not responded to or returned are not to be put "on the clock" for removal after two general federal elections. Popper Decl., ¶ 4-5. What this means is that those registrations will be listed on Kentucky's voter rolls forever.

As set forth below, Secretary Grimes' position is absolutely indefensible given the clear provisions of the NVRA, given Supreme Court precedent interpreting that statute, and given the plain terms of the Consent Judgment. By implementing the Consent Judgment in this way, Secretary Grimes is breaching its terms.

      **E.       This Motion Does Not Address Allegations Against Defendant Grimes That Are the Subject of a Special Counsel's Investigation.**

On August 27, 2018, State Board of Elections Executive Director Jared Dearing wrote a letter to the SBE, the Executive Branch Ethics Commission, and the Kentucky Personnel Board. That letter alleged, among other things, that the day the Consent Judgment was signed by this Court, Secretary Grimes instructed staff to stop processing address confirmation cards and, when

they refused to stop, instructed them through surrogates to "slow walk" the process.[3]  These and other allegations have led to the appointment of Independent Counsel Mark Metcalf, whose investigation is ongoing.[4]

The instant motion is not addressed to Mr. Dearing's allegations.  Nothing in this motion, however, is intended to limit Judicial Watch's ability to move at some future time for a finding of contempt or breach based on those allegations.

F.     **Today's Filing in State Court.**

On October 10, 2019, while the instant motion was being prepared, the KDP sued in Franklin Circuit Court.  The complaint includes a motion for a temporary injunction noticed for Monday, October 14, 2019.  The complaint makes no mention of the NVRA or the federal regulations promulgated pursuant to it; nor does it refer to this Court's Consent Judgment.  Popper Decl., Ex. 12.

That complaint incorporates a motion for a temporary injunction, which is noticed for next Monday, October 14, 2019, at 9:00 a.m. in the Franklin Circuit Court in Frankfort, Kentucky.  *Id.* The timing of this filing and the uninformative nature of the complaint suggest a coordinated, collateral attack on this Court's Consent Judgment.  Plaintiffs will monitor those proceedings.

---

[3]     *See, e.g.,* Jessica Huseman and Daniel Desrochers, *A Power Grab in Kentucky Sparks a Revolt*, PROPUBLICA, Jan. 31, 2019, available at https://www.propublica.org/article/kentucky-state-board-of-elections-power-grab.     Mr. Dearing's letter is available at https://www.documentcloud.org/documents/5700423-Jared-Dearing-Complaint.html.

[4]     *See, e.g.,* Daniel Desrochers, *Beshear Appoints Independent Counsel to Investigate Allegations Against Grimes*, LEXINGTON HERALD-LEADER, Oct. 2, 2018, available at https://www.kentucky.com/news/politics-government/article219381855.html.

## II.    ARGUMENT.

"Consent decrees and judgments are binding contracts." *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 372 (6th Cir. 1998), citing *Brown v. Neeb*, 644 F.2d 551, 557 (6th Cir. 1981).  Accordingly, "[t]he interpretation of a consent decree or judgment is a question of contractual interpretation." *Id.*, citing *Huguley v. GM Corp.*, 67 F.3d 129, 132 (6th Cir. 1995).

As set forth below, Defendants have breached the Court's Consent Judgment in three ways.

### A.    Defendants Breached the Terms of the Consent Judgment by Failing to Send Confirmation Notices Prior to the November 2018 Elections.

The Consent Judgment required Defendants to include in any compliance plan "[t]he expected date(s) between May 23 and August 8, 2018 when [Confirmation Notices] will be sent under . . . 8(d)(2) of the NVRA." ECF 39, ¶ 34(e) (page 12).  Defendants admit that they sent the first (canvass) mailing to identify registrants "who may have unreported moves since 2009" in May 2018.  ECF 39, ¶ 34(c) (page 11); Popper Decl., Ex. 5 at 1.  That means that Defendants had all of June and July, and the first week of August, 2018, in which to send Confirmation Notices.  Yet they failed to do so.

