**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION - FRANKFORT**

| | |
|---|---|
| **JUDICIAL WATCH, INC.,**<br><br>Plaintiff,<br><br>**UNITED STATES OF AMERICA**,<br><br>Plaintiff-Intervenor,<br><br>v.<br><br>**ALISON LUNDERGAN GRIMES**, et al.,<br><br>Defendants. | Civil No. 3:17-CV-94-GFVT-EBA |

**UNITED STATES' STATEMENT IN SUPPORT OF**
**PLAINTIFF JUDICIAL WATCH'S**
**MOTION TO MODIFY AND ENFORCE THE CONSENT JUDGMENT**

On October 10, 2019, Plaintiff Judicial Watch filed a motion to modify and enforce the

Consent Judgment in the above-captioned case, related to voter registration list maintenance

pursuant to the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501, *et seq.* The

Consent Judgment addresses Kentucky's long-standing violations of the Section 8 of the NVRA,

52 U.S.C. § 20507.

Due to Defendants' breaches of the Consent Judgment, Judicial Watch seeks to extend

the term of the Consent Judgment through March 31, 2025 and asks this Court to confirm and

order that Defendants (1) are required to cancel certain registrants after the statutory waiting

period and (2) must not treat registrants differently based on whether they failed to respond to a

statutory notice or the notice was returned as undeliverable. Plaintiff-Intervenor the United

1

States agrees that the Defendants have breached the Consent Judgment, and supports the request for extension of the term through March 31, 2025, as an appropriate remedy. The United States also supports Judicial Watch's request for declaratory relief, to make clear the requirements for tracking and removal under the Consent Judgment.

In working with Defendants on efforts to comply with the Consent Judgment, the United States has found that Defendants have disagreed among themselves on the proper procedures for voters who have been mailed Section 8(d)(2) notices, and the Secretary of State has sided against the State Board of Elections ("SBE") in state court over some of these procedures. The United States has not received a clear answer from the Secretary of State on her commitment to comply with all of the terms of the Consent Judgment, including tracking all registrants who were sent Section 8(d)(2) notices and removing those registrants after the statutory waiting period in compliance with Section 8(d) of the NVRA. We understand that the SBE, at the direction of the Secretary of State, is treating certain registrants who were mailed Section 8(d)(2) notices differently, depending on whether their notice was returned as undeliverable or not, despite there being no basis for doing so in either the NVRA or this Court's Consent Judgment. Further relief is therefore appropriate as to those issues.

Accordingly, the United States files this statement in support of Plaintiff Judicial Watch's motion. As explained below, the United States also is submitting a proposed order with alternative language, to provide further detail and clarity as to what is required of Defendants under the NVRA and the Consent Judgment. *See* Ex. 22. The language is consistent with the relief sought by Judicial Watch in its own proposed order.

I.      **FACTS**

A.      **Purposes and Requirements of the National Voter Registration Act**

Congress enacted the NVRA, 52 U.S.C. § 20501, *et seq.*, to increase the number of

eligible citizens who register to vote in federal elections, enhance the participation of eligible

citizens as voters in federal elections, protect the integrity of the electoral process, and ensure

that accurate and current voter registration rolls are maintained.  52 U.S.C. § 20501.  The

Attorney General is charged by Congress with enforcement of the NVRA.  52 U.S.C. §

20510(a).[1]

To further the NVRA's purpose of "ensur[ing] that accurate and current voter registration

rolls are maintained," 52 U.S.C. § 20501(b)(4), Section 8 of the statute sets out various

provisions for ensuring voter eligibility and removing ineligible registrants from the rolls, 52

U.S.C. § 20507.  Section 8(a) requires covered states to, among other things, "conduct a general

program that makes a reasonable effort to remove the names of ineligible voters from the official

lists of eligible voters by reason of . . . a change in the residence of the registrant, in accordance

with subsections (b), (c), and (d)."  52 U.S.C. § 20507(a)(4)(B).

Section 8(b) requires list maintenance programs and activities to be "uniform,

nondiscriminatory, and in compliance with the Voting Rights Act of 1965."  52 U.S.C.

§ 20507(b)(1).

Section 8(c) establishes that a state may meet its obligation under Section 8(a)(4) by

using change-of-address information from the Postal Service to identify registrants whose

---

[1]     The NVRA covers 44 states and the District of Columbia, including Kentucky.  Exceptions
from coverage apply to certain states that permit, in federal elections, election-day voter
registration or do not require voter registration.  *See* 52 U.S.C. § 20503(b).  Kentucky is not such
a state.  *See* KY. REV. STAT. ANN. § 116.045(2) (West 2019) (requiring voter registration to end
28 days before an election).

addresses may have changed. 52 U.S.C. § 20507(c)(1)(A). If it appears that the registrant has moved within the registrar's jurisdiction, the registrar updates the voter registration record and sends a notice by which the registrant may verify or correct the address information. 52 U.S.C. § 20507(c)(1)(B)(i). If it appears that the registrant has moved outside the registrar's jurisdiction, the registrar uses the notice described in Section 8(d)(2). 52 U.S.C. § 20507(c)(1)(B)(ii). Any program to remove ineligible voters shall be completed "not later than 90 days prior to the date of a primary or general election for Federal office," unless the removal is at request of the registrant or due to criminal conviction, mental incapacity, or death. 52 U.S.C. § 20507(c)(2). This 90-day period is frequently referred to as a "quiet period."

