UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | | |
|---|---|---|
| JUDICIAL WATCH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | Civil No. 3:17-cv-00094-GFVT |
| Plaintiff-Intervenor, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ALISON LUNDERGAN GRIMES, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ALISON LUNDERGAN GRIMES' RESPONSE TO JUDICIAL WATCH'S
MOTION TO MODIFY AND ENFORCE THE CONSENT JUDGMENT**

Defendant, Alison Lundergan Grimes, in her official capacity as the Secretary of State of the Commonwealth of Kentucky (the "Secretary of State"), by counsel, for her response in opposition to the Motion to Modify and Enforce the Consent Judgment filed by Plaintiff, Judicial Watch, Inc. ("Judicial Watch") (DE 45), states as follows.

## INTRODUCTION

Judicial Watch, with the support of Plaintiff-Intervenor United States of America (the "United States"), seeks to modify and "enforce" the Consent Judgment entered by this Court on July 3, 2018 (the "Consent Judgment," DE 39). The motion should be overruled because it is premature, seeks an advisory opinion on matters that are not in controversy, misstates the position of the Secretary of State, and is factually and legally incorrect.

Judicial Watch and the United States have known since July 31, 2018—at the latest—that the SBE could not send the notices required by Section 8(d)(2) of the National Voter Registration

Act (the "Section 8(d)(2) Notices") by August 8, 2018, which was the last day before the 90-day quiet period leading up to the 2018 federal general election. But Judicial Watch and the United States waited until October 2019—months after the Section 8(d)(2) Notices were sent in June 2019, and the same day the Kentucky Democratic Party filed a lawsuit in Kentucky state court challenging the SBE's maintenance of an illegal "inactive" voter list—to move this Court to extend the Consent Judgment on the grounds that the Notices should have been sent back in August **2018**. Judicial Watch and the United States are simply wrong that the Consent Judgment required the Section 8(d)(2) Notices to be sent in August 2018, and have used their briefs as an opportunity to needlessly reference false accusations made by Jared Dearing, the Executive Director of the SBE, against the Secretary of State, and to misrepresent the Secretary of State's actions and legal positions in other lawsuits that have no bearing on the Consent Judgment or the instant case. Judicial Watch's motion is nothing more than a request for an advisory opinion on hypothetical legal issues that are not ripe for decision under any circumstances, much less here, where the Court is limited to applying contract principles to the plain language of the Consent Judgment.

Judicial Watch's motion is premature because the term of the Consent Judgment—which runs through October 31, 2023—may only be extended if the "Court determines that the Defendants have not achieved substantial compliance with its terms." Here, the Secretary of State and the SBE (the "SBE") mailed all required Section 8(d)(2) Notices in June 2019, additional Section 8(d)(2) Notices will go out in 2020, and two federal general elections will have occurred as of the day after the November 2022 federal general election. Moreover, additional Section 8(d)(2) Notices will go out in 2021, 2022, and 2023—all during the duration of the Consent Judgment. In 2023, if Judicial Watch and the United States feel that the SBE has not "substantially complied" with the Consent Judgment, the Court could hold the requisite evidentiary hearing and

make the findings of fact at that time. Evaluation of Defendants' compliance with the Consent Judgment prior to 2023 is premature.

Judicial Watch's motion is also premised on an outright misstatement of the Secretary of State's interpretation of federal and Kentucky law. The Secretary of State has never stated a position to Judicial Watch or the United States on whether voters who receive a Section 8(d)(2) Notice and who do not thereafter vote or appear to vote for two federal general elections are subject to immediate removal by the SBE. The Secretary of State's position in the lawsuit brought by the KDP in Franklin Circuit Court (the "KDP Lawsuit") was to contest the SBE's illegal removal of eligible voters from the list of active registered voters and imposition of illegal barriers to vote. In Franklin Circuit Court, Judicial Watch and the United States supported the illegal removal of voters and the illegal barriers to vote, and suggested that the state court lawsuit would interfere with this case. The Franklin Circuit Court agreed that the Secretary of State's interpretation of the law was correct, and rejected the notion that the KDP Lawsuit interfered with this matter. In any event, the issues in the KDP Lawsuit concerned a state election to which the NVRA—and thus the Consent Judgment—does not apply.

Also contrary to the hearsay representations in the briefs of Judicial Watch and the United States, the Secretary of State has never contended that voters who do not respond to Section 8(d)(2) Notices should be treated differently from those voters whose Section 8(d)(2) Notices are returned undeliverable. Judicial Watch's and the United States' contentions are based on inadmissible hearsay and do not give rise to a justiciable controversy. Indeed, the issue of how to treat or process the returned and non-returned Section 8(d)(2) Notices is not expressly addressed in the Consent Judgment. The allegations are also factually nonsensical as the Secretary of State did not—by

3

design of House Bill 114—have control over the operations of the SBE at the time of the alleged statements.

For the foregoing reasons, and as set forth in further detail below, there is no cause to extend or modify the Consent Judgment. Accordingly, Judicial Watch's motion should be denied.

