1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF KENTUCKY
2                    CENTRAL DIVISION AT FRANKFORT

3   JUDICIAL WATCH, INC.,

4        Plaintiff,
                               Docket No. 3:17-CV-94-GFVT-EBA
5                              At Frankfort, Kentucky
                               Wednesday, December 18, 2019
6                              2:10 p.m.
    USA,
7
         Intervenor Plaintiff,
8   VS.

9   ALISON LUNDERGAN GRIMES, et al.,
    MARY SUE HELM,
10  ALBERT B. CHANDLER, III,
    DONALD W. BLEVINS,
11  JOSHUA G. BRANSCUM,
    STEPHEN HUFFMAN,
12  GEORGE RUSSELL,
    MICHAEL G. ADAMS,
13
         Defendants,
14
    KENTUCKY DEMOCRATIC PARTY,
15
         Movant,
16
    COMMONWEALTH OF KENTUCKY,
17  STATE BOARD OF ELECTIONS,

18       Intervenor Defendants.

19      TRANSCRIPT OF MOTION HEARING PROCEEDINGS BEFORE
           U.S. DISTRICT JUDGE GREGORY F. VAN TATENHOVE
20

21   Court Reporter:      SANDRA L. WILDER, RMR, CRR
22                        Official Court Reporter
                          313 John C. Watts Federal Building
23                        330 West Broadway, Suite 327
                          Frankfort, Kentucky  40601
24
         Proceedings recorded by mechanical stenography,
25    transcript produced by computer.

```
 1     APPEARANCES:

 2
       For the Plaintiff:   ERIC W. LEE
 3     Judicial Watch, Inc. ROBERT D. POPPER
                            T. RUSSELL NOBILE
 4                          Judicial Watch, Inc.
                            425 Third Street SW, Suite 800
 5                          Washington, DC  20024
                            (202) 645-5199
 6
                            MARK A. WOHLANDER
 7                          WOHLANDER LAW OFFICE
                            P. O. Box 910483
 8                          Lexington, Kentucky  40591
                            (859) 361-5604
 9
       For Intervenor       JENIGH J. GARRETT
10     Plaintiff USA:       JOHN ALBERT RUSS, IV
                            MICHELLE CHRISTINE RUPP
11                          4 Constitution Square
                            150 M Street NE
12                          Washington, DC  20002
                            (202) 305-4777
13
       For the Defendants:  DANIEL LUKE MORGAN
14                          McBrayer, McGinnis,
                            Leslie & Kirkland, PLLC
15                          201 East Main Street, Suite 900
                            Lexington, Kentucky  40507
16                          (859) 231-8780

17      For the Defendant   R. KENYON MEYER
        Secretary of State: DANIEL J. O'GARA
18                          Dinsmore & Shohl, LLP
                            101 South Fifth Street
19                          Suite 2500
                            Louisville, Kentucky  40202
20                          (502) 540-2353

21     For the Intervenor
       Defendant:           BRETT ROBERT NOLAN
22                          Attorney General's Office
                            700 Capital Avenue, Suite 118
23                          Frankfort, Kentucky  40601
                            (502) 696-5300
24

25
```

```
 1            [Proceedings commenced at 2:10 p.m. in open
 2   court]
 3            THE COURT:  Thank you very much.  Madam
 4   Clerk, call the pending case.
 5            DEPUTY CLERK:  Yes, Your Honor.  Frankfort
 6   Civil Action 19-CV-94, Judicial Watch, Incorporated
 7   versus Grimes, et al.  This matter is called for a
 8   motion hearing.
 9            THE COURT:  Thank you.  Counsel, state your
10   appearances, please.
11            MR. WOHLANDER:  Good afternoon, Your Honor.
12   Mark Wohlander on behalf of Judicial Watch, along with
13   Robert Popper, Russ Nobile, and Eric Lee.
14            THE COURT:  All right.  Who'll be arguing for
15   Judicial Watch?
16            MR. WOHLANDER:  Mr. Popper.
17            MR. POPPER:  I'll be arguing, Your Honor.
18   Robert Popper.
19            THE COURT:  Mr. Popper, good morning.
20            MR. POPPER:  Good morning.
21            THE COURT:  Thank you for your patience this
22   morning.
23            MS. RUPP:  Michelle Rupp for Plaintiff
24   Intervenor United States.  And I have with me Bert
25   Russ and Jenigh Garrett.
```

1              THE COURT:  Okay.

2              MS. RUPP:  And I'll be arguing.

3              THE COURT:  Okay.  Thank you.

4              MR. MEYER:  Your Honor, Kenyon Meyer and

5  Daniel O'Gara for the Secretary of State, and I'll be

6  arguing.

7              THE COURT:  Mr. Meyer.

8              MR. MORGAN:  Good afternoon, Judge.  If the

9  Court please, Luke Morgan here on behalf of the State

10  Board of Elections.  Jennifer Scutchfield is present

11  in the courtroom as well.

12              THE COURT:  Excellent.  Anybody else?

13              MR. NOLAN:  Good afternoon, Your Honor.

14  Brett Nolan with the Attorney General's office here on

15  behalf of the Commonwealth of Kentucky.

16              THE COURT:  Mr. Nolan.  All right.  Anybody

17  else need to state an appearance?

18              Okay.  First of all, my apologies for keeping

19  you waiting, counsel.  I appreciate the patience.  I

20  had a commitment at the University of Louisville this

21  morning.  And it's always a mistake to step on the

22  campus of my alma mater's greatest rival, and so --

23  but I want to be respectful of your time, and

24  apologize for the delay.

25              Let me frame the purpose of this hearing.

1 And I understand there's a pending motion to intervene

2 by the Democratic Party, and it's pending before me.

3 I've not ruled on that.  They're not before me on this

4 case.  There's a fairly narrow focus of my interest in

5 the time we spend together this afternoon.

6          There's two things I really want to

7 accomplish.  First of all, there seems to be a pretty

8 fundamental disagreement between Judicial Watch and

9 the Secretary of State's office in the way that the

10 NVRA should be interpreted, particularly as it relates

11 to Kentucky's statutory interpretation of their

12 obligations under the NVRA.

13          And I want to make sure I'm clear primarily

14 what the position of the Secretary of State is.  And I

15 want to do it because in terms of the chronology of

16 this case, it's a little bit of an odd time, because

17 the Secretary of State is about to change in Kentucky.

18 And it very well may be that the litigation posture in

19 this case changes.

20          And what I didn't want to have happen is that

21 when this case gets resolved, there's a lot of

22 representations about what the position was of this

23 Secretary of State in terms of the law in this case,

24 without giving this Secretary of State a really full

25 and fair opportunity to articulate their view and

1 their point of view and the reasoning behind that

2 point of view.  Does that make sense?

3        MR. MEYER:  Yes, it does, Your Honor, and we

4 appreciate that.

5        THE COURT:  Okay.  So that's really what I'm

6 -- and before we're done today, we're going to need to

7 address the issue of kind of what happens next in a

8 case in which there's obviously going to be a change.

9 And we probably need to wait until the new Secretary

10 of State comes in after the first of the year, and we

11 need to see what the position is of the Secretary of

12 State's office in terms of the litigation posture of

13 the case.

14        As a young trial lawyer at the Department of

15 Justice, I worked through the change in

16 administrations between George Herbert Walker Bush and

17 President Clinton.  And I worked on cases in which the

18 world changed dramatically in those cases because the

19 administration changed; that's the nature of this kind

20 of case.  That's what happens.  And so I've -- this is

21 not the only case on my docket in which I'm walking

22 through kind of some -- just a thoughtful pause to

23 reflect what's happening in terms of the political

24 branches in which there's been a change.

25        So the only thing that's pending before me

1  for purpose of this hearing is the motion brought by

2  Judicial Watch to modify and enforce the consent

3  decree; that's all I'm concerned about.  And I'm not

4  really as concerned about all the factual predicate

5  here at this juncture.  There's a lot of this email

6  was sent, and this email was sent, and they said this,

7  and then they represented this.  I really want us to

8  try to come to some agreement in terms of what the law

9  requires, okay?

10         So although I would typically begin with the

11  movants in terms of argument, I actually want to begin

12  with the Secretary of State.  And what I want to do

13  is, for my benefit, what I'm trying to do here is to

14  make sure I'm really clear on the positions of the

15  parties as I make decisions about this case going

16  forward.

17         So the first question I have, Mr. Meyer, is,

18  is it the position of the Secretary of State that they

19  are today in compliance with the NVRA?

20         MR. MEYER:  The answer to that, Your Honor,

21  is yes, with a caveat.

22         THE COURT:  Okay.

23         MR. MEYER:  And as the Court may be aware,

24  during the pendency of this case, the statute that

25  assigned the Secretary of State as the chair of the

1  Board, of the State Board of Elections changed, and
2  removed her ability to vote on the Board.
3            THE COURT:  Okay.
4            MR. MEYER:  So when this case started, she,
5  by state statute, was chair of the Board of Elections,
6  was the tie breaker.  House Bill 114 was passed, and
7  now -- and during the pendency of this case, her
8  ability to vote was removed.  So the duty -- the legal
9  obligation to comply with both federal and state law
10 in this arena is directed at the State Board of
11 Elections, and she no longer has an ability to impact
12 that State Board's actions formally.  She can't vote,
13 she can't direct people to do things, so --
14            THE COURT:  But could she decide on her own
15 to unilaterally send the Section 8 notice, for
16 example?
17            MR. MEYER:  No.  And she is not participating
18 -- and since the change, she has not participated in
19 those mailings.  So she no longer has the legal
20 ability to cause the State Board of Elections to send
21 those notices.
22            And in fact, all of the mailings -- the
23 mailing of the 8(d)(2) notice, which took place this
24 year occurred at a time when she didn't have the
25 ability to impact that.

1          THE COURT:  So she had nothing to do with

2   that notice being sent out?

3          MR. MEYER:  Other than because of my status

4   as counsel in this case, she is the chief election

5   official, and she's a defendant.

6          We have had the opportunity to participate in

7   conversations with what the notice said, and I have

8   expressed my -- and frankly, there have been

9   discussions and changes have been made as a result of

10  my input.

11         So as a result, she is the chief election

12  official still by state statute.  That does have legal

13  implications under federal law.  And as a result of

14  our status as a defendant in this case, I have

15  participated in discussions with the government and

16  with Judicial Watch and with the State Board of

17  Elections, have expressed my opinion about certain

18  matters, and I have not been disconnected from the

19  cause.  I mean --

20         THE COURT:  Sure.

21         MR. MEYER:  -- they've been receptive --

22         THE COURT:  Okay.

23         MR. MEYER:  -- but she's got -- she currently

24  has no ability.  And at the time the 8(d)(2) notices

25  went out, had no ability legally under state law to

1  influence the mailing of those notices.

2          THE COURT:  So if the federal statute is in

3  breach, in other words, if it has not been followed,

4  the accountable entity is the State Board of

5  Elections?

6          MR. MEYER:  That would be correct, now,

7  certainly, and it would be the entity that was

8  responsible for doing things under this agreement.