Both Judicial Watch and the Department of Justice wrote letters pointing out this failure (along with other problems with Defendants' implementation of the Consent Judgment) and noted the serious violence it did to any effort to bring order to Kentucky's voter rolls.  Popper Decl., Ex. 3 at 4 & Ex. 6 at 1.  Defendants sent a letter in response that sought to justify their failure to send Confirmation Notices prior to August 8.  Popper Decl., Ex. 5.

That letter makes clear that the failure to send Confirmation Notices was a deliberate choice by Defendants, and not the result of any unforeseen practical obstacle.  *Id.* at 1-2.  Defendants argue, however, that "[t]he Agreed Order does not require the SBE to implement a follow-up

mailing by August 8, 2018." *Id.* at 1. This is simply incorrect, given that the Consent Judgment specifically identified the "expected date(s) between May 23 and August 8, 2018 when notices will be sent" as one of the *mandatory terms* to be included in the Comprehensive Plan. *See* ECF 39, ¶ 34 (page 9) ("At a minimum, the Comprehensive Plan shall include the following:"); *id.* at ¶ 34(e) (page 12).

Defendants main argument is that the "SBE's decision to wait to send the follow-up mailer until after the General Election was made to avoid treating voters differently based upon the inconsistencies of the U.S. Postal Service throughout the Commonwealth of Kentucky." Popper Decl., Ex. 5 at 1. "If the SBE had conducted the follow-up mailer to the voters whose cards were received before August 8, 2018, the SBE would be treating these voters differently than those whose cards arrived on August 9, 2018," given that the later date would be within the NVRA's 90-day freeze period. *Id.* at 2. "It would be manifestly unfair to have an arbitrary line drawn between Kentucky's voters based only upon when the SBE received these postcards." *Id.* Defendants also argue that they preferred to wait to see if some of those identified by the canvass mailing "actually voted on November 6, 2018." *Id.*

These arguments are empty. The NVRA specifies *mailing* as its method for testing whether voters may have moved, and it specifies *elections* as the critical event for counting the time for removal of voter registrations. 52 U.S.C. § 20507(d)(1)(B)(1) & (d)(2) (describing mailing); *id.*, § 20507(d)(1)(B)(ii) & (d)(2)(A) (incorporating general federal elections to mark time). Arguing that "the inconsistencies of the U.S. Postal Service" are an "unfair" or "arbitrary" basis for confirming voters' eligibility, or that it is wasted effort to mail to registrants because some of them may end up voting, is like arguing that the NVRA itself is unfair, arbitrary, or wasted effort.

Congress has determined otherwise, and the states, including Kentucky, are bound by that determination.

As a final matter, we cannot let pass without comment Defendants' hyperbolic assertion that while "the SBE generally agrees with the parties on what the law states," it "will not rush to needlessly disenfranchise thousands of Kentucky voters." *Id.* This statement is preposterous. Voters who *have* moved to another jurisdiction are not disenfranchised when their old registrations are cancelled. Voters who have *not* moved may, of course, return any Confirmation Notice they are sent and confirm their current addresses. Indeed, they could confirm their current addresses at any time during the NVRA's two to four-year statutory period by simply contacting county election officials. *And even if they do not return that Confirmation Notice, they can still vote on Election Day*—after which they are returned to active status. *See* 52 U.S.C. § 20507(d)(2)(A) & (e)(3). No one has been or will be "disenfranchised."

As noted, the NVRA uses general federal elections as the crucial counters marking the statutory time that must elapse before a registration may be removed. At the time the Consent Judgment was entered on July 3, 2018, there were three such counters remaining prior to its expiration—in 2018, 2020, and 2022. Defendants let the first of these elections slip away without any justification. Accordingly, Judicial Watch respectfully requests that the Court order that the term of the Consent Judgment be extended through March 31, 2025, so as to include the November 2024 general federal election.

### B. Defendant Grimes' Contrived Interpretation of State Law Violates the NVRA and Constitutes a Breach of the Consent Judgment.

Secretary Grimes' interpretation of Kentucky law seems plainly incorrect as a matter of simple statutory interpretation. Yet neither Judicial Watch nor this Court need take any position regarding the correct reading of KY. REV. STAT. § 116.112(5). This is because, if the statute is

given the meaning suggested by Secretary Grimes' interpretation, it necessarily conflicts with the NVRA, and is preempted.