Section 8(d) forbids removing registrants due to a change of residence unless the registrant either (a) confirms in writing that he or she has moved outside the registrar's jurisdiction, or (b) has failed to respond to a statutorily-described notice and "has not voted or appeared to vote (and, if necessary, correct the registrar's record of the registrant's address) in an election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice." 52 U.S.C. § 20507(d)(1). The notice must be "a postage prepaid and pre-addressed return card, sent by forwardable mail, on which the registrant may state his or her current address, together with a notice to the following effect:

> (A) If the registrant did not change his or her residence, or changed residence but remained in the registrar's jurisdiction, the registrant should return the card not later than [the voter registration deadline or 30 days before the next election, whichever is lesser]. If the card is not returned, affirmation or confirmation of the registrant's address may be required before the registrant is permitted to vote in a Federal election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice, and if the registrant does not vote in an election during that period the registrant's name will be removed from the list of eligible voters.

(B) If the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered, information concerning how the registrant can continue to be eligible to vote.

52 U.S.C. § 20507(d)(2). This notice is colloquially referred to as an "8(d)(2) notice" or an "address confirmation notice." A registrar "shall correct" the voter registration rolls "in accordance with change of residence information obtained in conformance with this subsection." 52 U.S.C. § 20507(d)(3).

### B.    Participation in *Judicial Watch v. Grimes* and Consent Judgment

On April 2, 2018, the United States sent a notice letter to the Commonwealth of Kentucky, the SBE, and Secretary of State Alison Lundergan Grimes stating that a lawsuit to enforce Section 8 of the NVRA had been authorized. After extensive negotiations, the parties reached agreement on an Agreed Order to resolve the claims of the United States and Judicial Watch that Kentucky had failed over a period of years to conduct a general program of list maintenance to identify and ultimately remove registrants who had become ineligible to vote based on a move outside of the registrar's jurisdiction. Ex. 1, ¶¶ 9, 10 (Declaration of John A. Russ IV).[2] On June 12, 2018, the United States filed both an unopposed motion to intervene in this ongoing litigation and a joint motion to enter the Agreed Order. ECF Nos. 32, 33. The court granted leave for the United States to intervene and subsequently adopted the parties' proposed Agreed Order as a Consent Judgment on July 3, 2018. ECF No. 39.

---

[2] For the convenience of the court, the United States has submitted one declaration by Mr. Russ summarizing the history of this litigation following the Consent Judgment. This declaration was previously attached to the United States' opposition brief to the Kentucky Democratic Party's motion to intervene. ECF No. 53. The United States is attaching this declaration again with today's statement in support of Judicial Watch's motion, as well as identical exhibits relevant to both filings by the United States. The only new exhibit for this Statement in Support is a proposed order. Ex. 22.

As part of the Consent Judgment, the parties stipulated that the NVRA "requires states to conduct a general voter registration list maintenance program that makes a reasonable effort to remove persons from the voter list who have become ineligible by reason of . . . a change in residence outside the jurisdiction . . . ." ECF No. 39, ¶ 14. "[A] state can remove the name of a person from the voter registration list on grounds of a change of residence upon completion of the process set forth in Section 8(d), 52 U.S.C. § 20507(d), which allows removal if: (a) The registrant fails to respond to a notice ("Section 8(d)(2) notice"), which includes a postage prepaid and preaddressed return card sent by forwardable mail, on which the registrant may state his or her current address, and which contains specific instructions and information, 52 U.S.C. § 20507(d)(1)(B)(i), (d)(2), and (b) [t]he registrant then fails to vote or appear to vote during the period ending on the day after the second federal general election subsequent to the Section 8(d)(2) notice being sent. 52 U.S.C. § 20507(d)(1)(B)(ii)." ECF No. 39, ¶ 17.

The parties further stipulated in the Consent Judgment that there were currently no registrants on an inactive list or in the removal process set out in Section 8(d) of the NVRA, that no notices required by Section 8(d) of the NVRA had been mailed since 2009, and that no registrants had been removed from the voter registration list pursuant to the procedures in Section 8(d) of the NVRA since 2015. ECF No. 39, ¶ 28. As a result, the SBE would be unable to remove any registrants ineligible due to an unreported move from the voter registration rolls pursuant to Section 8(d) until after the November 2020 election.

To remedy these deficiencies, the SBE agreed to send a nonforwardable "canvass mailing" intended "to identify registrants through mail returned as undeliverable who may have unreported moves since 2009." ECF No. 39, ¶ 34(c). It further agreed to undertake specified follow-up procedures in compliance with NVRA Section 8 for each registrant for whom the

"nonforwardable canvass mailing is returned as undeliverable." *Id.* When canvass cards were returned with a forwarding address inside the registrar's jurisdiction—*i.e.*, within the same county as the registrant's existing voter registration address—the registrant's voter registration record was to be updated, and a notice was to be sent to the registrant informing him or her of the update as contemplated by Section 8(c) of the NVRA. ECF No. 39, ¶ 34(d)(i). When canvass cards were returned with a forwarding address outside the registrar's jurisdiction, or without any forwarding address, a notice under section 8(d)(2) of the NVRA was to be sent to the registrant. ECF No. 39, ¶ 34(d)(ii).