## **FACTUAL BACKGROUND**

### I.     Procedural History.

On November 14, 2018, Judicial Watch filed a Complaint alleging the Secretary of State and the SBE violated Section 8 of the NVRA. (*See* DE 1, Complaint, at 14.) More specifically, Judicial Watch sought a declaratory judgment that the Secretary of State and the SBE were in violation of Section 8(a)(4) of the NVRA and ordering the Secretary of State and the SBE to develop and implement a general program that makes a reasonable effort clean up Kentucky's voter rolls to remove the registrations of ineligible registrants. (*See id*., at 14.) On June 12, 2018, the United States moved to intervene, DE 32, and the parties filed an agreed Consent Judgment. (DE 33.) The Court entered the Consent Judgment on July 3, 2018. (*See* DE 39.)

### II.    The Consent Judgment.

The parties agreed that voter list maintenance had occurred in Kentucky. Specifically, Judicial Watch and the United States agreed as follows: "The Kentucky State Board of Elections maintains and follows a registration removal program that since 2011, has removed 424,429 individuals from Kentucky's voter rolls due to an individual's death, felon status, mental incompetence, move out of state with their written confirmation, or at their request." (DE 39, at ¶ 28.) Judicial Watch and the United States also agreed that "[t]he Kentucky State Board of Elections ha[d] been unable to secure sufficient funding to implement its list maintenance procedures as to registrants who have moved … despite seeking funding from the General Assembly in every

budget request since 2008." (*Id*., at ¶ 28.) As such, it was agreed by all parties that the reason the "practices currently in place in Kentucky d[id] not comply with the NVRA's requirement that states conduct a general voter registration list program" was not necessarily due to a lack of desire to implement the necessary procedures, but "due to this lack of funding." (*Id*., at ¶ 29.)  There was no agreement or any court finding that the Secretary of State ever violated the NVRA.

      A.    <u>Voter List Maintenance</u>.

      The Consent Judgment stipulates that Section 8 of the NVRA provides two circumstances under which a registrant may be removed because the registrant has moved to another jurisdiction. (*Id*., at ¶¶ 15-17.) First, a state can remove a registrant from the voter registration list because of "a change of residence based on the registrant's written confirmation of a change of address to a location outside of the registrar's jurisdiction" pursuant to 52 U.S.C. § 20507(d)(1)(A). (*Id*., at ¶ 16.) Second, a state can remove a registrant if (a) ***the registrant fails to respond to a Section 8(d)(2) Notice*** which includes a postage prepaid and preaddressed return card sent by forwardable mail, on which the registrant may state his or her current address, and which contains specific instructions and information, ***and (b) the registrant then fails to vote or appear to vote during the period ending on the day after the second federal general election subsequent to the Section 8(d)(2) Notice being sent***. (*Id*., at ¶ 17.) (emphasis added). The parties also stipulated to similar provisions of Kentucky law set forth in KRS 116.112(1). (*Id*., at ¶ 24.)

      The United States and Judicial Watch also agreed that Kentucky law permits only those registrants who do not respond to the notice ***and*** do not vote or appear to vote for two federal election cycles, to be included on an inactive list. Specifically, Judicial Watch and the United agreed:

> As part of its list maintenance program, the Kentucky State Board of Elections is
> required by state law to maintain an inactive list. State law provides that when the

State Board sends the notices described in KRS § 116.112(3) to registrants identified as having moved to a new county or state, the registrants who do not respond to the notice and do not vote or appear to vote for two federal election cycles are maintained on an inactive list. KRS § 116.112(5). When the State Board last sent such notices in 2009, those registrants who did not respond to the notice and did not vote or appear to vote for two federal election cycles were included on an inactive list and ultimately 67,743 individuals were removed from the registration list.

(*Id*., at ¶ 25) (citing KRS § 116.112(5).) Judicial Watch and the United States now take positions directly contrary to the express language of the Consent Judgment.

      B.    <u>The Comprehensive Plan</u>.

The Consent Judgment requires the SBE to develop a Comprehensive Plan for its voter list maintenance program. (DE 39, at ¶ 31.) The Comprehensive Plan must include "[p]rocedures for a general program of list maintenance for registrants who may have become ineligible due to a change of residence that has not been reported to election officials" and "procedures that can be implemented in 2018 (***bearing in the mind the 90-day quiet period before federal elections***.)" (*Id*., at ¶ 34(a)) (emphasis added).

Consistent with federal and Kentucky law, the Consent Judgment requires the SBE to base removals due to a change in residence only on either: (1) the registrant's written confirmation of a change of address outside the jurisdiction; or (2) the registrant (a) failing to respond to a forwardable notice sent by the Kentucky State Board of Elections or its designee, which meet the requirements of section 8(d)(2) of the NVRA and KRS 116.112(3) ***and (b) failing to vote or appear to vote during the period ending on the day after the second federal general election subsequent to the notice began.*** (*Id*., at ¶ 31(e).)

The Consent Judgment required that "[w]ithin 45 days of the effective date of the Agreed Order, the [SBE] shall provide counsel for the parties with its draft of the Comprehensive Plan." (*Id*., at ¶ 33.) The parties were given thirty days to respond. If the parties could not "in good faith"

agree upon the terms of the appropriate plan within thirty days of the latest response, "the parties may seek a resolution from the Court." (*Id.*, at ¶ 33.) Thus, under the terms of the Consent Judgment, the draft Comprehensive plan would not be exchanged until after the beginning of the 2018 "quiet period."