9  How -- at all times.  However, at a period of time

10 frankly that has been raised in this motion, she was

11 chair of the Board and did have a vote.

12          So in the brief there's a lot of discussion

13 about the fact that the 8(d)(2) notice was not sent

14 out before the 2018 election.  During that period of

15 time, she was chair.  Subsequent to that, she was

16 removed by state statute.  And the period of time when

17 the mailings actually went out and everything that has

18 occurred this year, which really is not at issue,

19 other than some debates about what we have --

20 positions we've taken in the state lawsuit and that --

21 or other legal issues, she has no legal ability to

22 impact any action.

23          So if there's a breach now, she's got -- she

24 and -- unless the law changes, she will not have the

25 it ability to --

1          THE COURT:  What, though, is the distinction
2  -- so as chair, she simply has a vote?
3          MR. MEYER:  Correct, right.
4          THE COURT:  So she could say -- they could,
5  as a policy matter, the State Board of Elections can
6  sit down and say, You know, we think that Kentucky's
7  implementing statutory language as it relates to the
8  NVRA requires "X."  And she could say, No, I disagree
9  with that, and then it could be put to a vote, she
10 could be in the minority, and the -- the State Board
11 of Elections will prevail, based on what, I think,
12 you're representing, and that interpretation will
13 prevail in terms of the law in this case.
14         MR. MEYER:  Correct.  And, for example, the
15 question of whether this consent decree should be
16 extended, the State Board voted on that.  And
17 Mr. Morgan as the counsel of the State Board, the
18 State Board voted on that, voted that it should not be
19 extended, they -- the Board does not believe it
20 violated the consent decree, and instructed counsel to
21 oppose that motion, but the Secretary had no vote on
22 that.
23         THE COURT:  But the Secretary could have a
24 position on that?
25         MR. MEYER:  Sure.

1          THE COURT:  She's the chief election officer.
2  And what is that position?  Is the position of the
3  Secretary of State's office that the NVRA has been
4  complied with?

5          MR. MEYER:  Yes, Your Honor.

6          THE COURT:  And the only caveat -- when you
7  say "with a caveat," the only thing you mean by that
8  is, we think it's been complied with, but, Judge,
9  don't confuse where the ability is to comply with it.
10  We don't have the ability to comply with it as the
11  Secretary of State's office.  You didn't have the
12  ability to comply with it when she was chair --

13          MR. MEYER:  Correct.

14          THE COURT:  -- of the Elections Board, right?

15          MR. MEYER:  Right.  Correct.

16          THE COURT:  That's what your -- the position
17  of the Secretary of State's office, this falls
18  squarely in the State Board of Elections.  They have
19  to comply with the federal statute.  They have to do
20  it consistent with Kentucky law presumably, unless
21  Kentucky law isn't in compliance with the federal
22  statute.

23          MR. MEYER:  Correct.

24          THE COURT:  And your position is they have?

25          MR. MEYER:  Correct.  With -- again, too many

1  caveats -- but just -- I assume that you're referring

2  to the period of time after the consent decree was

3  entered until the current time --

4          THE COURT:  Yes.

5          MR. MEYER:  -- correct?  Yes.

6          THE COURT:  Yes, I am.  That's fair.  Because

7  I think there was a concession in the consent decree

8  that part of the NVRA hadn't been complied with for

9  ten years.  Part of it --

10          MR. MEYER:  I wouldn't go that far, but there

11  was a concession that due to the failure of the

12  legislature to acquiesce and request for money,

13  notices had not been sent out for a period of time.

14          THE COURT:  That's an explanation, though.

15  That's not -- I mean, as I've read the briefing, I

16  thought -- you know, I think partly what the Secretary

17  of State is saying is, We are not in -- we were not in

18  compliance, but there's an explanation.  And the

19  explanation for the reason we were not in compliance

20  is we weren't appropriated the money to do it, in

21  part.

22          MR. MEYER:  If, if we weren't in compliance,

23  it was because we weren't appropriated money.  I think

24  that the -- whether or not we're in compliance, you

25  know, gets squishy because the law requires a

1  reasonable program that can be satisfied by doing

2  certain things.  We didn't -- the state did not do

3  certain things, mailing these notices out for a

4  certain period of time, but it isn't per se a

5  violation by not sending those notices out, I don't

6  think.  But frankly, at the time I got in, we were

7  past all that.

8            THE COURT:  Yeah.

9            MR. MEYER:  What happened, happened.  We

10 didn't do certain things, there was an explanation,

11 the parties reached an agreement, set forth the

12 reasons.  And what did and did not happen in the past,

13 nobody conceded liability, but acknowledged that there

14 was a desire by everybody to send the notices out, and

15 went forward, and attempted to agree on how to proceed

16 from there.

17           THE COURT:  And to be fair, it's academic in

18 terms of that past behavior --

19           MR. MEYER:  Yes, Your Honor.

20           THE COURT:  -- at this point, so we won't

21 dwell on that.

22           Well, let me turn to Mr. Morgan.  Mr. Morgan

23 was expecting that I would turn to him.

24           MR. MORGAN:  Yes, sir.

25           THE COURT:  Do you agree with the position of

1  the Secretary of State that it's the responsibility of

2  the State Board of Elections to comply with the NVRA?

3          MR. MORGAN:  Yes.

4          THE COURT:  That if the Secretary of State

5  took a position counter to the State Board of

6  Elections on what compliance looked like, you would,

7  I'm sure, respect it, listen to it, but in the end,

8  it's the State Board of Elections that decides on

9  compliance with the NVRA?

10         MR. MORGAN:  Yes, sir, I think that that

11 is -- that's, that's the position of the State Board

12 of Elections now, and it would have been, before the

13 law was changed pursuant to HB 114 earlier in this

14 year.

15         THE COURT:  Okay.  Does the State Board of

16 Elections believe then that it is in compliance with

17 particularly the 8(d)(2) requirements of the NVRA?

18         MR. MORGAN:  Yes.

19         THE COURT:  Why?

20         MR. MORGAN:  Because it has made this initial

21 canvass mailing.

22         THE COURT:  Did it do it in the time frame

23 that was set out by agreement of the parties in the

24 consent form?

25         MR. MORGAN:  Yes, sir.  The State Board of

1  Elections, when you look at paragraph 34, is really
2  the -- is the main paragraph on this.  And this is on
3  page -- begins on page ID number 292, and runs through
4  293.  That's the consent agreement, or the, or the
5  consent judgment that was entered on July 3.  And it
6  lays out in here when the canvass mailing and when the
7  second mailing, or also known as the 8(d)(2) notice.
8  The canvass mailing, pursuant to the consent
9  agreement -- this is paragraph 34(c) -- says in
10  pertinent part, that the State Board of Elections'
11  initial use of -- let's see, I'm sorry.  Initial use
12  of this information listed in subparagraph (b),
13  including the expected dates between May 23, and
14  August 8, on which the canvass mailing will be sent.
15  It was done.  That was done in June.  And then in
16  July, and they were receiving responses to that
17  canvass mailing up into -- up into 2019, well in --
18  But there were, I think, literally hundreds of
19  thousands of these responses to this canvass mailer,
20  the initial mailing, were received after this August
21  8, 2018, and that's the bright line deadline here that
22  the plaintiffs are talking about.
23         Now, that initial mailing has gone through,
24  the adjustments have been made in the database and
25  then the --

1          THE COURT:  When you say "the adjustments,"
2   so a couple of things happened when you do that
3   mailing, right?  So put on the record, you do the
4   mailing, then you're going to get some that come back
5   undeliverable?
6          MR. MORGAN:  Right.
7          THE COURT:  What happens to those?
8          MR. MORGAN:  Then a -- as I understand it,
9   Judge, then a second mailing is going to go out to
10  attempt to try to find these, these persons who come
11  back as non-deliverable.
12         THE COURT:  And what's the time -- what is
13  the authority for the second mailing, and what's the
14  timing of the second mailing?
15         MR. MORGAN:  The authority for that second
16  mailing comes from both the NVRA, as well as the KRS,
17  KRS 116 -- I think it's 115(2), or thereabouts.  And
18  the timing on that is that it must be done prior to
19  the 90 day before -- 90 days up until the next federal
20  election.  So in this case, in 2019, we were able to
21  send out that mailer.
22         THE COURT:  The second mailer?
23         MR. MORGAN:  Yes, sir, the 8(d)(2) notice.
24  And that's been done, and adjustments have been made.
25         There's been challenges to that process, and

1 the lists that have been developed on the -- pursuant

2 to the responses on that second notice, whether there

3 should be a supplemental list or the list maintenance.

4 But this list that has been developed is what the

5 State Board of Elections believes is envisioned by the

6 NVRA, as well as its counterpart in the KRS.

7         THE COURT:  So there's two parts to this

8 particular mechanism under the NVRA.  One is the

9 notice.  And then you have to wait a certain amount

10 of -- a certain number of elections.  How many

11 elections do you think you have to wait under the

12 NVRA?

13         MR. MORGAN:  Pursuant to the second notice or

14 the 8(d)(2) notice -- now, when --

15         THE COURT:  Yeah, so let me back up there.

16 You're describing the second notice as the 8(d)(2)

17 notice, not the first notice?

18         MR. MORGAN:  Correct.

19         THE COURT:  So if the consent decree required

20 that the 8(d)(2) notice be completed by that August

21 date in 2018, you're not in compliance, right?  I

22 mean, you don't concede that.  You concede the consent

23 decree is okay as long as that canvassing notice was

24 sent out.  But I think it's the position of Judicial

25 Watch, that needed -- that the 8(d)(2) notice was the

1 notice that needed to be sent out by the deadline that

2 was agreed to in the consent decree.

3          MR. MORGAN:  You are offering a correct

4 summary, I think, of what the parties' position is.

5 All due respect, the State Board of Elections'

6 position on this is the consent decree does not say

7 that.

8          THE COURT:  Okay.

9          MR. MORGAN:  When you look at the paragraph I

10 just read to you on canvass mailing, as well as the

11 next page dealing with subsection (e) on timing and

12 notices, and updates, it talks about the canvass

13 mailer or the 8(d)(2) notice, the second notice.

14          I think that this -- I was involved in the

15 drafting of this consent judgment, and I think we all

16 were having in this idea that this was a dynamic

17 document that was -- did not have hard and fast

18 deadlines, particularly for the 8(d)(2) notice, which

19 is why the State Board of Elections' argument in part

20 is if this was a time of the essence type of an

21 argument, then it should have said very specifically.

22          THE COURT:  Part of Judicial Watch's

23 arguments -- and, Mr. Popper, I'm going to promise

24 you, I'm going to let you make your own arguments

25 here, and we'll give you plenty of time to do that --

1  but part of what they're saying is that there's these

2  two prongs to this process.  And if you interpret this

3  prong the way you've interpreted it, then you can't

4  make the second prong work; that's about the number of

5  elections.  And if you interpret this prong the way

6  you've interpreted it, then you're going to have at

7  least four elections before you can finally address

8  what the definitive answer is in terms of what should

9  happen to that registration, and that's in conflict

10  with the NVRA.