Secretary Grimes' interpretation can only have one of two meanings. First, it could be read to effectively abolish the inactive period altogether. Under this scenario, a registrant who fails to respond to a Confirmation Notice would be subject to placement on the inactive list at precisely the same time that the registrant becomes subject to removal from the voter rolls. This would occur because the passing of two general federal elections that justified placing such a registrant on the inactive list would equally justify removing that registrant from the voter rolls under the NVRA. There would never be an occasion under this scenario for any registrant to have to affirm his or her current address, because no registrant would ever be in an inactive status for more than a short time. This result is plainly contrary to the NVRA, which makes explicit provision for voters who have failed to respond to a Confirmation Notice to vote by affirming their old residences. 52 U.S.C. § 20507(d)(2)(A) & (e)(3). These provisions would be meaningless under this approach to Secretary Grimes' interpretation.

A second, alternative approach to Secretary Grimes' interpretation would be to suggest that four general federal elections must take place before a voter is removed. In this scenario, the passage of the first two general federal elections suffices to place a registrant on the inactive list, and the passage of two more general federal elections warrants the removal of that registrant from the rolls. The period of four general elections amounts to a minimum of six and a maximum of eight years. This interpretation would effectively gut the Consent Judgment. Because the Consent Judgment has a current term of five years, no voter could be removed under the address confirmation procedure during the time it is in force. For obvious reasons, Plaintiffs would never have consented to such a meaningless agreement.

In any case, this interpretation is plainly contrary to the NVRA. As the Supreme Court has noted, Section 8(d) of the NVRA

> provides that a State may remove a registrant who "(i) has failed to respond to a notice" and "(ii) has not voted or appeared to vote . . . during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice" (about four years). 52 U. S. C. §20507(d)(1)(B). Not only are States allowed to remove registrants who satisfy these requirements, *but federal law makes this removal mandatory.*

*Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833, 1841-42 (2018) (emphasis added), citing 52 U.S.C. § 20507(d)(3) ("A voting registrar shall correct an official list of eligible voters in elections for Federal office in accordance with change of residence information obtained in conformance with this subsection."); 52 U.S.C. § 21083(a)(4)(A) ("registrants who have not responded to a notice and who have not voted in 2 consecutive general elections for Federal office shall be removed from the official list of eligible voters"). Note also that Congress' preemption powers are particularly strong when legislation—like the NVRA—is passed pursuant to the Elections Clause.

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 133 S. Ct. 2247, 2256 (2013) ("Elections Clause legislation, 'so far as it extends and conflicts with the regulations of the State, necessarily supersedes them.'") (citations omitted); *Harkless*, 545 F.3d at 455 (the rule "that Congress must be explicit when it encroaches in areas traditionally within a state's core governmental functions [] does not apply when Congress acts under the Elections Clause, as it did in enacting the NVRA") (citations omitted).

Secretary Grimes' interpretation is also contrary to the express terms of the Consent Judgment. In describing the mandatory terms to be included in any plan, the Consent Judgment provides that "[a]t a minimum, the Comprehensive Plan *shall include* the following:"

> procedures to be followed where data . . . indicates that registrants may have an unreported move outside the registrar's jurisdiction, which shall include sending the specific forwardable notice described in section 8(d)(2) of the NVRA to confirm

the registrants' changes in residence, waiting for two federal general elections for the registrant to respond or vote or appear to vote, and failing that, to remove them from the statewide voter registration database according to the procedures set forth in section 8(d) of the NVRA . . .

ECF 39, ¶ 34 (page 9), ¶ 34(d)(ii) (pages 11-12) (emphasis added).

Secretary Grimes' interpretation is also contradicted by an email communication, to which none of Defendants' attorneys objected, representing that the parties "did agree" that "[r]egardless of what the time period was called under State law, once an 8(d)(2) notice is sent and two consecutive general federal elections take place without voter activity, a voter registration becomes subject to immediate cancellation"; and that a "tag be placed on voters' computer records to allow the State to track whether they vote or update their records after being sent an 8(d)(2) notice . . . [and] to indicate whether a voter needs to affirm an address prior to voting" and "when two general federal elections have elapsed so that a registration becomes subject to cancellation." Popper Decl., Ex. 7 (email from Robert Popper on June 3 at 5:18 p.m.).