Both the canvass cards and follow-up procedures under Sections 8(c) and (d) were to be completed no later than August 8, 2018. ECF No. 39, ¶ 33, 34(c), 34(e). This deadline was chosen because it was the beginning of the NVRA-mandated 90-day "quiet period" before the 2018 federal general election. As a result, any registrant sent a Section 8(d)(2) notice prior to August 8, 2018, would have been removed from the rolls following the November 2020 election, provided that he or she failed to respond and failed to vote or appear to vote between the date of the notice and the November 2020 election. 52 U.S.C. § 20507(d)(1)(B); ECF No. 39, ¶ 34(g).

To ensure and facilitate compliance with Section 8 going forward, the SBE agreed to "create a Comprehensive Plan and implement and adhere to its terms." ECF No. 39, ¶ 32.

The agreement was to remain in effect through October 31, 2023, "unless the parties mutually agree to extend it or the Court determines that the Defendants have not achieved substantial compliance with its terms." ECF No. 39, ¶ 41. This term included three federal general elections—November 2018, November 2020, and November 2022—following the first scheduled mailing of Section 8(d)(2) notices prior to August 8, 2018. After the latter two elections, Kentucky was expected to carry out voter removals in accord with Section 8(d)(2).

## C.    The Defendants Failed to Timely Mail Section 8(d)(2) Notices

From May to early July 2018, the United States had multiple discussions directly with SBE staff regarding the SBE's plans.  These discussions were primarily with the SBE's General Counsel Jennifer Scutchfield, and covered, among other things, the form of the postcards to be used for the canvass mailing, the size and scope of the canvass mailing, the processing of postcards returned as undeliverable, and the form of the Section 8(d)(2) notice to be used.  On June 22, 2018, counsel for the United States reminded SBE staff in writing that the Section 8(d)(2) notices were to be mailed prior to August 8, 2018.  *See* Ex. 1 ¶¶ 12, 13 (Russ Decl.); Ex. 7 (email).

The SBE sent the initial canvass mailing in June 2018 to approximately 617,000 registrants who, as of 2014, had not voted or had any other contact with election officials.  Soon after the canvass mailing, the productive working relationship with SBE staff stopped for an extended time.  On July 9, 2018, counsel for the United States emailed the SBE General Counsel to inquire about revisions to the Section 8(d)(2) notice and the procedures for processing the returned canvass cards.  The SBE General Counsel responded that she had been "asked to have all communication go through our legal counsel," by which she meant outside counsel, Luke Morgan.   On July 16, Mr. Morgan assured the United States that "everything [was] going according to schedule."  Ex. 1 ¶¶ 14-16 (Russ Decl.).

On July 31, however, Mr. Morgan informed the United States in a telephone call that the follow-up procedures, including mailing the Section 8(d)(2) notices, would not be completed by the August 8 deadline due to "staff constraints."  He said that although the United States was led to believe that the follow-up mailing would occur before August 8, the SBE had not agreed to

that.[3]  He also stated that the SBE would not mail any of the Section 8(d)(2) notices before the August 8 deadline.  Counsel for the United States reiterated during the phone call that paragraph 34 of the Consent Judgment required follow-up procedures to the canvass mailing (including the mailing of Section 8(d)(2) notices to registrants whose canvass mailing was returned as undeliverable) to be completed by August 8.  However, the United States decided not to take further action at that time because, with a mere nine days before the start of the quiet period, there was insufficient time to seek an emergency order and have the SBE rush through a process that it appeared unprepared to properly execute.  Ex. 1 ¶ 17 (Russ Decl.).

On August 27, the United States learned that SBE Executive Director Jared Dearing had publicly accused the Kentucky Secretary of State of, among other things, ordering him "to not comply" with the Consent Judgment.  In a letter to the members of the SBE, Mr. Dearing wrote that:

> After several months of joint negations [*sic*] between SBE counsel, SOS staff and the Department of Justice, the SBE entered into a Federal Consent Decree on July 3, 2018.  The consent decree mandated SBE to proceed with, and in a timely manner, the completion of a voter registration address confirmation and inactive voter process. . . . Later that same day [July 3, 2018], I was called in to speak to Secretary Lundergan-Grimes in her office.  In this meeting I was specifically told to immediately stop the scanning of all returned voter address confirmation cards, which was in direct contradiction to the consent decree.  At that time, SBE had already mailed over 600,000 postcards and had received back over 100,000, all of which were to be scanned.  By not scanning the returned cards, we would not be able to generate the second mailing, which was required per the signed consent decree.  After leaving this meeting, having voiced my concern about the nature of this request, both [Assistant Director] Scutchfield and I continued to question the legality of this request to SOS staff.  By the following Monday, both AD Scutchfield and I were told by SOS staff that we were allowed to continue the scanning process, however, we were (per SOS staff) to "slow-walk" them.  Neither AD Scutchfield or I complied with the demands to either "stop" or "slow-walk"