      C.   <u>Timing of Canvass and Section 8(d)(2) Notices</u>.

Paragraph 34(c) states that the Comprehensive Plan must include "the expected date(s) between May 23 and August 8, 2018, on which the canvass mailing will be sent. Where such nonforwardable canvass mailing is returned as undeliverable with or without forwarding address, this would include procedures for moving ahead during the time period between May 23 and August 8, 2018 as set forth in subparagraphs (d)(i), d(ii), and (e) below." (DE 39, at ¶ 34(c).) Paragraph 34(e) states that the Comprehensive Plan must include "[t]he expected date(s) between May 23 and August 8, 2018 when notices will be sent under sections 8(c)(1)(B)(i) or 8(d)(2) of the NVRA . . . and the expected timeframes in future years (not within 90 days of an upcoming primary or general election for federal office) when such notices will be sent and updates carried out." (*Id.*, at ¶ 34(e).) The timing requirements set forth in Paragraph 34 are contingent upon having a Comprehensive Plan in place. In the event a Comprehensive Plan was not in place, Paragraph 33 of the Consent Judgment controlled. That paragraph states that "[t]he [SBE] will proceed with the actions described in subparagraph 34(c) below ***regarding a canvass mailing*** in the stated timeframes regardless of whether a Comprehensive Plan is in place." (*Id.*) Thus, in the event a Comprehensive Plan was not in place, SBE was only required to proceed with the canvass mailing before August 8, 2018.

Presently, there is still no Comprehensive Plan in place. The United States and Judicial Watch have been in possession of the latest draft of the SBE Comprehensive Plan since September

4, 2019. They have not provided any comments on the draft to counsel for the Secretary of State since that date.  The Secretary of State will likely have substantive input on the version of the draft Comprehensive Plan that results from the review of Judicial Watch and the United States.

## II.    Communications between Judicial Watch, DOJ, the SBE, and the Office of the Secretary of State.

Six days after entry of the Consent Judgment, DOJ's David Cooper emailed Jennifer Scutchfield, Assistant Executive Director and General Counsel of the SBE, asking if she "ha[d] any updates on revisions to the postcard or on [] procedures for processing the returned canvass cards." (DE 55-8, Cooper Emails with Scutchfield, July 9, 2018, at 2:14 pm.) Scutchfield responded that she had been "asked to have all communications go through our legal counsel." (*Id.*, at 4:45 pm.) It is highly inappropriate for the United States to criticize the SBE for utilizing outside counsel after the United States filed suit against it. There can be no adverse inference that results from the decision of SBE to utilize outside counsel and to enforce the ethical prohibition of direct contact by opposing counsel with a represented client.

On July 31, 2019, outside counsel for the SBE, Luke Morgan, and DOJ attorney John Russ had a phone call in which Morgan explained that the SBE did not agree that the Consent Judgment required the SBE to send out the Section 8(d)(2) Notices before August 8, 2018—the start of the "quiet period" leading to the November 2018 election. (*See* DE 55, United States Statement in Support of Judicial Watch's Motion, at 8-9.) The United States did not challenge the SBE's position. (*See* DE 45-6, October 11, 2018 Letter from Morgan to Popper and Russ.)

The "quiet period" started on August 8, 2018. On August 17, 2018, the SBE circulated its draft Comprehensive Plan to both Judicial Watch and the United States as required by the Consent Decree. On September 17, 2018, 30 days later, Judicial Watch and the United States responded, claiming that the SBE "fail[ed] to send 8(d)(2) notices before the current 'freeze' period" and that

the "proposed plan f[ell] short of the clear and detailed set of procedures contemplated in the agreed order." (*See* DE 45-4, Judicial Watch's September 17, 2018 Response, at 1; DE 45-5, DOJ September 17, 2018 Response, at 1.) Judicial Watch cited the unfounded allegations by SBE Executive Director Jared Dearing "that Secretary Grimes instructed him to stop processing the responses to nonforwardable mailings, or (through subordinates) to 'slow walk' them," and claimed it was working on an order of contempt and wanted to extend the Consent Judgment. (*See* DE 45-4, Judicial Watch's September 17, 2018 Response, at 2.)

Morgan responded to letters from Judicial Watch and the United States on October 11, 2018. In his letter, Morgan communicated that the SBE disagreed with Judicial Watch's and the United States' position that the Consent Judgment required the Section 8(d)(2) Notice to be sent by August 8, 2018. (*See* DE 45-6, October 11, 2018 Morgan letter.)  Morgan noted that the SBE sent an initial post card canvass mailing to 617,005 registered voters in May of 2018, that postcards were still being returned long after the quiet-period began on August 8, and that, as such, "[i]t would be manifestly unfair to have an arbitrary line drawn between Kentucky's voters based only upon when the SBE received these postcards." (*Id.*, at 2.) Morgan affirmed "the SBE generally agrees with the parties on what the law states, however, the SBE will not rush to needlessly disenfranchise thousands of Kentucky voters." (*Id.*) In reference to removals, Morgan agreed that "the clock starts running" on removal after the passage of the requisite two federal general elections the day the Section 8(d)(2) Notice is sent. (*Id.*, at 5.)