11          MR. MORGAN:  Okay.  Well, I understand, and I

12  agree with you, Judge, that's, that's their position.

13          The State Board of Elections' position on

14  this is that this consent agreement required this

15  canvass mailer to go out certainly between May 23, and

16  August 8, and it did.  And it was asking -- it would

17  be unreasonable, and it turned out to be factually

18  unreasonable for all, I don't know how many, 200?

19  Well, no, there was 400, 600 -- almost 600 -- 600,000

20  canvass mailers went out, and we got approximate some

21  200 plus in return.  And the language of this

22  agreement is in the alternative.

23          THE COURT:  Okay.  So I understand that, and

24  I under -- what the consent agreement cannot do,

25  though, is agree to not comply with the NVRA, right,

1   in some ways?

2           MR. MORGAN:  Right.

3           THE COURT:  The consent agreement has to be

4   consistent with the requirements of the NVRA;

5   everybody has to agree on what the NVRA requires.  And

6   it could be very well -- and I understand this because

7   I hear a lot of kind of governmental arguments, and my

8   sole practice area's in that area.  So I understand

9   the challenge that counsel sometime has in a world of,

10  you know, representing a client in which the funding's

11  not there or the manpower's not there.  Those are all

12  explanations as to why compliance did not happen.  And

13  that's really what I'm trying to focus on today.  Is

14  this a circumstance in which there's general agreement

15  on what compliance looks like, but there were honest

16  reasons why it didn't happen?  Or is this a case in

17  which you actually think you're in compliance with the

18  NVRA, even though it calls for that two election-rule,

19  this necessarily's going to result in longer than

20  that, right?  And I think that's your position.

21          MR. MORGAN:  Well, it is, Judge, but I would

22  also like to -- I think it's awfully close to saying

23  both.  You know, it's not a -- to me, the way you've

24  just phrased it, it's not an exclusive --

25          THE COURT:  Fair.

1          MR. MORGAN:  -- one or the other.  From the
2  State Board's position, they did their level best to
3  get this canvass mailer out and to collect these
4  things, put them through the gate to scan them and get
5  all the information that they could, and then treat
6  everybody fairly.
7          THE COURT:  I'm not unsympathetic to that,
8  but I'll just simply say, I don't see kind of an
9  escape clause in the statutory framework for just
10  trying to do your level best, right?  I mean --
11          MR. MORGAN:  Well, true.  And I know you've
12  heard plenty of people come in here and say, "I'm
13  doing my best," and that doesn't necessarily mean
14  that's legal.  In this case, Judge, it is legal --
15          THE COURT:  All right.  Let me again focus
16  your attention back to that question, which is the
17  plaintiff's argument here, the movant's argument here,
18  which is it can't be legal because it results in too
19  many elections unfolding, contrary to the NVRA.
20          So that's my -- that goes back to my
21  questions, how many elections must occur after the
22  Section 8(d)(2) notice is sent and not responded to
23  before the registered -- the registration is canceled?
24          MR. MORGAN:  Two elections, two federal
25  elections.  And as you noted in our response on page 5

1 of the State Board of Elections' response, that the

2 SBE's position on this issue is that after the second

3 notice has been sent and the registrant has failed to

4 respond, that person is placed on a list where they

5 are monitored for two federal election periods.

6 That's consistent with the NVRA, as well as KRS.

7 That's what we're doing.

8            THE COURT:  That's my final question really

9 on this point is, is that's what's going to occur

10 here.  After the 8(d)(2), there'll be two elections.

11 What about after the first notice, how many elections

12 will there be?

13            MR. MORGAN:  Well, in this case, there was

14 one federal election, after the initial -- the canvass

15 mailer went out.

16            THE COURT:  So there'll be -- after the

17 initial canvass mailer go out, there'll be three

18 federal elections before a cancellation occurs?

19            MR. MORGAN:  Yes.

20            THE COURT:  So if that should have been when

21 the 8(d)(2) notice went out, then there would have --

22 you could still abide by the two election rule.  But

23 because that was the confirmation notice, and the

24 8(d)(2) notice happened later, it will take three

25 elections from the confirmation notice, all of which I

1  understand you say is perfectly in compliance with the

2  NVRA.

3          MR. MORGAN:  And you're right, Judge; that is

4  our position.  And I see nothing in the NVRA that says

5  that that -- those, that second mailer, that 8(d)(2)

6  notice must go out within some period of time.  The

7  consent judgment does not say anything about it having

8  to go out within "X" period of time from the canvass

9  mailer.

10          The consent judgment, as well as the NVRA do

11  clearly talk about treating voters fairly.  And that's

12  the balance that the State Board of Elections struck

13  here, is because we have had ten years of build-up on

14  these notices going out, that -- and you're talking

15  about 200,000 persons, voters, they should all be

16  treated as a group consistently, fairly.  And rather

17  than having some cut-off period of August 8, when

18  you've got approximately 100,000 who would be treated

19  one way, and then you've got those folks who come on

20  August 9 and thereafter, another 100,000, another

21  almost half of the group being treated as a separate

22  class or separate group.  The State Board of Elections

23  decided after reading the NVRA, as well as the consent

24  decree, that let's treat them all as one group, and

25  treat them consistently.

1          THE COURT:  The other way to resolve that --

2   that's not a bad motive, certainly -- another way to

3   resolve that is to moved it all up and done it sooner

4   so that you didn't run into that overlap; you'd have

5   enough time to get the responses.

6          MR. MORGAN:  Well, you're right.  I think it

7   should -- I've got to say this on behalf of the State

8   Board of Elections.  They invited, in a way, and

9   I'm -- air quotes here for the record -- they invited

10  for the Department of Justice to come in and to

11  intervene, and worked collaboratively with the

12  Department of Justice and Judicial Watch in developing

13  this consent decree, and they -- that, I think on

14  behalf of the State Board of Elections, is an

15  indication of them speeding matters up.

16         THE COURT:  Okay.  Well, let me ask you,

17  Mr. Morgan, and then, Mr. Meyer, I want to ask you

18  this question as well, and then I'm going to turn to

19  Mr. Popper.

20         I'm interested in the position of the State

21  Board of Elections from a policy standpoint, is why

22  this matters?  In other words, what's the position of

23  the State Board of Elections, and why is it important

24  to do this?

25         MR. MORGAN:  Well, for one, it's the law.

1              THE COURT:  Okay.

2              MR. MORGAN:  For another -- I mean, that's --

3  NVRA --

4              THE COURT:  Fair.

5              MR. MORGAN:  -- and the state KRS say to do

6  this.  It's not the State Board of Elections to pick

7  and choose what law it decides to follow.

8              THE COURT:  But what's the harm in not doing

9  it?  Obviously --

10             MR. MORGAN:  Right.

11             THE COURT:  -- you've got to follow the law.

12 But if you don't do it, what are we concerned about?

13             MR. MORGAN:  Well, there is a concern -- it's

14 striking a balance frankly, in my perspective, that

15 there are those who say that putting persons on a list

16 or preventing them, taking them off the list of

17 registered voters is a disenfranchisement.

18             THE COURT:  Well, but this whole process is

19 to make sure that doesn't occur.

20             MR. MORGAN:  That's exactly right.

21             THE COURT:  They're not necessarily prevented

22 from voting.  It's just they need to go vote in

23 Minnesota where they've moved, right?  I mean, that's

24 --

25             MR. MORGAN:  That, or vote in Kentucky where

1  they have been registered, and failed to vote for year

2  after year.

3        THE COURT:  Right.  Okay.  So that's fair.

4  That's a disagreement with the law, which says that if

5  you aren't exercising your vote and we can't find you,

6  we're going to remove you from the rolls, right?

7        So that's just a disagreement with the law.

8  That could -- and I get that from a policy standpoint.

9  People can say, Look, there should be a different NVRA

10 that doesn't so quickly, even though it seems like a

11 long process, remove voters, okay?  So I understand

12 that.  So if not doing anything, though, actually

13 fixes that problem, if you think that's a problem,

14 right?  So what else -- what other reason from a

15 policy standpoint, what would the Board of Elections

16 say is the reason that we go through this process, we

17 follow the law, but the reason we -- this law's in

18 place is "X?"

19        MR. MORGAN:  Well, my understanding of the

20 NVRA's premise is to make sure that the voter rolls

21 accurately reflect those persons who live within that

22 jurisdiction, whether it's at the state level or down

23 to the precinct level.

24        THE COURT:  Why is that important?

25        MR. MORGAN:  Because there is concern that

1 persons who are not voting -- or should not be voting,

2 may vote.  There's a concern that -- as Judicial

3 Watch, and to a lesser extent, the Department of

4 Justice, have pointed out, that there are -- there

5 becomes a bloat, if you will, of -- on the

6 registration, that there are more people on the voter

7 rolls than really who reside in that county or in that

8 precinct, and that's because the rolls have not been

9 cleared off.  I get that, too.  I get that -- to me,

10 that policy is a concern that -- of potential fraud.

11 It creates an environment in which that could happen.

12 I have never seen any allegation that that has in fact

13 occurred, but it does create that environment.

14          THE COURT:  There's a lot of allegations out

15 there, which you may not have seen as any evidence

16 that it's occurred, but every year every election

17 cycle people make those allegations.

18          MR. MORGAN:  Yes, sir, very true.

19          THE COURT:  Fair enough.  Well, Mr. Meyer, I

20 want to ask you the same question.  I want to know

21 what the Secretary of State's position is.  Is it that

22 we don't really like complying with this, but we know

23 we have to?  We don't think this is a good law or a

24 good policy, or is there a recognition that we're

25 trying to comply with this law because we have the

1  same, the same goal that the, that the political

2  branches had when they put this policy in place?

3          MR. MEYER:  No.  I think the position of the

4  Secretary of State's office is that the policies

5  behind the law are valid and should be enforced and

6  should be complied with, and they are good things.

7  And we've never had any other position.

8          The Court is -- just to make clear on our

9  position on the two, we -- you are correct.  If the

10  8(d)(2) notice had gone out before the 2018 election,

11  two federal elections would be two years earlier than

12  two federal elections after the notices went out this

13  year.

14          So -- but there has never been any -- the

15  policy behind it is that it is a good thing that the

16  voter registration records be accurate.  I think that

17  the voter registration statistics have implications on

18  other things that happen in government, funding, maybe

19  the -- and I'm not an expert on this, but the, you

20  know, the delineation of representatives, et cetera,

21  possibly that's -- but, there's no reason, and it's

22  never been the position of the Secretary of State that

23  8(d)(2) notices should not go out, that if a person --

24  and this is -- there's been some representations in

25  the briefs about our position that are not our

1  position.

2        Like, for example, if an 8(d)(2) notice goes

3  out, and we never get it back, or they, they never get

4  it back, 45 days passes, that person has not

5  responded, and the clock begins to tick, and two

6  elections, federal elections later, they are subject

7  to removal.