Not only does Secretary Grimes' interpretation conflict with controlling authority, it conflicts with positions Defendants took earlier in these very proceedings. In discussing when a voter should go on the inactive list after failing to respond to a Confirmation Notice, Defendants' counsel opined as follows: "KRS 116.112(5) provides that a voter is not placed on the inactive list until they 'fail to respond' to notice. We suggest that a reasonable amount of time to allow for return of the 8(d)(2) mailer is 45 days." Popper Decl., Ex. 5 at 7. Forty-five days is a far cry from the two general federal elections (from two to four years) that Secretary Grimes *now* claims must elapse before a voter is declared inactive.

By interpreting Kentucky law in a way that necessarily conflicts with the NVRA, Supreme Court precedent, and the terms of the Consent Judgment, Defendant Grimes is breaching that Consent Judgment. In addition, the fact that her interpretation leads to bizarre statutory results,

and that Defendants' counsel previously adopted contrary positions, renders her current position inherently implausible.

### C. Defendant Grimes Breached the Agreement by Refusing to Process the Registrations of Those Who Failed to Respond to Confirmation Notices.

Judicial Watch has learned from SBE's counsel that Secretary Grimes has directed that when Confirmation Notices are sent to registrants but are never responded to or returned, those registrants are not to be processed any further. Popper Decl., ¶ 4. Apparently, these registrants are treated differently than those whose Confirmation Notices are returned as "undeliverable." *Id.*, ¶ 5. As a practical matter this means that registrations that are not responded to will never be processed or removed.

The NVRA could not be clearer: failure to respond to a Confirmation Notice is a proper basis for commencing the statutory period and, in the absence of a vote or further contact, removing a registration from the voter rolls. 52 U.S.C. § 20507(d)(1)(B)(i) (a registration shall not be removed on account of a change of residence "unless the registrant . . . *has failed to respond* to a notice described in paragraph (2)") (emphasis added); § 20507(e) (Heading: "Procedure for voting following failure to return card").

The Consent Judgment just as clearly acknowledges the same thing. ECF 39, ¶ 17 ("52 U.S.C. § 20507(d) . . . allows removal if [] [t]he registrant fails to respond to a notice ('Section 8(d)(2) notice')"); *id.*, ¶ 24 ("failed to respond to the mailed notice"); *id.*, ¶ 31(e) ("failing to respond to a forwardable notice").

Secretary Grimes' refusal to process the registrations of those who fail to respond to a Confirmation Notice is contrary to the NVRA and to this Court's Consent Judgment.

## CONCLUSION

For the foregoing reasons, Plaintiff Judicial Watch respectfully requests that this Court enter an order to enforce the Consent Judgment as set forth in the attached Proposed Order, to amend ¶ 41 of the Consent Judgment to extend its duration until March 31, 2025, and to grant such other and further relief as this Court deems necessary.

October 10, 2019

Respectfully submitted,

*/s/Robert D. Popper*
Robert D. Popper*
T. Russell Nobile**
Eric Lee*
JUDICIAL WATCH, INC.
425 Third Street, S.W.
Washington, D.C. 20024
rpopper@judicialwatch.org
(202) 646-5172
(202) 646-5199 (fax)

H. Christopher Coates*
Law Office of H. Christopher Coates
934 Compass Point
Charleston, South Carolina 29412
(843) 609-7080 (phone)
curriecoates@gmail.com

Mark A. Wohlander
mark@wohlanderlaw.com
WOHLANDER LAW OFFICE, PSC
P.O. Box 910483
Lexington, Kentucky 40591
(859) 309-1691 (office)
(859) 361-5604 (mobile)
(859) 309-1698 (fax)

Counsel for Plaintiff
*       *Admitted Pro Hac Vice*
**      *Pro Hac Vice Motion Pending*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 10, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of the electronic filing to all counsel of record.

/s/ *Robert Popper*
*Counsel for Plaintiff*
*Judicial Watch Inc.*