---

[3]  Mr. Morgan began the call by stating that he had been given "clear instructions" by his clients and then proceeded to read a prepared statement that included the above comments.  To the best of the United States' understanding at the time, Mr. Morgan served as outside counsel for both the SBE and the Secretary of State.

this process. At the time of this report, SBE has scanned approximately 220,000 postcards. It is important to also note that during the negotiations with the DOJ, SOS staff mandated that neither AD Scutchfield (who was, at the time, also the General Counsel to the SBE) nor I were to have any further contact with the DOJ and that all further communication with DOJ would immediately go through outside counsel, Luke Morgan, and SOS staff.

Ex. 1 ¶ 18 (Russ Decl.); Ex. 10 (letter). These and other allegations are being investigated by an independent counsel appointed by the Kentucky Attorney General. Ex. 1 ¶ 19 (Russ Decl.); Ex. 11 (news article). To the best of the United States' knowledge, no report has yet been issued.

Like Judicial Watch, the United States does not seek to have the court resolve here the truth of these allegations still under investigation by the state, and it reserves the right to return to court later on that point. However, Mr. Dearing's letter does confirm that the SBE understood that the Consent Judgment required the follow-up procedures to be completed in a timely manner. It is also consistent with Ms. Scutchfield's email response of July 9, the end (for a period of time) of the productive working relationship between the SBE and the United States, and the SBE's subsequent failure to send the Section 8(d)(2) notices prior to the 2018 federal general election.

On August 17, the SBE provided the parties with a draft comprehensive plan, as required by the Consent Judgment. Ex. 1 ¶ 22 (Russ Decl.); Ex. 12 (SBE plan). On September 17, in accordance with the Consent Judgment, the United States and Judicial Watch each sent letters responding to the SBE's proposed Comprehensive Plan. The letters detailed numerous failures of the proposed plan to meet the requirements of the Consent Judgment, as well as the SBE's failure to complete the follow-up procedures to the canvass mailing. *See* Ex. 1 ¶ 22 (Russ Decl.); Ex. 13 (letter from United States).

On October 11, Defendants through counsel denied that the Consent Judgment required a follow-up mailing by August 8, 2018 but provided no support for this claim. Defendants also set

forth an explanation for failing to complete the follow-up, explaining that returned canvass cards were received both before and after August 8, and that sending the follow-up mailing only to those registrants whose cards were returned before August 8 would constitute "treating voters differently based upon the inconsistencies of the U.S. Postal Service." Ex. 1 ¶ 23 (Russ Decl.); Ex. 14 (letter).

The United States subsequently informed Mr. Morgan via telephone that it wanted a specific schedule to be set out for the canvass mailing follow-up, including the mailing of Section 8(d)(2) notices, as well as an extension of the Consent Judgment to cover an additional federal general election. On October 17, the United States sent a letter to Mr. Morgan indicating the same. The letter also noted that the United States remained interested in resolving the concerns without contested court proceedings, and would thus refrain from filing a motion, without any prejudice to its right to do so in the future if an agreement could not be reached promptly. After some additional back and forth, the parties agreed to postpone discussions until after the November 2018 election. The United States refrained from seeking relief from this Court at that time because it wanted to try to resolve the matter with Defendants. Ex. 1 ¶ 24 (Russ Decl.); Ex 15 (letter).

Between the November 2018 election and the next quiet period—which began February 20, 2019 for a statewide primary in May 2019—the United States continued to urge the SBE to move ahead with canvass mailing follow-up, and the SBE indicated that it was taking steps to prepare a Section 8(d)(2) mailing prior to the quiet period. However, in February, the SBE informed the United States that it would be unable to proceed with the Section 8(d)(2) mailing by February 20 because it had failed to procure card stock, and that the mailing would therefore have to wait until after the quiet period ended. Ex. 1 ¶ 25 (Russ Decl.).

In March 2019, Kentucky enacted legislation limiting the Secretary of State's role in the SBE. *See* Ex. 16 (HB114 (2019)). By April 2019, the United States was able to speak to the SBE's General Counsel directly once again and have more detailed discussions about Defendants' efforts to comply with the Consent Judgment.[4] Ex. 1 ¶ 26 (Russ Decl.). In June 2019, 10 months after the deadline in the Consent Judgment, the SBE mailed out the Section 8(d)(2) notices in follow-up to the canvass mailing. Ex. 1 ¶ 33 (Russ Decl.).