The parties had a telephone call on October 16, 2018 to work out differences regarding the canvass mailers and Comprehensive Plan. On October 17, 2018, DOJ sent a letter reiterating concerns regarding "both the SBE's failure to implement required follow-up to the June 2018 canvass mailing and the SBE's development of a comprehensive list maintenance plan." (DE 45-

7, Department of Justice Letter, October 17, 2018, at 1.) DOJ threatened to seek resolution from the Court since "good faith attempts to resolve [their] concerns" had not worked, and suggested it may seek to extend the Consent Judgment to cover an additional federal election. (*Id*.) The parties agreed to stay communications until after the November 2018 election.

After the November 2018 election, the parties continued to discuss the canvass mailing follow up, including the Section 8(d)(2) Notice. The parties still could not agree on the Comprehensive Plan, and the SBE indicated it could not send Section 8(d)(2) Notices before February 20, 2019, the start of the quiet period leading up to the May 2019 primary. As of May 2019, the parties had not yet agreed on the language in the Section 8(d)(2) Notices.

In May 2019, the parties were discussing the language that would be included in the Section 8(d)(2) Notices. In an email on May 28, 2019, in response to Scutchfield, Morgan stated "I think it incorrect under KY or federal law to say that upon sending the second mailing a voter will automatically be marked inactive. KRS 116.112(5) states the process by which a voter becomes inactive." (DE 45-8, May 28, 2019 Morgan email at 4:01 p.m.) Morgan's email was consistent with the parties' agreement in Paragraph 25 of the Consent Judgment. Scutchfield maintained that "[t]he *easiest* way from a developer standpoint is to mark the voter inactive upon sending the 8(d)(2) mailer." (*Id*., May 28, 2019 Scutchfield email at 4:10 p.m.) Counsel for the Office of the Secretary of State agreed with Morgan on how these issues should be interpreted, stating,

> KRS 116.112 (5) only permits a voter to be designated as inactive if the voter fails to respond to the notice described in KRS 116.112(3) and fails to appear to vote for two federal general elections after the notice goes out. See KRS 116.112(5). Whether complying with the law is easy for the "developer" is irrelevant. The law should be complied with, and the memo should be corrected as soon as possible. I have never agreed on any of the calls that we should not comply with the law.

(*Id*., May 29, 2019 Meyer email at 4:24 p.m.). Judicial Watch disagreed, maintaining that a voter becomes inactive "while the clock is still ticking" for removal. (*Id*., May 29, 2019 Popper email at

4:38 p.m.) The United States took the position that the "the NVRA and our consent judgment do not specify whether or when 'inactive' status should be applied to registrants who are mailed a section 8(d)(2) notice," but that SBE must "keep track of the registrants who receive the mailing . . . and ensure that any registrant who is mailed such a notice, does not respond to it, and does not vote or appear to vote or otherwise have contact with election officials through two federal general elections is removed from the voter registration list." (*Id.*, May 29, 2019 DOJ email at 5:20 p.m.) The United State contradicts this position in its recent filing. The parties thereafter had a phone call in which they agreed that "once an 8(d)(2) notice is sent and two consecutive general federal elections take place without voter activity, a voter registration becomes subject to immediate cancellation" and that SBE could place a "tag" on voters' computer records to allow SBE to "track whether they vote or update their records after being sent an 8(d)(2) notice, to indicate whether a voter needs to affirm an address prior to voting, and ultimately to indicate when two general federal elections have elapsed so that a registration becomes subject to cancellation." (*Id.*, June 3, 2019 Morgan email at 5:18 p.m.)

On June 14, Scutchfield sent an email with the sample Section 8(d)(2) Notice postcard. Counsel for the Office of the Secretary of State disagreed with the form of the postcard and reiterated that "if a person did not change his or her residence, it would not be appropriate to place a voter on a list of inactive voters." (DE 45-9, June 14, 2019 Meyer email at 10:07 a.m.) The parties discussed this disagreement on a call, and the SBE mailed out the Section 8(d)(2) Notices in June 2019.

## III.   SBE Improperly Excludes Voters From The List Of Registered Voters.

In August of 2019, the Kentucky Democratic Party ("KDP") requested voter registration data from the SBE and compared it with voter registration data from April of 2019. (DE 45-10,

September 16, 2019 KDP Letter to SBE.) In April of 2019, the voter registration data contained 3,421,795 registered Kentucky voters. However, the voter registration data obtained by the KDP in August 2019 indicated a drastic change in registered Kentucky voters to 3,259,076 – a difference of 162,719 registered voters. (*Id*.) The registration statistics located on the SBE website indicated this illegal removal of voters occurred in July of 2019. (*Id*.) In response, the KDP filed an Open Records Request to the SBE for voters marked inactive in the voter file. (Exhibit _, KDP Letter to SBE September 16, 2019.) Scutchfield responded with "a list of 165,709 voters who 'must update their information within two federal election cycles (November 2022).'" (*Id.* at 2.)

The KDP wrote a demand letter to the SBE requesting the "immediate[] reactivat[ion] of the registrations of more than 150,000 Kentuckians who were improperly placed on an 'inactive list' in violation of KRS 116.112 and removed from the official voter registration statistics and voter registration data provided to the KDP." (*Id*.) When this proved unfruitful, the KDP filed a Complaint against both the SBE and Secretary of State for injunctive relief and a declaration of rights in order to reinstate the registrations of the 150,000 voters who had been illegally removed. (*See* DE 45-13, KDP Complaint.)