8        So -- and we acknowledge and agree that there

9  are two important policies behind this law as is set

10  forth in the consent judgment.  Number one, ensure

11  that Kentucky residents are not removed from official

12  lists of registered voters, absent the procedural

13  safeguards set forth in the NVRA.  And two, improve

14  the accuracy of voter registration records, 'cause if

15  the voter registration records are not accurate, bad

16  things can happen.

17        THE COURT:  Got it.

18        MR. MEYER:  So there's no -- I mean, no

19  disagreement with the policy, no disagreement -- no

20  incentives --

21        THE COURT:  Everybody's in agreement that the

22  integrity of elections depends in part on making sure

23  that there's not this pool of unregistered -- or

24  voters that are registered, but not legally in

25  compliance because they've moved or they're deceased,

1  or whatever, right?

2          MR. MEYER:  Right.

3          THE COURT:  Yeah.

4          MR. MEYER:  And the position about the --

5  whether or not the 8(d)(2) notice should have gone out

6  before August 8, 2018, is a question of contractual

7  interpretation.  It's not -- and I'm repeating what

8  Luke has said.  You know, there's no -- nobody on --

9  from my client -- or my client is not advocating that

10  it's bad that 8(d)(2) notices go out --

11          THE COURT:  Right.

12          MR. MEYER:  -- that they shouldn't go out.

13  It's simply that there wasn't a requirement that they

14  go out.  They have gone out since, and to resolve the

15  question of whether they should have gone out, if you

16  decide to resolve it.  Because our argument is whether

17  or not the defendants have achieved substantial

18  compliance with the consent decree can be determined

19  in 2023.

20          THE COURT:  Here's the problem I have with

21  that argument.  The problem I have with that argument

22  is this chronology, this timing issue.  One of the

23  things we did in preparation of this hearing, my law

24  clerk very helpfully kind of created a chronology

25  which kind of helps figure out the timing of

1  everything that's happening and everything that's

2  supposed to happen.  But if you wait until the end to

3  see if there's compliance -- let me give you an

4  example.  Let's say you did nothing.  Your argument

5  that I have to wait until -- or the plaintiffs have to

6  wait to come in and get you to -- you know, try to get

7  you to comply --

8            MR. MEYER:   Right.

9            THE COURT:  -- until then, means there's been

10  this long period of non-compliance, so -- And to be

11  fair to you, Mr. Meyer, your argument may be more

12  nuanced, which is, is you can't tell right now --

13  obviously, you could tell if we did nothing, that

14  we're not in compliance, but this isn't ripe in terms

15  of the facts haven't developed.  We think we're in

16  compliance, but it needs to unfold further to really

17  be able to know whether we've complied with the

18  consent degree.

19            MR. MEYER:  I think my argument is even more

20  nuanced than that, and here's my -- the 8(d)(2)

21  notices did not go out before the 2018 election --

22            THE COURT:  Right.

23            MR. MEYER:  -- everybody agrees with that.

24  That's never going to change.  That's the basis for

25  the motion to extend.  There is not an allegation that

the State Board of Elections is violating now.  In
fact, I think there will be an acknowledgement that
there has been cooperation -- you know, the whole
process that happened this year, there was a
collaboration, the 8(d)(2) language was circulated.
There was comment from the government.  We made some
comments that resulted in revisions, Judicial Watch
participated in their weekly phone calls.

        So I don't believe that there's an
allegation, other than about my legal positions in
other courts, but I don't think there is an allegation
that the State Board of Elections is not complying
now.

        So, of course, if the administration changes
and new board members are elected and they say, This
is a stupid law; we're just going to ignore it, they
should -- they will come back, they should come back,
and you should address it.

        But if the only allegation is they didn't get
it out before '18, everybody agrees with that, that's
never going to change.  Everybody's trying their best
to comply now.  They're going to be monitoring it this
year.  They're going to go out again next year.
They're going to go out again next year.  In 20 -- in
two federal elections from now, which is going to be

1   under your purview, the people that should be removed

2   are going to have to be removed, so they're going to

3   be able to --

4           THE COURT:  Will the consent decree still

5   be -- an agreement still be in effect?

6           MR. MEYER:  Yeah, until 2023.  So this year

7   the notices went out in 2019.  There's a federal

8   election in 2020.  There's a second federal election

9   in 2022.  That's when everybody who hasn't responded

10  will get renewed, all of which is under your

11  monitoring and under their monitoring.

12          So assuming the State Board of Elections does

13  that, you will know, okay, they didn't get it out

14  before the federal election 2018, but they've sent

15  notices out every year.  They've removed 100,000

16  people in 2022.  They've sent notices out again in

17  2022.  2023, you can look at and say, Okay, look,

18  we've got a different Secretary of State, we've got

19  six new board members, we've got a different possibly

20  justice department.  Everything has been done.

21  There's no allegations of any violation, other than

22  the fact they didn't get this first mailing out.  Do I

23  need to continue to watch this for two more years?

24          So that's really the argument, not that you

25  shouldn't get involved ever until the end.  If we had

said we're not sending the notices out, they would ask

you to step in, and you should.  But -- so my argument

really is not that you should never.  It's just simply

in these particular circumstances based on this

particular allegation, in order to evaluate "Whether

the defendants are in substantial compliance," the

more appropriate time in light of the cooperation of

the parties, in light of the progress that's been made

would be sometime other than now.

THE COURT:  And so your argument's more

fairly characterized as a request for me to simply

defer my decision on whether there's a need to extend

the length of time that the parties are under this

consent decree?

MR. MEYER:  Correct, while everybody concedes

and stipulates that the 8(d)(2) notice did not go out

before the 2018 election.

THE COURT:  Okay.  All right.  Just back up

just a moment.  And would that be the position of the

State Board of Elections?

MR. MORGAN:  Yes, sir.

THE COURT:  So it could be the case that you,

under a certain particular time, you would agree that

it's appropriate to extend the agreement as it relates

to the amount of time the parties are operating under

1  it, but it's just too soon to make that decision right

2  now?

3         MR. MORGAN:  Yes, sir.

4         THE COURT:  Okay.  Mr. Popper, you've been

5  very patient, sir.  Let me begin by kind of letting

6  you address that question in terms of why we care

7  about this from the position of Judicial Watch.  And,

8  you know, part of this is, is kind of policy-based,

9  but it's also about harm.  Trying to gauge what's the

10 harm that's occurred.  This -- the State Board of

11 Elections, the Secretary of State is arguing that

12 they're in compliance, and they believe a compliance

13 is important, and they're going to do this.  What's

14 the harm that comes from the fact that it's going to

15 take longer than you believe is required under the

16 law?

17        MR. POPPER:  With all respect, Your Honor,

18 that's the argument we heard right before we sued.

19 But now that we have sued -- and what Your Honor has

20 correctly identified is that once a general federal

21 election goes by, you can never get it back.

22        THE COURT:  Right.

23        MR. POPPER:  This Court, with all respect,

24 Your Honor, cannot craft an order, I believe, that

25 would remove someone who has not responded to an

1 8(d)(2) notice any faster than two general federal

2 elections.  In a way -- not in a way, it's not fair to

3 the voter.  The voter didn't do anything.

4          THE COURT:  Well, it's the law.

5          MR. POPPER:  Well, but the registrant has to

6 be removed after two general federal elections after

7 receiving the notice.

8          THE COURT:  Right.

9          MR. POPPER:  Right.  And if that notice

10 doesn't go before November 2018, or really August

11 2018, there -- we can never get that time back.

12          And what's more is, these aren't the only

13 people being removed.  This law is, of course, always

14 in force.  They need to send out more notices to

15 people who they believe have moved, and they need to

16 put them on the NVRA clock, as we've been calling it.

17          THE COURT:  Is the issue before me primarily

18 what it means to be on the NVRA clock versus the

19 canvassing notice in the 8(d)(2) notice?

20          MR. POPPER:  I don't believe so, Your Honor.

21 And in fact, there was some discussion that makes me

22 want to clarify in particular about the canvass

23 mailing.

24          The canvass mailing was a party-agreed

25 remedy.  I guess I'm not certain --

1          THE COURT:  That's right.

2          MR. POPPER:  -- whether it's required under

3    state law, but it's not required by the NVRA.  The

4    initial canvass mailing to identify people who may

5    have moved was non-forwardable, which is contrary to

6    the NVRA.

7          THE COURT:  And it was in kind of response to

8    the fact that it had just -- for years, hadn't been

9    done.

10          MR. POPPER:  Nine years, that's right.

11          THE COURT:  That's right.

12          MR. POPPER:  And then, Your Honor, the

13    obligation to send an 8(d)(2) notice existed

14    independently of the consent decree --

15          THE COURT:  Right.

16          MR. POPPER:  -- in August 2018.  It existed

17    once, as a matter of reasonable construction of the

18    statute once they identified people who likely were no

19    longer registered in Kentucky.

20          And so the loss is real, and the fact that

21    they're trying hard now doesn't make up for what has

22    been lost.  And the only thing that can make it up,

23    Your Honor, is to extend the concern -- the term of

24    the consent judgment.

25          To the extent that the Court was asking about

1  policy, I addressed this -- if the Court was asking --
2  the policy behind the NVRA, you know, it was a
3  Congressional edict.  It has the force of law, and
4  should be obeyed for that reason.  It was part of the
5  bill that both guaranteed that more people would be
6  registered to vote, but there would be safeguards
7  about whether their registrations were valid.
8          It does permit voting by people by
9  affirmation if they're designated as someone who
10  received a notice and didn't return it, and that is
11  susceptible to fraud.
12          There are other reasons, Your Honor, that go
13  beyond the scope of the record.  For example, it has
14  been argued, I've seen it argued, and I've argued it
15  myself, that where parties -- I'm sorry -- individuals
16  or groups seeking to undertake get-out-the-vote
17  efforts depend on a registration list for their
18  mailings and their contacts, it becomes more expensive
19  for them to do that.  It also looks bad.
20          And when it comes to voter registration, Your
21  Honor, we respectfully submit, it shouldn't look bad;
22  it should look clean.  All that being said, Congress
23  has made this determination, and Kentucky is bound by
24  it.
25          Now, with respect to that particular issue,

1  whether it's two general federal elections or four

2  general federal elections, as may be the case under

3  certain interpretations of Kentucky law, that is a

4  separate issue, Your Honor.  That's the second breach

5  that we alleged, and it would be important not to

6  conflate the two.

7         The first issue, whether they breached the

8  agreement by not conducting a mailing prior to August

9  2018 --

10         THE COURT:  Not just any mailing, not --

11         MR. POPPER:  The 8(d)(2).  The 8(d)(2)

12  federal mailing is a matter of contract construction.