### D. The Defendants Treated Registrants Differently Based on Whether Their Section 8(d)(2) Notices Were Returned as Undeliverable

The Consent Judgment requires the SBE to track "all registrants" who are mailed Section 8(d)(2) notices and do not vote, appear to vote, or otherwise have contact with election officials between when the notice is sent and the second subsequent general election for federal office. ECF 39, ¶ 34(f), (g). Since at least August 17, 2018, when the SBE submitted its draft Comprehensive Plan to Plaintiffs' counsel, the United States and the other parties to this case were aware that the SBE intended to track these voters by marking them "inactive" in the Voter Registration System ("VRS").[5] The parties' counsel engaged in some back-and-forth discussion about when exactly registrants would be marked inactive, but all of the proposals involved

---

[4] Since then, the Division has once again been in regular contact with SBE's General Counsel and the SBE has made progress, although the Comprehensive Plan has yet to be finalized.

[5] The NVRA does not require states to mark registrants "inactive" during the statutory waiting period, but doing so has always been understood to be consistent with the NVRA's requirements, and it is common practice. *See* Ex. 18 at 6-10 (U.S. Statement of Interest) (explaining this point in more detail and citing to the House Committee Report on the NVRA, guidance issued by three different federal agencies, and reports by the U.S. Election Assistance Commission and the National Association of Secretaries of State).

marking registrants inactive prior to the next election following when the notices were sent.[6] Ex. 1 ¶ 28 (Russ Decl.).

In May 2019, the parties were discussing finalizing the language on the SBE's section 8(d)(2) notice. Mr. Kenyon Meyer, who filed a notice of appearance on behalf of the Secretary of State in March 2019, objected to marking voters inactive and asserted that state law forbids registrants from being marked inactive until after the second federal general election after the Section 8(d)(2) notice is sent. Ex. 1 ¶ 30 (Russ Decl.) In other words, according to the Secretary's counsel, the NVRA and state law both have the same waiting period, but the NVRA requires registrants to be removed at the end of the waiting period, while state law does not permit them to be marked inactive until that same point in time. This means that registrants would be on the inactive list for the briefest of moments, as a momentary transitory state between active status and required removal from the rolls after two federal general elections pass following the sending of the section 8(d)(2) notice. *See also* Ex. 18 at 12-17 (U.S. Statement of Interest).

In June 2019, the parties agreed that a "tag" would be placed on the registration records of registrants who had been sent a Section 8(d)(2) notice. The SBE General Counsel subsequently informed the parties that the only way to "tag" these registrants in the voter registration system was to mark them inactive. She also told counsel for the United States that

---

[6] The Federal Election Commission ("FEC") issued guidance to states in 1994, the year after the NVRA was enacted. That guidance recognized that "[s]tates will have to decide *when* to designate recipients of [Section 8(d)(2) mailings] as 'Inactive.'" The FEC suggested three possibilities: when the notice is mailed, at an arbitrary date (such as thirty days) after the notice is mailed if no response has been received, or after the voter registration deadline for the next election. FEC, IMPLEMENTING THE NATIONAL VOTER REGISTRATION ACT OF 1993: REQUIREMENTS, ISSUES, APPROACHES, AND EXAMPLES 5-13, https://www.eac.gov/assets/1/1/Implementing%20the%20NVRA%20of%201993%20Requireme nts%20Issues%20Approaches%20and%20Examples%20Jan%201%201994.pdf

the Secretary of State had instructed the SBE to only mark those registrants whose Section 8(d)(2) notices had been returned as undeliverable. Ex. 1 ¶¶ 31-32 (Russ Decl.). The NVRA, however, makes no such distinction between registrants whose Section 8(d)(2) notices are returned undeliverable by the U.S. Postal Service and those whose notices are not, and the Consent Judgment requires "all registrants" who were sent Section 8(d)(2) notices to be tracked.[7] ECF No. 39 ¶ 34(f).

The parties continued to discuss the SBE's efforts to comply with the Consent Judgment, including the SBE's procedures for handling registrants who had been mailed Section 8(d)(2) notices, throughout the summer. In August 2019, counsel for the United States informed Defendants that the United States planned to seek an extension of the Consent Judgment. On September 4, 2019, counsel for the United States met with the other parties' counsel in person in Lexington to discuss potential revisions to the Consent Judgment, including an extension of the term. No resolution was reached. Ex. 1 ¶ 35 (Russ Decl.).

On October 10, 2019, the Kentucky Democratic Party ("KDP") filed a state court lawsuit and motion for a temporary restraining order, alleging, *inter alia*, that the SBE's use of an inactive list violated state law. *Kentucky Democratic Party v. Kentucky State Board of Elections*, No. 19-CI-1043 (Franklin Cir. Ct. 2019). In its complaint, the KDP took the same position that Defendant Secretary of State's counsel had in May 2019, *i.e.* that under state law, registrants may not be placed on an inactive list until after both they are sent a Section 8(d)(2) notice and they do not respond to the notice, vote or appear to vote, or otherwise affirm or update their

---

[7]  With regard to the NVRA, Section 8(i) requires states to maintain lists of "all persons to whom [Section 8(d)(2) notices] are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made." 52 U.S.C. § 20507(i). The question for removal is whether the registrant has failed to respond to the notice, not whether the notice was returned as undeliverable. 52 U.S.C. § 20507(d)(1)(B).

address during the subsequent two election cycles following the date of the notice. *See, e.g.*, ECF No. 52-6 at 4-5 (KDP complaint). On October 14, the state court issued an order, requiring the SBE to use one list of registered voters at the polls and to use an asterisk to denote which registrants had previously been marked inactive. *Id.* Defendant Secretary of State subsequently confirmed this position in her answer. *See, e.g.*, ECF No. 52-5 at 2 (Secretary of State answer).