In Franklin Circuit Court, the Secretary of State opposed the SBE's illegal removal of eligible voters from the voter rolls and the imposition of illegal barriers to vote. The Complaint filed by the KDP alleged that, despite the express agreement to place a tag on the status of a registered voter, the SBE removed voters from the registration list and placed them on an inactive list. (*Id*. at 8.) The Secretary of State agreed that KRS 116.112 requires failure to vote in "two federal elections by law" before placing a voter on an inactive list. (*See id*. at 11.) The Secretary of State agreed that there was an "explicit agreement to not strip voters from the Master List" and that the SBE's actions "disadvantage[d] [] more than 175,000 illegally culled Kentucky voters."

(*See id.* at 7, 13.) On October 11, 2019, the United States filed an "emergency motion" for leave to participate in the KDP Lawsuit as an amicus and to file a statement of interest. Judicial Watch did not move for leave to appear in the KDP Lawsuit, but its counsel was present and permitted to state its position at the October 14, 2019 hearing in the Franklin Circuit Court.

The Franklin Circuit Court held a hearing on October 14, 2019 and subsequently granted the KDP's motion for an injunction. (*See* DE 55-19, Franklin Circuit Court Order October 14, 2019.) In doing do, the Court expressed "utmost concern" for "the chilling effect raised by the [KDP] that the actions of the State Board of Elections will cause Kentucky voters placed on the separate list." (*See id.* at 4.) The Court went on to say

> Not every voter has the luxury of waiting for a possibly lengthy period of time to jump through unnecessary hoops when the State Board of Elections' intent can be achieved through simpler, less prejudicial means such as placing an asterisk by the names of the 175,000 voters on the Master Voter List and having poll workers confirm each voters' address

(*See id.* at 5.) While the SBE tried to argue to the contrary, the Court found the "best practice to ensure a just and fair election … is to … utilize one (1) Master List and place an asterisk by the necessary names of voters to alert poll workers to confirm the voters' address." (*See id.* at 7.)

## **LEGAL STANDARD**

"It is widely recognized that a consent decree is to be construed for enforcement purposes basically as a contract and interpreted by reference to the four corners of the document itself." *Landrum v. Bd. of Regents*, Case No. 90-475, 1992 U.S. Dist. LEXIS 13466, at *30 (E.D. Ky. Feb. 26, 1992) (internal citations omitted*.*) "Reference to extrinsic evidence, such as the circumstances of formation, is permissible only if the order is ambiguous in some respect." *Id.* (*quoting Robinson v. Vollert*, 602 F.2d 87, 92 (5th Cir. 1979)). Similar to construing a contract, a consent decree should be "strictly enforced according to its own terms, absent ambiguity." *Id.* at *30-31. As such,

13

"[a] court is not entitled to expand or contract the agreement of the parties as set forth in the decree and must give the explicit language of the decree great weight." *United States v. Int'l Bhd. of Teamsters*, 141 F.3d 405, 408 (2d Cir. 1998).

Although District Courts may be flexible in the modifying of consent judgments, it is not warranted in all circumstances. *See Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 383-84 (1992). "In the Sixth Circuit, 'modification of a consent decree requires a complete hearing and findings of fact.'" *Ne. Ohio Coal. for the Homeless v. Husted*, No. 2:06-CV-896, 2013 U.S. Dist. LEXIS 109609, at *10 (S.D. Ohio Aug. 5, 2013) (*quoting Vanguards of Cleveland v. City of Cleveland*, 23 F.3d 1013, 1017 (6th Cir. 1994)). Importantly,

> a party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree. If the moving party meets this standard, the court should consider whether the proposed modification is suitably tailored to the changed circumstance. A party seeking modification of a consent decree may meet its initial burden by showing a significant change either in factual conditions or in law. Modification of a consent decree may be warranted when changed factual conditions make compliance with the decree substantially more onerous.

*Rufo*, 502 U.S. at 383-84.

## **ARGUMENT**

**I.     Modification of the Consent Judgment is Not Ripe for Review Because the Court Cannot Yet Determine Whether the Defendants have Achieved Substantial Compliance.**

The Court can only modify or extend the termination date of the Consent Judgment if it "determines the Defendants have not achieved substantial compliance with its terms." (DE 39, Consent Judgment, at 17.) "[T]he basic rationale of the ripeness doctrine 'is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements.'" *NRA of Am. v. Magaw*, 132 F.3d 272, 284 (6th Cir. 1997) (*quoting Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 580 (1985)). "In determining whether a claim is ripe, the Sixth Circuit

14

has considered the following factors: '(1) the likelihood that the harm alleged will ever come to pass; (2) whether the factual record is sufficiently developed to allow for adjudication; and, (3) hardship to the parties if judicial review is denied.'" *United States ex rel. Mich. Nat. Res. Comm'n v. Wayne Cty.*, 280 F. Supp. 2d 726, 730 (E.D. Mich. 2003) (*quoting Norton v. Ashcroft*, 298 F.3d 547, 554 (6th Cir. 2002)).