13  And the wanted -- paragraph 34(c) has two mailings and

14  two dates, two sets of dates saying the date for May

15  23, to August 8, when a mailing is expected.  And it

16  has that important word, as we pointed out, Your

17  Honor, "includes."  When you're talking canvass

18  mailing, you know, it says, Here are the required

19  procedures for any comprehensive plan.  That's the

20  long-term way we're going to fix this problem.  Any

21  comprehensive plan must include procedures for

22  conducting a canvass mailing in these time frames

23  ending August 8, which include where a canvass mailing

24  is returned, procedures for sending 8(d)(2) notices,

25  and you get that by the cross-reference to 34(d).

```
 1              THE COURT:  So let's say I make a decision on
 2  the meaning of that contract provision.  What impact
 3  does that have on 8(d)(2) mailings going forward, if
 4  any?
 5              MR. POPPER:  Pardon?
 6              THE COURT:  If any?  I mean, I could decide
 7  that it was in compliance.  If I decide it wasn't in
 8  compliance, does either of those decisions --
 9              MR. POPPER:  I see.
10              THE COURT:  -- impact 8(d)(2) mailings going
11  forward?
12              MR. POPPER:  To the extent I understand the
13  Court's question, it's related to what's the harm now;
14  what can we do now?
15              THE COURT:  That's it.
16              MR. POPPER:  Yeah.  With 150,000 extra
17  registrations carried on the rolls, Your Honor, there
18  is an administrative cost to the state.  There is an
19  administrative burden in terms of arranging to have
20  them removed, not in 2020, but in 2022.  This burden
21  is occurring at the same time that other mailings are
22  going out, and other people either are or not
23  responding to the federal 8(d)(2) mailing.  The state
24  has to have procedures in place to deal with the
25  proper removal of these registrations.  It's threw in
```

1  effect 150,000 extra registrations on the fire, so to

2  speak, for two more years.  The administrative burden

3  is the harm.

4          And the other harm, Your Honor, is breaching

5  an order of this Court, an order that did not have an

6  escape clause, as the Court has pointed out.  And that

7  breach -- I mean, Your Honor has asked at a number of

8  times, why did it happen?  And I understand the

9  Court's directive not to get into the minutia of the

10  facts, but in this case, I must.

11          The reasons why it was explained to have

12  happened have changed from staff constraints, which

13  was the first explanation, to equity, which is the

14  second explanation.  And they sound like post-hoc

15  rationalizations.

16          I respectfully submit that the Court should

17  vindicate the power of the order that it issued that

18  was breached, and not because anyone acted in any kind

19  of good or bad faith, but because it was this Court's

20  order.  And as I started with, it was also the law all

21  along, regardless of whether any order was in place.

22          And, Your Honor, the second set of issues

23  still hasn't been adequately addressed, and I believe

24  that it turns on the phrase "immediate."

25          Initially in our motion papers, we were

1  concerned that what this was all leading up to by
2  suggesting that Kentucky law doesn't put someone on
3  the inactive list.  But the parties were concerned.
4  There's an email from Jennifer Scutchfield referring
5  to a possible eight-year removal cycle.  But what we
6  were concerned with was that this a sly way to turn
7  two general federal elections into four general
8  federal elections, two to get on the inactive list,
9  and two more to be removed.  Now --

10        THE COURT:  Okay.  So I'm -- and I'll let you
11  continue, but is that true then going forward?  Right?
12  So that -- I understand in terms of the context of the
13  consent agreement why two elections could get turned
14  into four because this is kind of about when to turn
15  on the spigot, right?

16        MR. POPPER:  Right.

17        THE COURT:  The spigot's now turned on, and
18  the law doesn't allow them to turn it off; it's got to
19  stay on going forward in terms of these notices.  So
20  now that the spigot's on -- and should I be
21  concerned -- I might be concerned that they turn it
22  off and they don't send the notice, but is that just
23  an anomaly of the way they interpreted the law to get
24  the spigot turned back on?

25        MR. POPPER:  Well, Your Honor, we would

1  submit that it's a way to interpret the spigot as a

2  completely different thing, and it is, and it is under

3  federal law.

4        Under *Husted*, people who have -- registrants

5  who have received a notice and not responded to it

6  must be removed in that statutory period.  To turn the

7  two general federal elections into four is contrary to

8  federal law.  It's also contrary the way they read the

9  inactive period is you don't get on the inactive list

10 until two general federal elections have elapsed.  If

11 that's the case, you don't have to affirm your address

12 when you show up to vote unexpectedly.

13       THE COURT:  So this again, is really a

14 question about educating me.  Is -- are you concerned

15 about that going forward?  Or are you just simply

16 concerned about that because of the way it unfolded

17 with the agreed on canvassing manor in this case?

18       MR. POPPER:  Absolutely going forward.

19       THE COURT:  Okay.

20       MR. POPPER:  Absolutely going forward.  To

21 have the entire country, or, forgive me, 43 states and

22 the District of Columbia removing registrants after a

23 notice is sent in two general federal elections, and

24 to have Kentucky, and Kentucky alone, removing

25 registrants after two general federal elections, and

1 two more general federal elections would be contrary
2 to federal law would be wrong, and we're concerned
3 about it from here to the end of the consent judgment.
4           THE COURT:  Both the Secretary of State's
5 office and the Board of Elections agree with the two
6 election rule.
7           MR. POPPER:  Not quite, Your Honor.  The
8 State Board of Elections does agree, and this is based
9 on their papers.  Something is wrong with the papers,
10 I respectfully submit, from Secretary Grimes because
11 she says -- and the place where she says it is ECF 57
12 at page 20 -- she says that, "Nothing requires the
13 immediate removal of a registrant who has received a
14 notice and two general federal elections have
15 elapsed."
16           Is "immediate" a word that's somehow in play?
17 Does "immediate" mean, as Luke Morgan wrote in a
18 letter in 2018, does it mean 45 days after -- in other
19 words, you're placed on the inactive list, I believe
20 Mr. Morgan said, 45 days after a notice is sent,
21 you're on the inactive list.  Or does the Secretary
22 interpret the law to be that after two general federal
23 elections after a notice is sent, you are instantly
24 placed on the inactive list, and eligible to be
25 removed?  And is she suggesting that there's some

other period of time beyond the fact that you become
eligible to be removed immediately?

Now, Your Honor, if we're talking about 10
days or 45 days, we're not concerned.  But are we
talking about two more general federal elections?
What is the alternative to "immediate?"  And the fact
that we don't know is why we're still here asking for
this clarification.

THE COURT:  So stay right where you are.  And
you've kind of highlighted about one of about six to
ten reasons that I thought this hearing could be
helpful at this particular stage because that was a
point of confusion for me as well in terms of
briefing.  The good news is, the legal representative
of the Secretary of State's here.

Mr. Meyer, I'm going to turn to you and see
if you can kind of provide a response to that and kind
of clarify the position of this Secretary of State in
terms of what the compliance means.  Because I think
both sides are asking me, in some ways, to work
through this and decide what the law is and rule on
what the law is.

And you can stay there, and you can stay up
here, Mr. -- you don't have to switch places, so ...

MR. MEYER:  We've never -- so the position of

1  the Secretary of State's office is the 8(d)(2) notice
2  goes out, two federal elections occur, and after that
3  second election, there must be a determination of
4  whether or not any of these people voted.  So you got
5  150,000 people that are on the list of people who have
6  not responded to the 8(d)(2) notices.
7          THE COURT:  Right.  So you want to find out
8  have they voted in either of those two elections?
9          MR. MEYER:  Correct.  Correct.  And then at
10 that point, the State Board of Elections, they are
11 subject to removal.
12         THE COURT:  So when you say "subject to
13 removal," are they removed automatically?
14         MR. MEYER:  I don't know if it's automatic.
15 I think the State Board of Elections has to do
16 something.  I think they have to --
17         THE COURT:  Do they have discretion -- does
18 the State Board of Elections have any discretion about
19 whether they should be removed or not?  We'll let the
20 State Board of Elections --
21         MR. MEYER:  We have never taken the position
22 that -- we have never taken a position on that one way
23 or the other.  But my belief is that those people
24 should be removed by the State Board of Elections
25 after they figure out whether or not they have voted

1  in either of the two elections.

2        THE COURT:  How long do you -- does -- how

3  long do you get to do that?

4        MR. MEYER:  I've seen emails just -- and this

5  is just -- this isn't a matter of fact, but I've seen

6  emails that sometimes that can take three months, but

7  that's -- that's Luke's -- or Mr. Morgan.

8        THE COURT:  We'll let you both respond to

9  this.  But would the Secretary of State's position be

10 consistent with this statement, which is once the

11 8(d)(2) notice has been sent, once an election passes

12 and the voter does not vote in that election, a second

13 election passes and the voter does not vote in that

14 election, they must be immediately removed from the

15 rolls?

16       MR. MEYER:  Well, let me say this.  The, the

17 word "must" is an interesting word because there is

18 a -- there's dicta, and they take the position that

19 they must be removed.  That arises from some dicta in

20 a Supreme Court case.

21       And I will say this, we don't dispute -- we

22 don't -- we've never taken a position on that issue,

23 and we are fine if the State Board decides they must

24 be removed.  So I don't want to -- I don't want to

25 concede that they --

1        THE COURT:  Because you're -- the Secretary

2    of State can't remove them?

3        MR. MEYER:  Correct.  We're fine with them

4    removing them.

5        THE COURT:  Okay.  Mr. Morgan, take my

6    statement --

7        MR. MORGAN:  The State Board of Elections --

8        THE COURT:  -- 8(d)(2) notice goes out,

9    election occurs, a federal election occurs, the voter

10   does not vote, a second federal election occurred, the

11   voter does not vote, must they, under the NVRA,

12   because that's really what I'm focused on.  I'll have

13   to get into the weeds on the implementing statute as

14   well -- must they on the NVRA immediately be purged

15   from the rolls?

16       MR. MORGAN:  They must be removed from the

17   rolls.  I'm going to quibble over the immediacy

18   because there are -- that -- there's the very real

19   potential that someone had voted, and it will take

20   approximately 60 days for the county clerks to bring

21   in the voter rolls for that election, and so we're

22   talking 2022 here.

23       THE COURT:  So my, my statement, my framing

24   of this, it's a given that they did not vote in the

25   first election, and it's a given that they didn't vote

1  in the second election?

2         MR. MORGAN:  They are to be removed.

3         THE COURT:  I think what you're saying to me

4  is there's a mechanism to figure out whether they

5  voted in those two elections.  But once you've

6  determined that they haven't voted in those elections,

7  they must immediately be removed from the rolls.

8  There's no waiting period, there's no due process to

9  the voter -- any more due process to the voter, under

10 the NVRA they're purged from the rolls?

11        MR. MORGAN:  Correct.

12        THE COURT:  Do you agree, Mr. Popper?

13        MR. POPPER:  I do, Your Honor, and --

14        THE COURT:  So what's the concern -- do you

15 recognize that there may be a period of time to make

16 sure that the predicate of did not vote in those

17 elections is confirmed by the State Board of

18 Elections?

19        MR. POPPER:  A credit process?  Absolutely,

20 Your Honor.  There is in every state that does this.

21        THE COURT:  And how long does that typically

22 take?