II.    **ARGUMENT**

A.    **Defendants Breached the Consent Judgment by Failing to Send Section 8(d)(2) Notices Prior to August 8, 2018.**

Judicial Watch argues in its Motion to Amend that the Defendants breached the Consent Judgment by failing to send notices pursuant to Section 8(d) of the NVRA before August 8, 2018. ECF No. 45, at 14-16. The United States agrees.

Paragraph 33 of the Consent Judgment states, in part, that "The Kentucky State Board of Elections will proceed with the actions described in subparagraph 34(c) below regarding a canvass mailing in the stated timeframes regardless of whether a Comprehensive Plan is in place." ECF No. 39 ¶ 33. Paragraph 34(c) says that the Comprehensive Plan must include procedures for sending a nonforwardable canvass mailing to identify registrants with unreported moves, "including the expected date(s) between May 23 and August 8, 2018 on which the canvass mailing will be sent. Where such nonforwardable canvass mailing is returned as undeliverable with or without forwarding address, this would include procedures for moving ahead during the time period between May 23 and August 8, 2018 as set forth in subparagraphs (d)(i), d(ii), and (e) below." ECF No. 39 ¶ 34(c). Paragraph 34(e) makes clear that these follow-up procedures include mailing section 8(d)(2) notices to eligible registrants, again between May 23 and August 8, 2018. It states that the Comprehensive Plan must include "[t]he expected date(s) between May 23 and August 8, 2018 when notices will be sent under sections

8(c)(1)(B)(i) or 8(d)(2) of the NVRA and updates carried out under section 8(f) of the NVRA, and the expected timeframes in future years (not within 90 days of an upcoming primary or general election for federal office) when such notices will be sent and updates carried out." ECF No. 39 ¶ 34(e). The Consent Judgment does not contain any exceptions for this timeline, and the United States has consistently told Defendants that the section 8(d)(2) cards should have been mailed out by August 8, 2018. *See, e.g.*, Ex. 1, ¶¶ 13, 17; Ex. 7 (June 22, 2018 email); Ex. 15 (Oct. 17, 2018 letter).

Defendants failed to meet the timeline, prevented the United States from speaking with SBE staff for a month preceding the deadline, assured the United States approximately three weeks before the deadline that "everything [was] going according to schedule," and then waited until nine days before the deadline to inform the United States that they had no intention of meeting the timeline. *See* Ex. 1 ¶¶ 15-17 (Russ Decl.). These actions deprived the United States of any opportunity to remedy any supposed problems with meeting the timeline before the deadline passed.

Defendants' explanations for failing to meet the timeline are insufficient justifications for their failure to meet the Consent Judgment's deadline. It is hard to gauge the accuracy of Defendants' representations that they did not have sufficient time that summer to send out the Section 8(d)(2) notices, particularly in light of serious allegations that one of the Defendants told the SBE to slow walk or not comply with this Court's order. And of course, the United States did not want the Defendants to rush a process at the last minute that would result in errors and other problems. The fact that mail is returned at different times, however, is foreseeable and should not be a basis for excusing Defendants' delay in sending out any Section 8(d)(2) cards. Defendants had not sent any Section 8(d)(2) notices since 2009, ECF No. 39, ¶ 28, and as a

result, it is not surprising that there would be a large number of registrants who had unreported changes of address during the intervening nine years.  Similarly, it was foreseeable that undeliverable canvass cards would not be returned by the U.S. Postal Service all at once, but rather would continue to trickle in.[8]  The appropriate solution here, to the extent Defendants claim that they needed more time to comply with the August 2018 deadline to mail out Section 8(d)(2) cards, is to extend the term of the Consent Judgment, as the process of rectifying almost a decade of non-compliance is taking longer that Defendants initially anticipated.

**B.    Extending the Term of the Consent Judgment Is an Appropriate Remedy for the Breach**

Because Defendants failed to timely send the Section 8(d)(2) notices, "Judicial Watch respectfully requests that the Court order that the term of the Consent Judgment be extended through March 31, 2025, so as to include the November 2024 general federal election."  ECF No. 45, at 16.  The United States agrees.

Registrants who are sent a Section 8(d)(2) notice become eligible for removal after the second federal general election from the date the notice was sent, unless they respond to the notice, vote or appear to vote, or otherwise affirm or update their voter registration address during that period of time.  52 U.S.C. § 20507(d)(1)(B).  If the SBE had complied with the

---

[8]   Blaming a failure to comply with list maintenance requirements on U.S. Postal Service timing is particularly problematic, because the NVRA proscribes general program list maintenance activities for 180 days in every even-numbered year, and state law proscribes them for 180 days in every other odd-numbered year, as well.  52 U.S.C. 20507(c)(2); Ky. Rev. Stat. Ann. § 116.112(6) (West 2019).  Thus, Kentucky is left with relatively narrow windows of time in which to ensure the accuracy of the voter registration rolls.  The fact that some mail may not be returned right away cannot be an excuse for failing to complete list maintenance activities when they are allowed, particularly given that it is impossible to know when one last notice might be returned.  Otherwise, states could choose to ignore their list maintenance obligations for extended periods of time under the guise of waiting to be certain that no more mail would be returned.