At this point, it is premature for the Court to determine whether the Consent Judgment should be modified. The SBE has drafted a draft Comprehensive Plan. The United States and Judicial Watch continue to review it and, presumably, will suggest revisions. Section 8(d)(2) notices were mailed to Kentucky voters in June of 2019. The SBE will send more Section 8(d)(2) notices in 2020, 2021, 2022, and 2023. In 2022, two Federal elections will have passed since the mailing of Section 8(d)(2) Notices in 2019 and 2020. The Consent Judgment will remain in effect during the removal of voters from the voter registration list in 2022. As such, only in 2023 will the Court truly be able to evaluate whether the SBE has substantially complied with the terms of the Consent Judgment, which is a necessary prerequisite to its extension.  If, at that time, the Plaintiffs feel the Defendants are not in substantial compliance with the Consent Judgment, the Court can hold the evidentiary hearing the Defendants are entitled to and make any requisite findings regarding its' modification. Accordingly, Plaintiffs' request for modification is not ripe for review. A determination of whether to extend the Consent Judgment should occur in 2023.

## II.    The SBE Did Not Violate The Consent Judgment Because The Consent Judgment Did Not Require Section 8(d)(2) Notices To Be Sent Before August 8, 2018.

Judicial Watch and the United States assert that extension of the Consent Judgment is necessary because the SBE failed to send Section 8(d)(2) Notices prior to August 8, 2018. However, the plain language of the Consent Judgment required only that the SBE perform a ***canvass mailing*** by August 8, 2018 and that the SBE propose a draft Comprehensive Plan within

forty-five days of entry of the Consent Judgment. The SBE complied with both of these obligations. Therefore, no breach of the Consent Judgment occurred.

The Consent Judgment contains provisions related to the timing of the canvass mailing, Section 8(d)(2) Notices, and other notices that the SBE was required to include within its draft Comprehensive Plan. Paragraph 34(c) states that the Comprehensive Plan must include "the expected date(s) between May 23 and August 8, 2018, on which the canvass mailing will be sent. Where such nonforwardable canvass mailing is returned as undeliverable with or without forwarding address, this would include procedures for moving ahead during the time period between May 23 and August 8, 2018 as set forth in subparagraphs (d)(i), d(ii), and (e) below." (DE 39, at ¶ 34(c).) Paragraph 34(e) states that the Comprehensive Plan must include "[t]he expected date(s) between May 23 and August 8, 2018 when notices will be sent under sections 8(c)(1)(B)(i) or 8(d)(2) of the NVRA . . . and the expected timeframes in future years (not within 90 days of an upcoming primary or general election for federal office) when such notices will be sent and updates carried out." (*Id.*, at ¶ 34(e).)

The timing requirements set forth in Paragraph 34, however, are contingent upon having a Comprehensive Plan in place. In the event a Comprehensive Plan was not in place, Paragraph 33 of the Consent Judgment controlled. That paragraph states that "The [SBE] will proceed with the actions described in subparagraph 34(c) below *regarding a canvass mailing* in the stated timeframes regardless of whether a Comprehensive Plan is in place." (*Id.*) Thus, *in the event a Comprehensive Plan was not in place, SBE was only required to proceed with the canvass mailing before August 8, 2018.* SBE was *not* required to proceed with any other mailings, including the Section 8(d)(2) Notices, until a Comprehensive Plan was in place. This made sense in light of the fact that forty-five days after the entry of the Consent Judgment (July 3, 2019) was

16

*after* the beginning of the "quiet period." There was simply not enough time to comply with the requirements of the Consent Judgment and send the Section 8(d)(2) Notices within thirty-six days. This is demonstrated by the inability of the SBE to gather the information necessary to send the Section 8(d)(2) Notices out before the 2019 primary and the length of time necessary to agree to the language of the Section 8(d)(2) Notices. The SBE was not required to submit a draft Comprehensive Plan until forty-five days of entry of the Consent Judgment. (*See id.*, at ¶ 33.) The Consent Judgment was not entered until July 3, 2018, meaning that SBE's draft Comprehensive Plan was not due until August 17, 2018.

Thus, Judicial Watch and the United States understood at the time the Consent Judgment was entered that the timing requirements related to the Section 8(d)(2) Notices would not spring into existence until August 17, 2018 at the earliest and, therefore, that Section 8(d)(2) Notices would not be sent by August 8, 2018. The SBE sent a canvass mailing in May of 2018 to approximately 617,005 registered voters, fulfilling the only other requirement of the Consent Judgment in the absence of an agreed-upon Comprehensive Plan.

That the Consent Judgment would not require the SBE to rush to send Section 8(d)(2) Notices before a Comprehensive Plan was in place and before the beginning of the quiet period on August 8, 2018—a mere 36 days after the Consent Judgment was entered—was also  consistent with the timing of the canvass mailing and the non-discrimination provision of the Consent Judgment. The Consent Judgment requires that "[p]rograms to maintain accurate and current voter registration lists must be uniform and nondiscriminatory . . . ." (DE 39, at ¶ 11.) Here, the SBE was still receiving responses to the May 2018 canvass mailing well after August 8, 2018. It would have violated the nondiscrimination provision of Consent Judgment (and caused an undue administrative burden) for the SBE to send Section 8(d)(2) Notices to those voters for whom the

canvass mailing was already returned as non-deliverable—and thereby trigger the two federal general election deadline—while waiting to do the same for those voters whose canvass card was still outstanding. It was not the intention of the Consent Judgment to disparately treat individuals within the group of voters who were sent a canvass mailing at the same time.