23        MR. POPPER:  Thirty (30) to 45 days is what

24 I've heard, but we would not blink at 60 days.

25 Forgive me.  To the extent that we were free to craft

1 the agreement and issue orders, we would not blink at

2 60 days.

3          THE COURT:  Okay.  So are you -- I'm not

4 asking whether you're comfortable with the

5 implementation thus far, but are we all on agreement

6 of what's required under the NVRA?

7          MR. POPPER:  Just for removals, Your Honor,

8 just for removals, not for the affirmation under

9 20507(e).

10         THE COURT:  All right.  I made a note to get

11 you to flesh out this affirmation issue for me, so

12 let's turn to that now.  Why don't you do that.

13         MR. POPPER:  Yes.  Your Honor, federal law --

14 while the NVRA does not define inactive registrants,

15 the CFR does, and we cite that -- it is -- okay.  I

16 don't have it to hand, but I believe that it's on page

17 11 of our opening brief, and it's a CFR citation.  And

18 it says that, "Inactive means that you've received an

19 8(d)(2) notice and the clock has essentially started

20 ticking."  What it actually says is, "Inactive voters

21 means registrants who have been sent but have not

22 responded to a confirmation mailing sent in accordance

23 with what is now the NVRA's federal cite, and have not

24 since offered to vote."  That's an inactive

25 registrant.

1          What we're concerned about is if Kentucky law

2    is read not to put someone in an inactive status until

3    two general federal elections have elapsed, then as

4    long as you're not in the inactive status, the

5    defendants may be taking the position that you don't

6    have to affirm that you live where you say you live,

7    and that's a federal requirement.

8          THE COURT:  So the notice gets sent out, a

9    number of different things are going to happen.  One

10   is you can get a response back that says that this

11   voter's been moved, right?  One is it can get sent

12   back as undeliverable?

13         MR. POPPER:  Yes, Your Honor.

14         THE COURT:  One is it gets sent, but there's

15   no response at all.  It assumes it got delivered, but

16   nobody's responding?

17         MR. POPPER:  Yes, Your Honor.

18         THE COURT:  That's the category you're

19   referring to --

20         MR. POPPER:  With respect to --

21         THE COURT:  -- that implicates the inactive

22   voter --

23         MR. POPPER:  With respect to this issue, Your

24   Honor, may also concern the undeliverable.  It may

25   also concern mail that goes out and comes back and is

1   stamped by the Post Office as undeliverable.

2         THE COURT:  Yeah.  Got it.  So this is a

3   chronology issue again.  What happens -- when does the

4   clock start to tick in terms of the two elections in

5   those -- in possibly those two circumstances?

6         MR. POPPER:  Yes, Your Honor, but not quite,

7   I believe, as you've phrased it.  The question is for

8   the elections that occur within that statutory

9   framework, which we all may agree on, which is your

10  two general federal elections plus 60 days for a

11  credit process.

12        If you do show up to vote unexpectedly

13  because you were thought to have moved, they may send

14  you a notice.  But if you do show up to vote, you need

15  to affirm your registration -- or, sorry, your address

16  in order to be permitted to vote.  The NVRA says yes.

17        THE COURT:  And your concern is that people

18  show up to vote who had gotten a notice, and there's

19  no affirmation process taking place at the polls?

20        MR. POPPER:  That's correct, Your Honor.  And

21  that would happen because under Kentucky law, you're

22  not on the inactive list, because by the

23  interpretation, which we believe is, by the way, an

24  absolutely incorrect interpretation.  But regardless,

25  by that interpretation, the inactive list doesn't

1  spring into existence for two general federal

2  elections, so they don't have to affirm their

3  addresses.

4          THE COURT:  All right.  Stay right there.

5  Mr. Meyer's studying carefully.  Do you want to take a

6  minute and kind of consult?  I mean, I'm not -- we've

7  got all afternoon here.  I'm not sure what time your

8  flight is.

9          MR. POPPER:  Tomorrow morning, Your Honor.

10          THE COURT:  Tomorrow.  All right.  Well,

11  we've got till midnight at least tonight.

12          So I'm interested in the chief election

13  officer's position on this, kind of what's this

14  Secretary of State's position on that requirement,

15  that affirmation requirement as it relates to those

16  voters who were sent a notice, there's no response or

17  it's undeliverable, subsequently show up to vote, does

18  anything have to happen at the polls before they can

19  vote?

20          MR. MEYER:  I mean, we've never taken the

21  position that the federal law or -- and the state, I

22  believe, and Luke was looking for it; there's a state

23  law that has a similar requirement, that it should be

24  complied with.

25          I mean, there's not -- so -- and I'm just

1  looking at -- I mean, it says, you know, registrant is

2  moot from an address in the area covered by a polling

3  place, shall be permitted to vote at that polling

4  place upon oral or written affirmation.

5          So the Secretary's never contested that.

6  That wasn't at issue in the consent judgment.  There's

7  never been any position taken on that issue in state

8  court.  We have no disagreement with the law, and we

9  think everybody should follow any obligation, any

10  obligation or legal requirement that one has if they

11  have not responded to a letter before they can vote,

12  so ...

13          THE COURT:  Okay.  Mr. Morgan, what's the

14  position of the State Board of Elections on this

15  factual predicate?

16          MR. MORGAN:  That an affirmation needs to be

17  made.

18          THE COURT:  Okay.  So --

19          MR. MORGAN:  And, if I may?

20          THE COURT:  Please.  Oh, please, yes.

21          MR. MORGAN:  Which is part of the reason why

22  in the State Board's response, we asked for this

23  guidance that you're giving, because shortly before

24  filing this response, we were across the street in

25  state court and we were getting direction there.  And

1  the -- we just want to make sure we're all abiding by

2  one set of rules here because I don't think that the

3  state and federal rules are that different.  The state

4  rules may not have as much detail as some of the

5  federal and -- but I, I recall, having been present in

6  the state court proceedings, that there was concern

7  about having this affirmation, and that the, the

8  difficulty, the pragmatic problems that causes to, to

9  have all of these affidavits, 'cause that's how it

10  manifests -- this affirmation manifests in these voter

11  affidavits, so ...

12      THE COURT:  As I recall, the federal

13  proceedings were not implicated at all in the state

14  court proceedings.

15      MR. MORGAN:  That's correct.

16      THE COURT:  There was no even discussion

17  really at least in the -- kind of what I've seen.

18  There may have been an argument in the federal

19  proceedings.

20      MR. MORGAN:  No.  I think that that is --

21  there really wasn't a lot of discussion, that's for

22  sure, and as I read the order, there certainly is

23  nothing pertaining to federal law.

24      There is this lawsuit that the Kentucky

25  Democrat Party has filed against the State Board of

1  Elections in state court.  Frankly, Judge, I think it

2  would be beneficial to have just one lawsuit deal with

3  all these issues, rather than something here,

4  something there.

5          THE COURT:  Which jurisdiction should decide

6  it?

7          MR. MORGAN:  This Court.

8          THE COURT:  Does the Secretary of State

9  agree?

10          MR. MEYER:  Well, no.  The issue before the

11  state court was an issue -- first of all, it related

12  to a state election, so the NVRA wouldn't pertain to

13  that election.  And the question before the Court in

14  Franklin Circuit Court was whether or not people who

15  had received an 8(d)(2) notice should be removed from

16  the list of eligible voters that was provided to the

17  public and to the -- so it was a particular issue of

18  state law.  It was resolved.  There's been no

19  allegation in this court or in that court that anybody

20  failed to abide by the requirement of an affirmation

21  during the past election.

22          And what our position is, with all due

23  respect to Mr. Morgan, is that while the State Board

24  may like your view on certain issues, it's not the

25  place of the Court to get advisory opinions on legal

1   issues that are not squarely about the language in the

2   consent decree.

3          THE COURT:  So let me, let me turn back to

4   that point, Mr. Popper, because I do feel like there's

5   a little bit of a tendency -- everybody's kind of

6   saying the right thing here, right?  But it's like

7   Reagan said, "You trust, but verify."  And it seems

8   like the plaintiff here in Judicial Watch is, Yeah,

9   but we don't think they're going to do it, right?  All

10  right.  You may have some grounds to believe that.  As

11  a watchdog institution, that's kind of what your job

12  is, to try to, you know, hold people accountable and

13  hold their feet to the fire using the legal process

14  fairly.  And I have great respect for that.  But I'm

15  not in the business of preemptively deciding things

16  until it comes to pass that they actually don't do it,

17  right?  The suspicion when they -- when there's an

18  agreement on what the federal law is here, then that's

19  kind of where my job ends.  And if they don't comply

20  with federal law, then I go back to work.

21         MR. POPPER:  Your Honor, what troubles us and

22  what continued to trouble me and trouble us was that

23  there was no disagreement on what Kentucky law meant,

24  until about May of this year.  Then there was a new

25  approach, and suddenly the KDP was arguing the same

1  approach, and the -- what the approach meant was

2  unclear.

3          And, Your Honor, we filed a -- our motion

4  practically begging for the elucidation we seemed to

5  have received today, and we didn't get it.  And what

6  we were told along the way was that we and the Court

7  should wait until the end of the agreement --

8          THE COURT:  Right.

9          MR. POPPER:  -- to see whether they've done

10  it right.  And as I've pointed out, and as the Court

11  is aware and has pointed out, every lost election is

12  gone for good.

13          THE COURT:  Well, I think you were well

14  within your rights under the consent decree and the

15  jurisdiction of this Court to file the motion you

16  filed.  I have no -- I don't think it was

17  improvidently filed.  I don't think it's asking -- it

18  requires me to resolve it, and I'm going to resolve

19  it.  And I want to talk in a moment before we're done

20  about the timing of the -- about the timing of that.

21          I do think, though, this consent agreement

22  might need to be extended.  But I think it's a fair

23  point to say let's let this unfold.  We're trying

24  here.  We agreed on what the law is.  There is some

25  disagreements that need to be resolved, and, you know,

1  my job will be to resolve those legal disagreements as

2  it relates to the consent agreement.  But it may be

3  that we just need to defer that decision.  I don't, I

4  don't -- I can foresee a situation in which it will be

5  important to extend the period of time that these

6  parties should operate under a consent agreement, and

7  the order of the Court as a decree, but it might be

8  provident to wait, decide the issue that's in front of

9  us in terms of the conflicts that are clear that there

10 are some conflicts in terms of the application of the

11 NVRA, but not just simply extend the two-year request,

12 as I recall, on the prospect that we're going to need

13 another -- and it's already clear we're going to need

14 another two years.

15        MR. POPPER:  Well, Your Honor, I wouldn't put

16 it that way, that it's already clear that we're going

17 to need another two years because of some

18 interpretation of Kentucky law.

19        I would absolutely agree that the

20 consequences of that are very much dependent on what

21 they stand up today and say.  And to the extent they

22 say the right thing, then that's the right thing.  And

23 they've said it to the Court; they've said it to a

24 federal judge.