Consent Judgment and sent the Section 8(d)(2) notices prior to the 2018 federal general election, as required by the Consent Judgment, those registrants who did not respond, vote or appear to vote, or otherwise affirm or update their address would have been eligible for removal following the 2020 federal general election. Instead, because the SBE did not send the Section 8(d)(2) notices until 2019, those same registrants will now not be eligible for removal until after the 2022 federal general election. This inaction prevented Kentucky's timely progress toward "ensuring an accurate and current voter registration" list, one of the core purposes of the NVRA and this Consent Judgment. *See* U.S.C. § 20501(b)(4); ECF No. 39 ¶ 8.

The Consent Judgment currently terminates October 31, 2023. That timeline should have allowed the United States and Judicial Watch to monitor Defendants' removal process after both the 2020 general election (for registrants who were sent notices prior to the 2018 election) and the 2022 general election (for registrants who were sent notices prior to the 2020 election). As a result of Defendants' failure to send out the notices on time, there is now only one removal period, *i.e.* following the 2022 election, before the expiration of the Consent Judgment. Defendants' lack of action should not deprive Plaintiffs of the benefit of the bargain that the parties struck—a consent judgment that covers two list maintenance cycles and removal periods. Moreover, given the need to ensure that the state's long-dormant list maintenance process is now working correctly, it is important for the United States to be able to monitor a second removal period and ensure that all procedures are carried out appropriately. The SBE has not removed registrants pursuant to Section 8(d) since 2015, ECF No. 39, ¶ 28, and while the United States does not doubt SBE's desire to conduct removals correctly, it is appropriate for oversight to cover a second removal period to ensure that everything will continue to work smoothly moving forward.

**C.    Defendants Are Required to Cancel Certain Registrations After the Statutory Waiting Period**

As explained in Judicial Watch's Motion to Amend, Kentucky law provides for the use of an "inactive list," but Defendant Secretary of State has taken the position that no registrants may be placed on the inactive list until after they are sent a Section 8(d)(2) notice and then two federal general elections pass.  ECF No. 45 at 8-11.  Defendant Secretary of State's counsel stated this position in May 2019, Ex. 1 ¶ 30 (Russ Decl.), and the Secretary continues to advance this position in state court, ECF No. 52-5 (Secretary of State answer).  This raises a serious question as to what Defendant Secretary of State believes should happen at the end of the second federal general election:  Should registrants be moved to an inactive list pursuant to her asserted view of state law, or removed from the voter registration rolls pursuant to federal law?  Given this lack of clarity from the Secretary of State, and the inherent uncertainty that accompanies a collateral proceeding in state court, it is appropriate for this Court to issue further relief.

Federal law requires that registrants who have been sent a Section 8(d)(2) notice be removed from the rolls if they do not respond to the Section 8(d)(2) notice, vote or appear to vote, or otherwise affirm or update their address with election officials between the date of the notice and the second federal general election following the date of the notice.  52 U.S.C. § 20507(d); ECF No. 39 ¶ 34(g).  The NVRA, which includes detailed instructions as to the form of the notice, requires the notice to explicitly inform registrants that they "will be removed from the list of eligible voters" if they do not respond to the notice and also fail to vote between the date of the notice and the second federal general election following the date of that notice.  52 U.S.C. § 20507(d)(2)(A).  The Supreme Court has held that this removal is mandatory under federal law.  *Husted v. A. Philip Randolph Institute*, 138 S. Ct. 1833, 1841-42 (2018) ("Not only are States allowed to remove registrants who satisfy these requirements, but federal law makes

this removal mandatory.").  Removal is also mandated by the Consent Judgment, ECF No. 39 ¶

34(g) (requiring the Comprehensive Plan to include "procedures for removing [such registrants]

from the statewide voter registration list," as well as "a commitment to remove the registration of

any registrant who meets the conditions prescribed by KRS § 116.112(4)," which mirrors the

NVRA's conditions for removal, and "the expected timeframe when such removals will be

carried out (not within 90 days of an upcoming primary or general election for federal office).")[9]

Even if Defendant Secretary of State's interpretation of state law is correct, to the extent that it

would prevent registrants from being removed from the voter registration rolls in accordance

with Section 8(d) of the NVRA, it is preempted by federal law.  U.S. Const. art. I § 4, cl. 1.  *See*

*also* Ex. 18 at 13-17 (U.S. Statement of Interest) (detailing the preemption argument).