The Consent Judgment only required that the SBE perform a ***canvass mailing*** by August 8, 2018 and that the SBE propose a draft Comprehensive Plan within forty-five days of entry of the Consent Judgment. The SBE met both of these deadlines. Accordingly, there was no breach of the Consent Judgment and Judicial Watch's motion to extend and amend the Consent Judgment should be denied.

**III.   The Secretary Of State Has Not Contended That Voter Registrants Who Do Not Respond to a Section 8(d)(2) Notice and Fail to Vote in Two Subsequent Federal Elections Should Not Be Removed from the Voter Registration Rolls.**

The Secretary of State, contrary to the Plaintiffs' assertions, has never contended that voter registrants should not be removed from the voter registration rolls after receiving a Section 8(d)(2) Notice and failing to vote or appear to vote in two Federal elections. In the KDP's lawsuit, the Secretary of State contested the SBE's illegal removal of eligible voters from the voter rolls and the imposition of illegal barriers to vote. This position was in no way inconsistent with the Consent Judgment or NVRA.[1] The Secretary of State ***agrees*** that—as set forth by the NVRA, Kentucky law, and the Consent Judgment— an individual who received a Section 8(d)(2) Notice ***and*** fails to vote or appear to vote in two federal elections is subject to removal from the voter registration list. (*See* DE 39, at ¶ 31(e).)

The Secretary of State ***disagrees*** with Judicial Watch, the United States, and the SBE as to the correct the interpretation of both federal and Kentucky law regarding the maintenance of an

---

[1] The NVRA was not applicable because the lawsuit was brought pursuant to a state election.

inactive list.[2] KRS 116.112 requires that an "inactive list" may only consist of voters who "fail to respond to the notice described in subsection (3) of this section [regarding out-of-county moves] **_and_** do not vote or appear to vote in an election during the period beginning on the date of the notice and ending on the day after the date of the second general election for Federal office that occurs after the date of the notice." KRS 116.112(5). Judicial Watch and the United States agreed to this in Paragraph 25 of the Consent Judgment. Thus, the inactive list created and maintained by SBE at issue in the KDP lawsuit improperly included voters who have only received a confirmation notice mailing **_but had not yet failed to vote in an election during the period between the date of the notice and ending on the day after the second general election for federal office._** As a result, SBE removed from the list of registered voters disseminated to the public and attempted to impose illegal barriers on their ability to vote. Because the Section 8(d)(2) Notices were mailed in June 2019, none of the voters on the SBE's "inactive list" could have possibly failed to appear to vote in two federal general elections as the next federal general election will take place in November 2020, then again in November 2022. The Secretary of State's correct interpretation of Kentucky law was recently affirmed by the Franklin County Circuit Court, which held in the *Kentucky Democratic Party v. Grimes et al.* lawsuit that SBE must return the Kentucky voters who received and have not responded to the Section 8(d)(2) Notice to active registration.  As such, the Secretary of State's correct interpretation of Kentucky law regarding the SBE's maintenance of an improper inactive list cannot give rise to a violation of the Consent Judgment as the Consent Judgment is premised on the same provisions of Kentucky law that the Franklin Circuit Court recently held

---

[2] The inactive list created by the SBE also violated Federal law. Federal law defines "inactive voters" as "registrants who have been sent but have not responded to a confirmation mailing sent in accordance with 42 U.S.C. 1973gg-6(d) *and* have not since offered to vote." CFR § 9428.2(d). Thus, contrary to the assertions of Judicial Watch, the federal regulations do not say that an "inactive voter" is simply a voter that has received a confirmation mailing; an "inactive voter" must also not appear to vote after receipt of the confirmation mailing.

were properly interpreted by the Secretary of State.

**IV.    There Is No Justiciable Controversy Before This Court Concerning The Maintenance Of Inactive Lists Or Removal Of Voters Pursuant To Section 8 Of The NVRA.**

In any event, the Parties' disagreement regarding the interpretation of law relating to maintenance of inactive lists presents a hypothetical legal issue that is not related to a dispute over the express language of the Consent Judgment. Federal courts can only consider issues presenting actual cases or controversies and "are not permitted to render advisory opinions," *Bigelow v. Mich. Dep't of Nat. Res.*, 970 F.2d 154, 157 (6th Cir. 1992) (*quoting Adcock v. Firestone Tire and Rubber Co*., 822 F.2d 623, 627 (6th Cir. 1987)). No actual case or controversy will arise with respect to maintenance of an inactive list until two Federal elections have passed, and the SBE is triggered by Kentucky law to place voters on an inactive list. Any decision rendered regarding the maintenance of an inactive list prior to this occurrence would constitute an impermissible advisory opinion.