25        THE COURT:  It sounds like in some respects

1  you think they have said the right thing.

2       MR. POPPER:  From what I've heard right now,

3  Your Honor, it sounded like the right thing, both

4  about the affirmation, unless we -- Your Honor knows

5  how you go back to a record and look at it and say,

6  "Did they really say that?"  But to the extent they've

7  said the right thing --

8       THE COURT:  The court reporter can already be

9  put on notice that this transcript will be required

10  for this hearing, so ...

11       MR. POPPER:  But, Your Honor, that's just

12  about the interpretation issue.  150,000 registrations

13  that should have been cleaned up by 2020 November,

14  will be on the voter rolls for two more years, subject

15  to whatever fraud may occur, subject to whatever

16  additional expense may occur to those who are trying

17  to use that list for other purposes, and just frankly,

18  in plain violation of the United States Code.  Nine

19  (9) years has become 11 years during the pendency of

20  this consent judgment.  That can't be right.

21       THE COURT:  All right.  I think I understand

22  that point.  I think it's a fair point.

23       Let me ask you this.  What would be the

24  position of Judicial Watch as it relates to the change

25  in administrations?

1          So what we know is that on January 6, or

2    whatever the date is, there'll be a new Secretary of

3    State.   That, you know, changes the -- perhaps the

4    litigation position of that particular office.   I

5    don't know that it has any impact necessarily on the

6    Board of Elections, although political changes often

7    changes the composition of members of the board.

8          What would be your recommendation in terms of

9    the management of the case, given that particular

10   circumstance, which is -- seems to me to perhaps had

11   some impact on the litigation posture in this case?

12         MR. POPPER:   Well, Your Honor, with respect

13   to the second breach, the interpretation of the law,

14   which again, pending close review of the record seems

15   to have been resolved.   And pending agreement on the

16   third issue of breach, which we've raised, which we

17   haven't really discussed, about treating undeliverable

18   marks from the Post Office differently from people who

19   just failed to respond, and there's a denial from the

20   Secretary of State that that ever happened.

21         THE COURT:   That was category two.   So let's

22   address that and let's see what the position is of --

23   what is the stat -- what happens to undeliverables?

24   Either one of you can begin.   I want to try to get a

25   sense of your position and your representation on

1 behalf of your client.

2      MR. MEYER:  I think that the issue raised was

3 you send an 8(d)(2) notice out, and there's zero

4 response.

5      THE COURT:  Right.

6      MR. MEYER:  And the position, I think, from

7 Mr. Morgan has been consistently that you got to give

8 a certain amount of time to see if they will respond.

9 I think that period of time has been 45 days.  And if

10 the person doesn't respond in 45 days, that person is

11 treated just the same as if it was responded -- it was

12 received as undeliverable.

13      THE COURT:  I imagine you're okay with that,

14 if that's what in fact happens?

15      MR. POPPER:  Yes, Your Honor.

16      MR. MORGAN:  That's correct, Judge.  And that

17 is -- you know, part of the plan that the State Board

18 of Elections has been working and developing in

19 writing with the input of the Department of Justice

20 and Judicial Watch.  I mean ...

21      THE COURT:  Okay.  So help me know what

22 relief you're seeking?  What am I to do about your

23 concern that that might not actually be happening?

24      MR. POPPER:  Your Honor, to the extent that

25 the representations have been made to the Court that

1    that is what should happen, the extent to which it has

2    not been happening isn't something -- I mean, how to

3    put this.

4            Here is an occasion, Your Honor, where the

5    Court's concern about what does this mean going

6    forward can be cured if it's no longer done.  Go and

7    sin no more.  That can work with respect to the second

8    and the third breach, although the offense to the

9    Court's consent judgment remains in the offense to the

10   law, but the practical effect can be cured.  The first

11   one can't.

12           And to turn back, Your Honor, to your

13   question about what does a change in administration

14   mean?  It means nothing, about 150,000 registrations

15   that are still on the rolls.  It could have had an

16   effect on the second and third breaches.  But if we're

17   all in agreement about what those mean, and we've made

18   these representations to a federal judge, that's

19   probably less important.

20           The first breach, Your Honor, is unfixable.

21           THE COURT:  Are you -- is part of the relief

22   you're seeking, though, is for a decision by the Court

23   that in essence requires state government entities to

24   process those 150,000 as if the breach had not

25   occurred, or what you describe as the breach?

1          MR. POPPER:  Your Honor, I don't believe that
2   the Court can order that kind of relief.
3          THE COURT:  I don't either.
4          MR. POPPER:  Yeah.
5          THE COURT:  Yeah.  Okay.
6          MR. POPPER:  So no, Your Honor.
7          THE COURT:  Okay.  Good.  All right.  One of
8   the things I always say at this point in the arguments
9   is, you came here today wanting to make sure that you
10  had made certain points based on what's pending in
11  front of me.  I want to make sure you've had the
12  opportunity to do that, sir.  So is there anything
13  else you want to focus on?
14         MR. POPPER:  Your Honor, I believe we had a
15  full opportunity, for which I thank the Court, and no,
16  there is nothing further.
17         THE COURT:  I appreciate the accommodation.
18  This ripened on December 4, as I recall.  It's a
19  difficult time of year to travel.  Originally I was
20  thinking about trying to schedule this on Friday, but
21  I don't want to schedule this on the Friday before the
22  holiday, and so I appreciate you accommodating on a
23  relatively short time frame to appear here in the
24  Eastern District, and appreciate that very much.
25  Thank you, sir.

1          Mr. Meyer, the reason I expedited this was to
2     make sure that the position of this Secretary of
3     State, they felt like they had had a full opportunity
4     to state on the record their position, not
5     characterized by anybody else, but characterized by
6     the legal representative of the Secretary of State.
7     So I want to make sure you feel like you've had an
8     opportunity to do that, and any points that you wanted
9     to make coming in here today, you've had the
10    opportunity to do that.
11         MR. MEYER:  Only I appreciate that, Your
12    Honor.  I think I've been given an opportunity to make
13    those points.
14         With respect to the one, it sounds like,
15    remaining issue, which is whether to extend the
16    consent decree now, we have -- and we're using the
17    150,000-person figure, some of those 150,000 people
18    will vote between now and 2022.  Some of those 150,000
19    people will make communication with their precinct or
20    their local county clerk.  Some of those people will
21    presumably register in other states, and that, as I
22    understand it, there is a process that is now in place
23    to gain information about that, that the State Board
24    is -- and if this Court extending the period of time
25    right now will not affect what the Court and what the

1  State Board does with the remaining people in 2022.

2      So the 150,000 people that have not responded

3  to the 8(d)(2) notices will not be affected by any

4  relief the Court make -- renders today.  And so our

5  suggestion, as we've -- as I've already said, not to

6  be redundant, is that the Court continue to rely on

7  the Department of Justice and Judicial Watch to

8  monitor what's going on in the Commonwealth, and if

9  they believe there are problems going forward, they

10  will raise it to your attention.  And then at the

11  appropriate time, you can determine whether you

12  need -- whether the parties have been -- have achieved

13  substantial compliance, and whether it's necessary to

14  extend the time of the consent decree at the

15  appropriate time.

16      THE COURT:  Thank you, Mr. Meyer.  Mr. Morgan

17  --

18      MR. MORGAN:  Thank you, Judge.

19      THE COURT:  -- same, same opportunity for

20  you, sir.

21      MR. MORGAN:  If the Court please, there's

22  been no breach.  The State Board of Elections is

23  working on compliance with the consent decree, as well

24  as drafting and updating, in an ongoing process, the

25  comprehensive plan that -- we've heard nothing really

1   about -- I've alluded to it just a little bit in

2   regards to this 45 days.

3          This is an ongoing process, both the

4   comprehensive plan, but also the consent judgment, and

5   that is reflected by the document -- the consent

6   judgment itself, that this is a dynamic, evolving

7   document, and the State Board of Elections is --

8   stands firm behind the law, stands firm by its actions

9   and --

10          THE COURT:  And asks the Court to promptly

11   rule on the pending motions.

12          MR. MORGAN:  Indeed.

13          THE COURT:  Okay.  That's really a question

14   about whether you have a different position in terms

15   of whether there's any need to defer.  And just to

16   make clear, because it's the office that's most

17   affected initially in terms of a change of

18   administration, you're not making any requests for any

19   deferral in terms of a decision on behalf of the

20   office of Secretary of State?

21          MR. MEYER:  Well, I mean, I don't know -- we

22   would believe that it's appropriate for you to rule on

23   the motion, but our belief is that the ruling on the

24   motion should be to defer a decision on whether or not

25   to extend.

1            THE COURT:   On that part of it?

2            MR. MEYER:   Correct.

3            THE COURT:   But there are other issues

4    presented as well.

5            MR. MEYER:   Well, I think the only two other

6    issues, there's simply no dispute.   There's -- and

7    it's a request for an advisory opinion.   We agree that

8    people who don't respond should be treated similarly

9    to people whose mail is -- responded -- are returned

10   as undeliverable.

11           And the only other issue was whether or not

12   our position concerning Kentucky law on the state

13   statutory -- statutorily defined term inactive list

14   negatively impacts any obligation to comply with

15   federal law.   We've never contended that.   I don't

16   think there's any lingering dispute on that issue.

17           THE COURT:   Mr. Popper, am I pronouncing your

18   name correctly?

19           MR. POPPER:   Yes, Your Honor.

20           THE COURT:   Okay.

21           MR. POPPER:   It's like corn popper.

22           THE COURT:   With a name like Van Tatenhove, I

23   try to get it correct, but I'm not very successful

24   sometimes.

25           So I think you would agree, after careful

review by everybody of the record today, that one

result might be just simply to deny the motion as moot

because the parties agree to the legal issues before

we begin today could have been interpreted as being in

context, with the exception of the extension.

MR. POPPER:  With the exception of the

extension --

THE COURT:  I'm not asking you to concede

that that should be the result, but it -- but as I

listened to your argument, you said, "This is helpful

today because we're now clarifying the positions of

these two parties?"

MR. POPPER:  I see the logic of what Your

Honor is saying, yes, sir.

THE COURT:  Okay.  That's -- you're a very

good lawyer, and that's a fair -- a very fair

response.

We have other entities represented here

today, so I don't want to overlook the Attorney

General's office or the Department of Justice, or

anybody else, who came in today feeling like they

needed to make a particular point, or thought it would

be helpful to make a particular point, so just kind of

a last call.  I'm not looking for anything in

particular, but ...

 1          MS. RUPP:  Yes, Your Honor.  The United

 2   States would like to be heard on several points, if I

 3   may.

 4          THE COURT:  I'd be pleased to hear from you.

 5          MS. RUPP:  Okay.  I will come to the podium.

 6   I believe I'll be able to be heard better.

 7          THE COURT:  I think that'd be a good idea.

 8          MS. RUPP:  There were a couple of points that

 9   were not quite made, and so I would like to put them

10   to Your Honor.