> **D.**     **For Removal Purposes, Defendants Must Not Treat Registrants Differently**
> **Based on Whether They Failed to Respond to the Section 8(d)(2) Notice or**
> **the Notice Was Returned to SBE as Undeliverable**

As explained in Judicial Watch's Motion to Amend, Defendant Secretary of State has

directed that registrants whose Section 8(d)(2) notices were returned as undeliverable are to be

treated differently than those registrants whose Section 8(d)(2) notices were not returned.  ECF

No. 45 at 12.  *See also* Ex. 1 ¶ 32 (Russ Decl.) ("The SBE General Counsel also informed the

United States that the Secretary of State had instructed to SBE to only mark as inactive those

registrants whose Section 8(d)(2) notices had been returned as undeliverable.  Registrants who

were sent Section 8(d)(2) notices that were not returned as undeliverable were not being listed as

inactive.").   The United States agrees with Judicial Watch that this differential treatment is

---

[9]   *See also* S. REP. NO. 103-6, at *19 (1993) ("If the registrant does not vote or appear to vote,
his or her name will be removed from the list of eligible voters.").

inconsistent with the NVRA and the Consent Judgment and an order from this Court on this point is appropriate.

Regardless of the method used to track registrants who have been sent Section 8(d)(2) notices—whether an "inactive" status or some other method—all registrants who have been sent Section 8(d)(2) notices must be treated alike for removal purposes. Neither the NVRA nor the Consent Judgment differentiate between registrants who were sent Section 8(d)(2) notices based on whether that notice is returned as undeliverable. The trigger for removal under the NVRA is simply that the registrant "has failed to respond to [the] notice" and "has not voted or appeared to vote (and, if necessary, correct the registrar's record of the registrant's address)" during the requisite time period. If a registrant receives a notice and does not return it, that registrant has "failed to respond" to the notice every bit as much as a registrant who never received the notice because it was returned as undeliverable. In either situation, the registrant must be tracked and then removed from the registration list after the second federal general election if he or she meets the trigger for removal. Such registrants must also be provided with the same opportunity to affirm or update their address if they appear to vote, both so that they will then not be removed from the rolls and so that they can be assured of voting in the appropriate precinct for their current address.[10]

---

[10]  For practical purposes, it is important to note that when a section 8(d)(2) notice is not returned to the SBE as undeliverable, that does not mean that the registrant continues to reside at the address on his or her voter registration record. The canvass card was non-forwardable with a return order, while the section 8(d)(2) notice is required to be forwardable. Thus, a registrant who moved to a new address would have had his or her canvass card returned to the SBE as undeliverable, but the section 8(d)(2) notice would have been forwarded to his or her new address if there was a current forwarding order. In addition, many of the returned canvass cards appeared to have been originally delivered to the address listed but then returned after someone at that address wrote "RTS" or "Return to Sender" on them. Some had additional hand-written information about the addressee having moved to a different state or having not lived at that address since some prior year. Ex. 1 ¶ 34 (Russ Decl.).

Defendants' practice of treating these two categories of registrants differently is inconsistent with the requirements of the Consent Judgment. Indeed, the SBE was using "inactive" status in the voter registration system to track registrants who would become eligible for removal after two federal election cycles if they failed to return the Section 8(d)(2) notice, vote or appear to vote, or otherwise affirm or update their voter registration address with election officials. Defendant Secretary of State's instruction to not track one category of registrants as "inactive" therefore raises serious questions, including but not limited to (1) how Defendant intended for those registrants to be tracked and later removed (or not) from the voter registration rolls, and (2) whether Defendant intended for those registrants to be removed at the end of two federal election cycles if they had not returned the Section 8(d)(2) notice, voted or appeared to vote, or otherwise affirmed or updated their address.

E.      **The United States Attaches Its Own Proposed Order**

The United States has attached a proposed order with some alternative language to provide further detail and clarity as to what is required of Defendants under the NVRA and the Consent Judgment. *See* Ex. 22. In particular, the United States thinks it appropriate to clearly reflect the language of Section 8 of the NVRA, to further clarify that all registrants sent Section 8(d)(2) notices must be treated the same under Section 8(d), and to take into account the SBE's "voter credit" process when ordering voter registration records to be cancelled after the NVRA's statutory waiting period. This latter point will protect registrants from having their registration cancelled if they vote only in the last federal election before they would otherwise be removed. This additional language is consistent with the relief sought by Judicial Watch in its motion.

## III.    <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff-Intervenor United States supports Plaintiff Judicial
Watch's motion to modify and enforce the Consent Judgment, with some modifications to the
language of the proposed order.

Respectfully submitted,

<div style="margin-left:45%">

ERIC S. DREIBAND
Assistant Attorney General
Civil Rights Division

ELLIOTT M. DAVIS
Acting Principal Deputy Assistant Attorney
    General
Civil Rights Division


*/s/ Michelle Rupp*
T. CHRISTIAN HERREN, JR.
JOHN A. RUSS, IV
MICHELLE RUPP
JENIGH GARRETT
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.923
Washington, D.C. 20530
Telephone: (202) 305-0565
Facsimile: (202) 307-3961
Email: michelle.rupp@usdoj.gov

</div>

Date: November 6, 2019

**CERTIFICATE OF SERVICE**

I hereby certify that on November 6, 2019, a true and correct copy of the foregoing

document was served via the Court's ECF system to all counsel of record.

*/s/ Michelle Rupp*
Michelle Rupp