Judicial Watch asks the Court to order that a voter registration be "immediately cancelled" after a Section 8(d)(2) Notice is not responded to and two consecutive general federal elections have taken place without voter activity. (*See* DE 45-14.) No legal authority permits the amendment of the Consent Judgment to include this language. Such an amendment would also be unnecessary as the Consent Judgment already requires the SBE to "implement a general program of statewide voter list maintenance that makes a reasonable effort to … remove the names of registrants who have become ineligible under Section 8 of the NVRA." (DE 39, at ¶ 31.)  The Consent Judgment limits removal to circumstances that include  "the registrant (a) failing to respond to a forwardable notice sent by the Kentucky State Board of Elections or its designee, which meets the requirements of section 8(d)(2) of the NVRA and KRS § 116.112(3), and (b) failing to vote or appear to vote during the period ending on the day after the second federal general election subsequent to the

notice being sent." (DE 39, at ¶ 31(e).) Altering this language by further order of the Court is

unwarranted. *See Landrum*, Case No. 90-475, 1992 U.S. Dist. LEXIS 13466, at *30 ("It is widely

recognized that a consent decree is to be construed for enforcement purposes basically as a contract

and interpreted by reference to the four corners of the document itself.")

Furthermore, the SBE has not failed to remove registrations of voters who have both

received a Section 8(d)(2) Notice ***and failed to vote or appear to vote for two federal general***

***elections***. Voters who received and failed to respond to the Section 8(d)(2) Notices mailed in June

2019 will be eligible for removal after the November 2022 federal general election, which is well

within the current effective period of the Consent Judgment. Thus, this Court can resolve any

disputes related to the SBE's failure to remove voters in accordance with Section 8(d)(2) beginning

in 2022, when those issues will be ripe for determination.

Because no voter registrations are currently eligible for removal pursuant to Section

8(d)(2), there is no potential harm to Judicial Watch or the United States, and nothing for this Court

to adjudicate. As such, Judicial Watch's motion is not ripe for adjudication and must be denied.

## V.  The Secretary Of State Never Instructed SBE Staff To Differentiate Among Registrants Who Were Mailed 8(d)(2) Notices.

Judicial Watch and the United States both rely on the unsubstantiated hearsay of the SBE's

Assistant Executive Director and General Counsel Jennifer Scutchfield to assert that "the SBE, at

the direction of the Secretary of State, is treating certain registrants who were mailed Section

8(d)(2) notices differently, depending on whether their notice was returned as deliverable or not."

(DE 45, United States' Statement of Support, at 2.)  In support of their position, Judicial Watch

cites the Declaration of Robert Popper in which he swears by penalty of perjury that

> Jenni Scutchfield, counsel for the Kentucky State Board of Elections, has told me
> that Secretary Grimes has directed that if address confirmation notices sent to voters
> pursuant to 52 U.S.C. § 20507(d)(2) are never returned, then the registrants to

whom those notices were sent are not processed further. That means they are not designated inactive, nor are they put "on the clock" for removal after two more general federal elections. Effectively, nothing happens to those registrations.

(Exh. 1 to Judicial Watch Motion, Popper Decl., at ¶ 4.) Popper further states that "Scutchfield told me that address confirmation mailings that are returned as 'undeliverable' or with some similar postal designation are processed under the NVRA." (*Id.*, at ¶ 5.)

The unsubstantiated and unreliable hearsay of Scutchfield is incorrect and should be disregarded. The Secretary of State never directed SBE staff to treat registrants who received a Section 8(d)(2) notice differently. Such an allegation is also nonsensical because HB 114 stripped her of her power and control over the SBE. Courts in other jurisdictions have refused to consider hearsay testimony contained in affidavits when ruling on a motion to enforce a consent decree. *See S. Med. Corp. v. Liberty Mut. Ins. Co.*, 454 S.E.2d 180, 182 (1995) (stating "affidavits and statements filed in the trial court referred to matters which were clearly hearsay" and that the "hearsay contained in the affidavits cannot be considered."); *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 621 n.18 (N.D. Cal. 1979) ("Many of the allegations contained in the affidavits are based upon hearsay … such testimony cannot readily be considered by the Court as 'factual' support.") Hearsay is a statement that "the declarant does not make while testifying at the current trial or hearing and a party offers in evidence to prove the truth of the matter asserted." FRCP 801(b). Here, the statements attributed to Scutchfield by Popper in his affidavit are clearly hearsay as (1) the statements were not made by Scutchfield while testifying in any capacity and (2) Judicial Watch seeks to use Scutchfield's statements to prove the Secretary of State directed SBE staff to treat undeliverable and non-returned Section 8(d)(2) Notices differently. Scutchfield's statements are incorrect, inadmissible, and should be disregarded by the Court.

22

## CONCLUSION

For the foregoing reasons, this Court should not extend or modify the Consent Judgment. Moreover, the Secretary of State reserves her right to an evidentiary hearing prior to any modification of the Consent Judgment.

Respectfully submitted,

/s/ Daniel J. O'Gara
R. Kenyon Meyer
Daniel J. O'Gara
Dinsmore & Shohl, LLP
101 S. Fifth Street, Suite 2500
Louisville, Kentucky 40202
(502) 540-2300 (phone)
(502) 585-2207 (fax)
kenyon.meyer@dinsmore.com
daniel.ogara@dinsmore.com
*Counsel for Defendant Alison Lundergan Grimes, in her official capacity as Chief Elections Official*

## CERTIFICATE OF SERVICE

I hereby certify that on November 18, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of the electronic filing to all counsel of record.

/s/ Daniel J. O'Gara
*Counsel for Defendant Alison Lundergan Grimes, in her official capacity as Chief Elections Official*