11          The first is with regard to the

12   interpretation of the consent judgment and what it

13   requires in terms of the timing, and whether the

14   8(d)(2) notices were required to be sent by August 8,

15   2018.

16          Multiple parties have referred to paragraph

17   34, but I don't believe anyone has specifically

18   referred to paragraph 33, and in particular, the last

19   sentence.

20          And I would say that the structure of the

21   consent judgment is flexible in that it gives the

22   defendants the opportunity to determine what

23   procedures and processes will work best for them in

24   terms of less maintenance.  And so it is structured

25   around the comprehensive plan that was required, and

1   as such, there are different things that appear in

2   different subsections and different paragraphs.

3           So the end of paragraph 33 says, "The

4   Kentucky State Board of Elections will proceed with

5   the actions described in subparagraph 34(c) below

6   regarding a canvass mailing in the stated time frames,

7   regardless of whether a comprehensive plan is in

8   place.  It must be done regardless of whether the plan

9   is in place."

10          And I would particularly note that actions

11  and time frames are both plural.  And that makes more

12  sense when you look to paragraph 34(c), or, I'm sorry,

13  to -- yes, to paragraph 34(c), which is referenced.

14          And paragraph 34(c) says that the

15  comprehensive -- I'm sorry -- the canvass mailing

16  includes the follow-up actions that are in several

17  other subparagraphs.  And then two of those

18  subparagraphs we have 34(e)(ii) -- sorry -- 34(d)(ii),

19  and that refers specifically to the 8(d)(2) notices.

20  And then paragraph 34(e), which requires the notices

21  to be sent by August 8.

22          So even though all of these provisions are in

23  different subparagraphs because, for example, the

24  8(d)(2) notice was going to have be a component of the

25  comprehensive plan for not just this year, but for

1  years going forward.

2      THE COURT:  The Department's position is the

3  8(d)(2) notice should have been sent out by that

4  deadline --

5      MS. RUPP:  Yes, sir.  Yes, Your Honor.

6      THE COURT:  -- not just simply an agreed on

7  canvassing mailing, for those reasons you've just

8  articulated?

9      MS. RUPP:  Yes.

10     THE COURT:  Thank you.

11     MS. RUPP:  And particularly paragraph 33,

12 saying that it must be done regardless of whether the

13 plan is in place.

14     THE COURT:  Okay.  Thank you.

15     MS. RUPP:  With regard to whether an

16 extension is needed and whether it's appropriate for

17 the Court to order it now, I would note that the

18 failure to substantially comply with the consent

19 judgment is not just about having failed to send the

20 notice on time, but it's also the fact that we still

21 do not have a comprehensive plan in place, which is

22 part of the reason in large part that we are here

23 today, you know, asking the Court for clarity about

24 different provisions.

25     It has taken a long time for the Commonwealth

1  to be out of compliance.  They haven't sent these

2  notices since 2009.  It is, I think, taking longer

3  than they expected to come into compliance with the

4  consent judgment to come up with a comprehensive plan.

5  There is a lack of institutional knowledge because it

6  has been so long since they have done this.  You have

7  new staff; I believe you have new board members.

8         And so this original agreement would have

9  provided the Court and the parties with oversight for

10 two different removal cycles after both the 2020

11 election and the 2022 election.

12        We are now limited to overseeing the removal

13 cycle only after 2022, because the notices went out

14 late.

15        We think it is important, not only as a

16 matter of equity to extend the deadline to again cover

17 two removal cycles, but is also important, given how

18 long things are taking, given the complicated nature

19 of this process, we think it's important for us to be

20 involved, and to make sure that this process happens

21 smoothly, not just once, but twice so that these

22 processes are truly institutionalized before oversight

23 ends.

24        THE COURT:  Thank you.  Okay.

25        MS. RUPP:  To the extent that Your Honor was

1   interested in policy arguments, I will just point out

2   that the legislative history, I believe it's the last

3   House report on the NVRA contains several pages

4   explaining at length the policy reasons for the

5   balance between wanting accurate voter registration

6   rolls and waiting the two federal general elections to

7   ensure that people are not wrongly removed.

8           And then finally, just a minor point.  You'd

9   mentioned something about if somebody -- if the

10  8(d)(2) notice is not returned, we assumed that it was

11  delivered.

12          And I would just point out that the fact that

13  it was delivered does not mean that it was delivered

14  to the person who's actually registered.  When it came

15  to the canvass cards, there were quite a few that

16  were -- that had handwritten notes on them, "Return to

17  sender."  Some of them said, "Return to Sender.

18  Person moved five years ago.  Returned to sender.  No

19  longer lives here.  Moved out of state," things like

20  that.  So just because a card gets delivered to an

21  address does not mean in any way that that registrant

22  still resides there.

23          THE COURT:  So the -- and this is intuitive

24  from all of our own experiences.  I live in a home

25  that I've lived in for the last couple of years, and

1 two owners ago we still get mail for them.  And we try

2 to forward it on.  But you're saying someone could get

3 that, it's not to me, just simply discard it and not

4 feel any obligation to do anything?

5 　　　　MS. RUPP:  Yes, Your Honor.  And that's part

6 of the reason that it is important to treat all of

7 these registrants the same way, so that when that

8 person goes to the polling place, they also have the

9 opportunity to affirm or to update their voter

10 registration address.

11 　　　　THE COURT:  Okay.

12 　　　　MS. RUPP:  And I'm sorry, if I can have just

13 a moment to look at my notes from my co-counsel.  I

14 believe I've hit everything, but I'd like to confirm.

15 　　　　THE COURT:  Please, yes.  Consult if you'd

16 like.

17 　　　　MS. RUPP:  I'm told I have nothing else.

18 　　　　THE COURT:  Thank you very much for

19 appearing.

20 　　　　MS. RUPP:  Thank you.

21 　　　　THE COURT:  I appreciate it.  And let me -- I

22 think -- I'll just say to the Board of Elections and

23 the Secretary of State, I think you've adequately

24 argued the 8(d)(2), so I know kind of what your

25 response is to what the Department is saying about

1 that.

2         What about, though, this -- I guess I want to

3 ask you kind of what is the harm?  You can see the

4 Department saying, Look, it's taking a long time to

5 put the comprehensive plan in place.  All right.

6 What's, what's the harm that comes with an extension?

7 Why, why is it -- you both oppose the extension, but

8 for reasons that I think the Department is fairly

9 articulating in terms of changes and the difficulty

10 after a dormant period of time almost of a decade,

11 this comprehensive plan is yet to be determined.  How

12 is it harmful to extend that particular time in the

13 face of that circumstance?  That's the Department's

14 argument.

15         And thank you.  You can return to counsel

16 table.

17         MS. RUPP:  Thank you.

18         MR. MEYER:  Your Honor, from my perspective,

19 it is an unnecessary determination that the

20 sovereignty of the state should be interfered with in

21 three -- over three years.

22         I mean, we have a system that is dependent

23 upon states running and overseeing fair elections

24 pursuant to federal law and state law, and the system

25 depends on the states exercising their sovereignty to

1  implement these various policies and statutory

2  requirements.

3        So when the federal government, through the

4  Department of Justice or a federal court, decides that

5  it is going to interfere in a neutral way, not that

6  that -- I'm not suggesting that it's inappropriate or

7  -- but to involve itself in that, that is something

8  that should not be taken lightly, and it should be

9  determined at the time that is appropriate.

10        As I've stated, and as the Court alluded to,

11  we will have a new Secretary of State in a matter of

12  days.  There will be new board members.  We may have a

13  new law.  Congress will change in the next three

14  years.  We will have new individuals, and maybe a new

15  administration, depending on elections between now and

16  then, so much can change.

17        It's not necessary for the Court to decide

18  that it is, that it is necessary to involve itself in

19  Kentucky's administration of the elections, and I

20  think it's not the right question when considering the

21  federal government's involvement in something that a

22  state -- a state responsibility to say what's the

23  harm?

24        THE COURT:  Is it fair to say that this --

25  see if I can describe what you're saying, and use

1  language that we use in the context of sentencing,

2  which is given prudential concerns about, you know,

3  oversight of what is clearly left in the Constitution

4  to the states, we ought to have oversight that is

5  sufficient, but not greater than necessary.

6          MR. MEYER:  I think that's a fair way to put

7  it.

8          THE COURT:  Okay.

9          MR. MEYER:   And that should be made at a

10  time where all of the facts and circumstances can be

11  fully considered, and you can have the benefit of

12  three more years of whether or not the future actors

13  are complying with this.

14          THE COURT:  Okay.  Mr. Morgan, do you want to

15  add anything to that?

16          MR. MORGAN:  I agree with what Mr. Meyer

17  said.  I also would add that we are, for the very

18  reason that we're here.  I understand the Court's

19  comment about the -- this motion not being improvident

20  made by Judicial Watch, but they're -- from my

21  client's perspective, there is no breach.  There's,

22  there's no good reason to be in this Court right now.

23  We are working, we have been working to get this done,

24  and it's a needless waste.

25          THE COURT:  Thank you.  Well, let me see if

1 the Attorney General's office has anything that they

2 feel they need to add to this?

3         MR. NOLAN:  Your Honor, we don't really have

4 anything to add here today.  You're very aware that we

5 have a new attorney general, and so we don't have a

6 position on this position.

7         THE COURT:  You're here taking lots of notes

8 today?

9         MR. NOLAN:  Yeah, that's right.  That, that

10 position could change.  Of course, it's the Attorney

11 General's position that your order and your judgment

12 should be enforced according to its terms, but as to

13 this particular motion, we don't have anything to say.

14         THE COURT:  Okay.  Fair enough.  Mr. Popper,

15 you're the movant; I always give the movant the last

16 word.  We've had some other arguments here, so I want

17 to be sure to do that.  And I don't think there's

18 anyone else that wants to speak, so let me give you

19 the final word.

20         MR. POPPER:  Your Honor, I'll be brief.  Nine

21 years of non-compliance, and, I mean, utter

22 non-compliance with the federal statute can justify

23 and abide a six to seven year consent judgment to get

24 it right.

25         THE COURT:  Thank you.  Well, these are

1  important issues.  I think in terms of the work that

2  I'm privileged to do, I enjoy nothing more than

3  weighing in to difficult issues sometimes, but issues

4  that are really well-briefed and very carefully argued

5  on both sides.  I really appreciate that with all

6  parties that are in front of me.  I have the benefit

7  of really good briefing.

8          So I'll take the pending motions under

9  advisement, but intend to rule on these motions based

10 on the arguments in front of me and the papers that

11 have been filed.

12         I hope everybody has a good holiday season.

13 We'll stand adjourned.

14         [END OF PROCEEDINGS - 3:51 p.m.]

15                    * * * * *

16         I, SANDRA L. WILDER, RMR, CRR, certify that

17 the foregoing is a correct transcript from the record

18 of proceedings in the above-entitled matter.

19

20 /s/ Sandra L. Wilder RMR, CRR      Date of Certification:
   Official Court Reporter            December 26, 2019

21

22

23

24

25