UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | |
|---|---|
| JUDICIAL WATCH, INC., ) <br> ) <br> Plaintiff, ) <br> ) <br> UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff-Intervenor, ) <br> ) <br> v. ) <br> ) <br> MICHAEL ADAMS in his official capacity ) <br> as Secretary of State, *et al.*, ) <br> ) <br> Defendants. | Civil No. 3:17-cv-00094-GFVT <br><br> **MEMORANDUM OPINION** <br> **&** <br> **ORDER** |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

As the Consent Judgment points out, the parties share the goals of (1) improving the accuracy of voter registration records through a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of registered voters and (2) ensuring that Kentucky residents are not removed from official lists of registered voters absent the procedural safeguards set forth in the NVRA. After many changes and substantial progress, Kentucky is becoming closer to fulfilling these intended goals. However, Plaintiffs allege that Defendants' previous "inaction prevented Kentucky's timely progress toward ensuring an accurate and current voter registration list, one of the core purposes of the NVRA and this Consent Judgment." [R. 55 at 18.] Therefore, for the following reasons, the Court will GRANT IN PART Judicial Watch's Motion to Modify and Enforce the Consent Judgment.

**I**

On November 14, 2018, Judicial Watch filed a Complaint that initiated this action against the Secretary of State[1] and the Executive Director and members of the Kentucky State Board of Elections (SBE). [R. 1.] Specifically, the Complaint sought a declaratory judgment that alleged "Defendants have failed to fulfill Kentucky's obligations under Section 8(a)(4) of the National Voter Registration Act of 1993 (NVRA) to conduct a general program that makes a reasonable effort to cancel the registrations of registrants who are ineligible to vote in Kentucky elections." *Id*. at ¶59. After Judicial Watch compared the number of voter registrations in Kentucky and its counties to the number of citizens who were old enough to register to vote, they found 48 counties had registration rates exceeding 100% of their age-eligible citizens. *Id*. at ¶¶ 15–17. Therefore, Judicial Watch concluded that the State of Kentucky had more registered voters than age-eligible citizens. *Id*. at ¶ 18. Further, Judicial Watch discovered that contrary to federal regulations, Kentucky failed to report the number of inactive registrations or the number of Confirmation Notices sent to the federal Election Assistance Commission in the previous two-year reporting period. *Id*. at ¶¶ 20–22.

On June 12, 2018, the United States moved to intervene which was granted by the Court. [R. 32; R. 34.] On the same day, the parties filed a proposed agreed Consent Judgment. [R. 33-1.] The Court approved and entered the Consent Judgment on July 3, 2018. [R. 39.] The parties

---

[1] This action was initially commenced against the former Secretary of State Allison Lundergan Grimes, who was able to present her position to this Court, opposing the Motion to Amend/Enforce the Consent Judgment, through briefing and oral argument. Since that time, there was a change of administration that included the transition to current Secretary of State, Michael Adams. Therefore, the events and circumstances leading up to the pending Motion are not attributed to Adams but as the public officer's successor, he is automatically substituted as a party and responsible for all further proceedings in this action. Fed. R. Civ. Pro. 25(d).

stipulated that due to the lack of funding, there were currently no registrants on an inactive list or in the removal process set out in Section 8(d) of the NVRA, no notices required by Section 8(d) had been mailed since 2009, and no registrants had been removed from the voter registration list pursuant to the procedures in Section 8(d) since 2015. [R. 39 at 7.] As a result, the SBE would be unable to remove any registrants ineligible due to an unreported change of address from the voter registration rolls pursuant to Section 8(d) until after the November 2020 election. [R. 55 at 6.]

The NVRA was enacted "to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office" while "ensur[ing] that accurate and current voter registration rolls are maintained." 52 U.S.C. 20501(b)(1), (4). Section 8 of the NVRA prescribes the conditions under which registrants may be removed from voter registration lists and the procedures that must be followed before making those removals. 52 U.S.C. 20507. In addition to other procedures, Section 8 requires that states conduct a general voter registration list maintenance program that makes a reasonable effort to remove persons from the voter list who have become ineligible by reason of death or a change in residence outside of the jurisdiction. 52 U.S.C. 20507(a)(4). These programs must be uniform and nondiscriminatory, and they must comply with the Voting Rights Act. 52 U.S.C. 20507(b)(1).

The parties stipulated in the Consent Judgment that Section 8 specifies two circumstances under which a registrant may be removed from the voter registration list because the registrant has moved to another jurisdiction. 52 U.S.C. 20507(d)(1). First, a state can remove a person from the voter registration list based upon the registrant's written confirmation of a change of address to a location outside of the registrar's jurisdiction. 52 U.S.C. 20507(d)(1)(A). Second, a state can remove a person from the voter registration list if (a) the registrant failed to respond to a

3

notice which includes a postage prepaid and preaddressed return card sent by forwardable mail, on which the registrant may state his or her current address, and which contain specific instructions, 52 U.S.C. 20507(d)(1)(B)(i), (d)(2), and (b) the registrant then fails to vote or appear to vote during the period ending on the day after the second federal general election subsequent to the Section 8(d)(s) notice being sent. 52 U.S.C. 20507(d)(1)(B)(ii). Any program to remove ineligible voters shall be completed no later than 90 days prior to the date of a primary or general election for federal office. 52 U.S.C. 20507(c)(2)(A).

Consistent with the NVRA's requirements, the Consent Judgment requires the SBE to develop and implement a general program of statewide voter list maintenance and to prepare a Comprehensive Plan for the parties to review. [R. 39 at 8–9.] The Comprehensive Plan "shall include a detailed description of all procedures to be followed by" the SBE to maintain an accurate and current voter registration list, including procedures to identify registrants who have become ineligible due to change in residence and the expected timeframe and frequency of such procedures. *Id*. at ¶ 34. The Consent Judgment also requires that "[w]ithin 45 days of the effective date of the Agreed Order, the [SBE] shall provide counsel for the parties with its draft of the Comprehensive Plan." *Id*. at ¶ 33. The parties were then given 30 days to respond. *Id*. If the parties cannot in good faith agree upon the terms of the appropriate plan within 30 days of the latest response, the parties can seek resolution from the Court. *Id*. However, the SBE must proceed with the mandated actions regarding the cavass mailing in the stated timeframes regardless of whether a Comprehensive Plan is in place. *Id*.

The procedures the SBE must include in the Comprehensive Plan include:

[p]rocedures for a general program of list maintenance for registrants who may have become ineligible due to a change of residence that has not been reported to election officials, including procedures that can be implemented in 2018 (bearing in mind the 90-

4

> day quiet period before federal elections), procedures going forward in subsequent years, and procedures for reaching back to identify registrants who may have become ineligible due to an unreported change of residence since 2009.

*Id*. at ¶ 34(a).  The SBE's procedures include an initial canvass mailing consisting of a non-forwardable notice to all Kentucky registrants who may have unreported change in residences since 2009.  *Id*. at ¶ 34(c).  Where such non-forwardable canvass mailing is returned as undeliverable with or without a forwarding address, this would include procedures for moving ahead during the time period between May 23 and August 8, 2018.  *Id*.  If information indicates the registrant may have an unreported move outside of Kentucky, then Defendants were required to send "the specific forwardable [Confirmation] notices described in Section 8(d)(2) of the NVRA to confirm the registrants' change in residence" and wait the statutorily required two federal elections prior to removal.  *Id*. at ¶ 34(d).  Defendants were to provide the "expected date(s) between May 23 and August 8, 2018 when notices will be sent under Sections 8(c)(1)(B)(i) or 8(d)(2) of the NVRA and updates carried out under Section 8(f) of the NVRA."  *Id*. at ¶ 34(e).

Therefore, the initial canvas cards and follow-up procedures under Sections 8(c) and (d) were to be completed by August 8, 2018.  [R. 55 at 7; R. 39 at 9–11.]  This deadline was chosen by the parties because it was the beginning of the NVRA-mandated 90-day quiet period before the 2018 federal general election.  [R. 55 at 7.]  "As a result, any registrant sent a Section 8(d)(2) notice prior to August 8, 2018, would have been removed from the rolls following the November 2020 election, provided that he or she failed to respond and failed to vote or appear to vote between the date of the notice and the November 2020 election." *Id*.

The Consent Judgment is to remain in effect through October 31, 2020, "unless the parties mutually agree to extend it or the Court determines that the Defendants have not achieved

5

substantial compliance with its terms." [R. 39 at ¶ 41.]  The term included three federal general elections, following the first scheduled mailing of Section 8(d)(2) notices prior to August 8, 2018.  [R. 55 at 7.]  Plaintiffs believed that "[a]fter the latter two elections, Kentucky was expected to carry out voter removals in accord with Section 8(d)(2)."  *Id*.

Presently, there is no Comprehensive Plan in place.  [R. 57 at 7.]  The United States and Judicial Watch have been in possession of the latest draft of the Comprehensive Plan since September 4, 2019.  *Id*. at 7–8.  The SBE sent the initial cavass mailing in June 2018 to approximately 617,000 registrants, who, as of 2014, had not voted or had any other contact with election officials.  [R. 56 at 2.]  A total of 264,711 initial notices have been returned to the SBE office, but 109,955 of those notices were received by the SBE after August 8, 2018.  *Id*.  The second mailing, which includes the NVRA required forwardable Confirmation Notices described in Section 8(d)(2) were not sent by Defendants before August 8.  [R. 45 at 7.]  Therefore, because the 90-day freeze period prior to any federal election causes state officials to pause any program whose purpose is to systemically remove ineligible registrations, the 8(d)(2) notices were not sent prior to the November 2018 elections.  *Id*.  Defendants explained that returned canvass cards of the initial mailing were received both before and after August, and that sending the follow-up mailing to those registrants whose cards were returned before August 8 would constitute treating voters differently based upon the inconsistencies of the U.S. Postal Service. [R. 55 at 11.]  The SBE was also unable to proceed with the Section 8(d)(2) mailing by February 20, 2019, the last day before the freeze period of the May 2019 primary election.  *Id*.

In March 2019, Kentucky enacted legislation that limited the Secretary of State's role in the SBE.  *Id*. at 12.  In June 2019, 10 months after the deadline in the Consent Judgment, the SBE mailed out the Section 8(d)(2) notices in follow-up to the canvass mailing.  *Id*.  On

6

November 13, the Kentucky Democratic Party moved to intervene in this action in order to protect Kentucky voters and their rights that have been placed at risk. [R. 59.] However, due to the untimely nature and prejudicial effects, the Court denied the motion on January 3, 2020. [R. 71.] This Court held its first hearing on December 18, 2019 to hear oral argument from the parties, including former Secretary Grimes, in regard to the pending Motion to Modify and Enforce the Consent Judgment. [R. 68.]

Following the hearing, there was a change of administration that included the transition of the current Secretary of State. In light of this change, the Court ordered the new Secretary of State, Michael Adams, to file a status report in regard to his position on the pending matter and update the Court on the status of compliance under the Consent Judgment. [R. 74.] In his status report filed on July 15, 2020, Secretary Adams stated that he "will work with the parties to this action, and anyone else, to ensure compliance with federal and state law." [R. 78 at 2.] In support, Secretary Adams recommends the SBE mark voters who are sent Section 8(d)(2) notices within the Voter Registration System at the time of mailing the notice. *Id*. at 1–2. He also includes his recent agreement with Governor Andy Beshear in regard to the June 23 election, as incorporated by an emergency regulation promulgated by the SBE to implement the agreement. [R. 78-1.] This agreement portrays that "in addition to compliance with the Consent Judgment, the Commonwealth now is taking proactive steps to get its voter rolls as clean as possible in advance of the earliest NVRA-permissible purgation following the November 2022 election." [R. 78 at 1-2.]

Given the changed circumstances and Secretary Adams' differing opinions compared to former Secretary Grimes, the Court held another hearing on the pending Motion to Modify and Enforce the Consent Judgment in order to allow Secretary Adams to present his position in

regard to the pending motion to the Court. [R. 84.] Secretary Adams informed the Court that he recently made a recommendation to send the 8(d)(2) notices out by postcard no later than July 31, 2020. Counsel for the SBE confirmed that the SBE acted upon that recommendation by mailing approximately 110,000 8(d)(2) notices at the end of July. The SBE also sent out 3.4 million postcards throughout the state to inform current voters of the changes and to assist in voter list maintenance. In addition, in accordance with emergency regulation that included a provision to send out letters to those that are on the inactive list, the SBE sent out approximately 162,000 letters and 3,200 8(c)(1) county mailings which has assisted in removal of approximately 1,000 people from the voter rolls. Thus, Secretary Adams believes that they have now complied with the Consent Judgment's requirement to conduct voter list maintenance, and they are taking additional efforts to bring Kentucky into compliance with the NVRA. However, some of the purging of voters that have not responded to the 2018 8(d)(2) notices have not occurred because two federal election cycles have to occur before those voters can be removed. Thus, Secretary Adams stated that it may be in the best interest of the parties to extend the deadline the Consent Judgment stays in effect.

     Judicial Watch responded to Defendants with gratitude as to their recent efforts and progress the current administration has made thus far in complying with the Consent Judgment and NVRA. However, Judicial Watch brought to the Court's attention two issues. First, Defendants agreed pursuant to paragraph 34(b)(5) of the Consent Judgment that they would use the Electronic Registration Information Center (ERIC) to identify persons who should be sent the 8(d)(2) notice to begin the process of removal. Judicial Watch stated that they just learned that 500,000 potential duplicates that have been sent an 8(d)(2) notice before the freeze period in August, could have already been sent the notices and were not. Thus, Judicial Watch requested

an assurance that the 500,000 registrants will be timely mailed an 8(d)(2) notice within months after the end of the federal freeze period. The second issue Judicial Watch wanted to clarify is that voters who fail to respond to a Confirmation Notice, and voters whose Confirmation Notice is returned as undeliverable are to be processed as set forth in the Consent Judgment. Thus, Judicial Watch requested an assurance from Defendants that the 70,000 voters who failed to respond to the previous notice will start the removal process now, so that the current election will count as one of the general federal elections for their removal.

In agreeing upon these issues and facts, Defendants stated they can certainly stipulate to these goals Judicial Watch outlined during the hearing and agree to comply with such demands as outlined in the Consent Judgment. Thus, the Court concluded that the only issue currently before the Court is the request for an extension of time as to the effect of the Consent Judgment. Any other future changes or clarifications to the Consent Judgment can be brought to the Court's attention as they become ripe for adjudication.

## II

"A consent judgment is a hybrid of a contract and a judicial act." *Universal Settlements Int'l, Inc. v. Nat'l Viatical, Inc.*, 568 F. App'x 398, 404 (6th Cir. 2014). "It mirrors a contract in that it reflects 'an agreement by the parties,' and it is a judicial act because it 'places the power and prestige of the court behind the compromise struck by the parties.'" *Id.* (quoting *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983)). "In fact, '[o]nce approved, the prospective provisions of a consent decree operate as an injunction.'" *Waste Mgmt. of Ohio, Inc. v. City of Dayton*, 132 F.3d 1142, 1145 (6th Cir. 1997) (quoting *Vanguards of Cleveland v. City of Cleveland*, 23 F.3d 1013, 1018 (6th Cir. 1994).

As the Sixth Circuit Court of Appeals has recognized, "this injunctive quality requires courts to: '1) retain jurisdiction over the decree during the term of its existence; 2) protect the integrity of the decree with its contempt powers; and 3) modify the decree should changed circumstances subvert its intended purpose.'" *Id.* at 1145–46 (quoting *Williams*, 720 F.2d at 920 (citations omitted)). "Courts, therefore, have a duty to enforce, interpret, modify, and terminate their consent decrees as required by circumstance." *McGoldrick v. Bradstreet*, 2019 WL 3491266, at *6 (S.D. Ohio August 1, 2019) (quoting *Waste Mgmt. of Ohio, Inc.*, 132 F.3d at 1146) (footnote omitted).

Modification of a consent decree "requires 'a complete hearing and findings of fact.'" *Williams*, 720 F.2d at 1017. The proper standard of review for a motion to extend a consent decree is a two-part standard: "(1) [A] party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree. (2) If the moving party meets this standard the court should consider whether the proposed modification is suitably tailored to the changed circumstance." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383 (1992). In this context, a significant change in circumstances can include: "(1) when changed factual modifications make compliance with the decree substantially more onerous . . . (2) when a decree proves to be unworkable because of unforeseen obstacles . . . or (3) when enforcement of the decree without modification would be detrimental to the public interest." *Id.* at 384. Moreover, in applying this standard to the facts of the case, "the district court properly focuse[s] on the goal of the consent decree." *Vanguards of Cleveland*, 23 F.3d at 1020.

**A**

Plaintiffs argue that Defendants have breached the Court's Consent Judgment and request this Court enter an order to enforce and amend the Consent Judgment to extend its duration until March 31, 2025, so as to include the November 2024 general federal election. [R. 45 at 21.] As presented at the last hearing before the Court, current Defendants, including Secretary Adams, do not object to this extension as they agree to cooperate with Plaintiffs during this extended time.

When parties state, as they have here, that a consent decree is designed to achieve a particular result and it fails to obtain that result, that unforeseen failure can be a significant changed circumstance. In *Vanguards of Cleveland*, the Sixth Circuit held "that the lower than expected pass rates by minorities on the 1984 and 1985 promotional examinations and the resulting slower than expected promotion rate for minorities" were "a significant change in factual circumstances" that "caused the consent decree to become 'unworkable' as well as 'detrimental to the public interest.'" 23 F.3d at 1019. The consent decree had failed to bring about "the 23 percent [of supervisor positions being held by minorities] goal." *Id*. at 1020. As a result of the failure of the decree to achieve the intended result during the time it was in effect, the Sixth Circuit upheld the district court's extension of the decree because "a significant change in circumstances which warrants revision of the consent decree [was] present in [that] case." *Id*.

Therefore, the failure of the decree to achieve the intended goal can itself constitute a significant change of circumstances. As the Third Circuit succinctly stated, modification of a consent decree is justified when "'time and experience have demonstrated' that 'the decree has failed to accomplish th[e] result' that it was 'specifically designed to achieve.'" *Holland v. New Jersey Dept. of Corrections*, 246 F.3d 267, 283 (3d Cir. 2001) (quoting *United States v. United Shoe Machinery Corp*., 391 U.S. 244, 249 (1968)). Furthermore, in *Rufo* the Supreme Court

held that, to justify a modification, a change in facts need be only "unforeseen," not "unforeseeable." 502 U.S. at 385. As the Court observed, "Litigants are not required to anticipate every exigency that could conceivably arise during the life of a consent decree." *Id*.

### 1

Plaintiffs argue that Defendants breached the Consent Judgment by failing to send notices pursuant to Section 8(d)(2) of the NVRA before August 8, 2018. [R. 45 at 14–16.] The SBE indicated that the "Judgment does not set a time period in which the second mailing would commence – instead it is left to the Comprehensive Plan to determine this at a future date." [R. 56 at 4.] Therefore, this is a matter of contract construction.

"[I]nterpretation of a consent decree is to follow the general rules prescribed in contract law." *Lorain NAACP v. Lorain Bd. of Educ.*, 979 F.2d 1141, 1148 (6th Cir. 1992). "If the language of the decree is ambiguous, . . . the court's interpretation of its substantive commands may depart from the four corners." *Dotson v. U.S. Dep't of Housing & Urban Dev.*, 731 F.2d 313, 318 (6th Cir. 1984) (citation and internal quotation marks omitted). "Contract language is ambiguous if it is subject to two reasonable interpretations," but the "ambiguity must be patent; that is, apparent on the face of the contract." *Schachner v. Blue Cross and Blue Shield of Ohio*, 77 F.3d 889, 893 (6th Cir. 1996) (citations omitted). If a contract is ambiguous, extrinsic evidence is admissible to aid in interpretation. *See id*.

"The court's task in interpreting a consent decree is 'to ascertain the intent of the parties at the time of settlement.'" *Nat'l Ecological Found. v. Alexander*, 496 F.3d 466, 477–78 (6th Cir. 2007) (quoting *Huguley v. Gen. Motors Corp.*, 67 F.3d 129, 134 (6th Cir. 1995)). "A court has no occasion to resolve the merits of the disputed issues or the factual underpinnings of the various legal theories advanced by the parties." *Williams v. Vukovich*, 720 F.2d 909, 920 (6th

Cir. 1983) (citations omitted).  Rather, "[a] consent decree . . . should be strictly construed to preserve the bargained for position of the parties." *Id.* (citing, among authorities, *ITT Cont'l Baking Co.*, 420 U.S. 223, 238 (1975)).

Here, examination of the language of the four corners of the Consent Judgment reveals that the initial parties agreed that the initial canvass mailing and Section 8(d)(2) notices were to be sent to eligible registrants by August 8, 2018.  The Consent Judgment states in Paragraph 33 that "Kentucky State Board of Elections will proceed with the actions described in subparagraph 34(c) below regarding a canvass mailing in the stated timeframes *regardless of whether a Comprehensive Plan is in place*." [R. 39 at ¶ 33.]  Paragraph 33(c) further states that at a minimum the Comprehensive Plan shall include:

> Procedures for sending a nonforwardable canvass mailing to identify registrants through mail returned as undeliverable who may have unreported moves since 2009, excluding any already identified through the Kentucky State Board of Elections' initial use of the information listed in subparagraph (b), including the expected date(s) between May 23 and August 8, 2018, on which the canvass mailing will be sent.  Where such nonforwardable canvass mailing is returned as undeliverable with or without forwarding address, this would include procedures for moving ahead during the time period between May 23 and August 8, 2018 as set forth in subparagraphs (d)(i), d(ii), and (e) below.

*Id.* at ¶ 34(c).  Lastly, Paragraph 34(e) points out that the procedures include mailing Section 8(d)(2) notices between May 23 and August 8, 2018.  *Id.* at ¶ 34(e).

Instead, the previous administration, including former Secretary Grimes, interpreted the requirements set forth in Paragraph 34 as being contingent upon having a Comprehensive Plan in place and in the event a Comprehensive Plan was not in place, Paragraph 33 controlled.  [R. 57 at 16.]  Therefore, former Secretary Grimes believed that since there was not a Comprehensive Plan in place, the SBE was only required to proceed with the canvass mailing before August 8, 2018 but not any other mailing, including the Section 8(d)(2) notices, until a Comprehensive

13

Plan was in place. *Id*. However, this argument ignores the last sentence of Paragraph 33 in the Consent Judgment. [R. 39 at ¶ 33.] This sentence, as stated above, concludes that it does not matter when a Comprehensive Plan is finally agreed upon by the parties, certain requirements must still be met. *Id*. Paragraph 33 cross references with Paragraph 34(c), which includes the provision regarding canvass mailing requirements. *Id*. at ¶ 34(c). Specifically, Paragraph 34(c) states that the "[p]rocedures for sending a nonforwardable canvass mailing" are to be understood to "include procedures for moving ahead between May 23 and August 8, 2018" with the second mailing pursuant to the NVRA. *Id*. Therefore, the previous administration's interpretation cannot be correct since it conflicts with the plain terms of the Consent Judgment.

Further, as Plaintiffs point out, that interpretation does not make sense given the timing of events in the Consent Judgment. [R. 62 at 6.] The Consent Judgment was issued on July 3, 2018. [R. 39.] The first draft of the Comprehensive Plan was due 45 days later on August 17, 2018. *Id*. at ¶ 33. This is nine days after the August 8 deadline. Therefore, if the deadlines in Paragraphs 34(c) and (e) only apply to an NVRA mailing once a Comprehensive Plan is finalized, "it would be pointless for these paragraphs to mention August 8, 2018 at all, because the first draft of the Comprehensive Plan would only be due after that date." [R. 62 at 6.]

The previous administration offered an explanation as to why they failed to mail the 8(d)(2) notices by August 8, as the SBE emphasized during oral argument that they did their level best. The Court is not unsympathetic as to Defendants' position, but there is no escape clause in the statutory framework for just trying to do your level best. The Consent Judgment nor the NVRA does not refer to any acceptable cause for delaying a Section 8(d)(2) mailing. Further, Defendants' main argument as to why they did not send the 8(d)(2) notices included that the "SBE's decision to wait to send the follow-up mailer until after the General Election was

14

made to avoid treating voters differently based upon the inconsistencies of the U.S. Postal Service throughout the Commonwealth of Kentucky." [R. 45 at 15.] "If the SBE had conducted the follow-up mailer to the voters whose cards were received before August 8, 2018, the SBE would be treating these voters differently than those whose cards arrived on August 9, 2018." *Id*. Defendants also argued that they preferred to wait and see if some of those identified by the canvass mailing "actually voted on November 6, 2018." *Id*.

However, mail is returned at different times and it was foreseeable at the time of the Consent Judgment that responses and undeliverable canvass cards would not be returned by the U.S. Postal Service all at once but at varying times. As Defendants had not sent any Section 8(d)(2) notices since 2009, it was very likely that there would be a large number of registrants who had unreported changes of address during the intervening years. Further, the Consent Judgment is intended to enforce the NVRA. The NVRA specifies that mailing is the proper method for testing whether voters have moved, and elections are used to mark time for removal of voter registrations. 52 U.S.C. 20507(d)(1)(B)(1), 20507(d)(1)(B)(ii), 20507(d)(2)(A). Consistent with the NVRA, the Consent Judgment uses general federal elections as the counters for a statutory waiting period that must elapse before a specific kind of registration is cancelled. [R. 45 at 8.] The Section 8(d)(2) notice commences the statutory waiting period encompassing two general federal elections. *Id*.

The SBE states that 264,711 cards were returned as undeliverable after the initial canvass mailing. [R. 56 at 2.] Of those returned cards, 154,756 were returned prior to August 8, 2018. *Id*. Since Defendants failed to follow up with the Section 8(d)(2) notices to these returned cards prior to August 8, registrations belonging to those with a change of address cannot be cancelled after the November 2020 election. [R. 62 at 3.] Instead, the 154,756 outdated registrations must

15

remain on Kentucky's voter rolls through at least November 2022. *Id*. Therefore, this inaction delayed Kentucky's progress toward "ensuring an accurate and current voter registration" list, one of the main purposes of the NVRA and Consent Judgment. 52 U.S.C. 20501(b)(4); [R. 39 at 8.]

**B**

The second part of *Rufo* requires the Court to determine whether the modification Plaintiffs seek "is suitably tailored to the changed circumstance." 502 U.S. at 383. Plaintiffs have asked the Court to extend the Consent Judgment through March 31, 2025, so as to include the November 2024 general federal election. [R. 45 at 16.] In *Vanguards of Cleveland*, the Sixth Circuit held that a modification which extended the consent decree "for a relatively short period of time, approximately two years" was suitably tailored. 23 F.3d at 1020. Two years, in *Vanguards of Cleveland*, covered two annual promotion examinations, each of which would move the defendants toward their goal of having 23% of supervisor positions held by minorities. *Id*.

In the present case, the initial Defendants breached the Consent Judgment when they failed to timely send the Section 8(d)(2) notices, as previously explained. "Registrants who are sent a Section 8(d)(2) notice become eligible for removal after the second federal general election from the date the notice was sent, unless they respond to the notice, vote or appear to vote, or otherwise affirm or update their voter registration address during that period of time." [R. 55 at 17 (citing 52 U.S.C. 20507(d)(1)(B)).] If Defendants had complied with the Consent Judgment and sent the Section 8(d)(2) notices prior to the 2018 federal general election, the registrants who did not respond, vote or appear to vote, or otherwise affirm or update their address would have been eligible for removal following the 2020 federal general election. *Id*. at

16

18.  Since the Section 8(d)(2) notices were not sent until 2019, those registrants will not be eligible for removal until after the 2022 federal general election.  *Id*.

The Consent Judgment currently terminates on October 31, 2023.  [R. 39 at ¶ 41.]  The timeline set out in the Consent Judgment "allowed the United States and Judicial Watch to monitor Defendants' removal process after the 2020 general election (for registrants who were sent notices prior to the 2018 election) and the 2022 general election (for registrants who were sent notices prior to the 2020 election)."  [R. 55 at 18.]  Due to Defendants' delayed actions, Plaintiffs are only able to monitor Kentucky's removal process the 2020 election, before the Consent Judgment expires.  *Id*.  When entering the Consent Judgment, Plaintiffs desired and agreed to monitor two maintenance cycles and removal periods but are now only given the benefit to monitor one.  Plaintiffs also point to the "need to ensure that the state's long-dormant list maintenance process is now working correctly" by monitoring a second removal period to ensure all procedures are carried out appropriately.  *Id*.  The SBE had not removed registrants pursuant to Section 8(d) since 2015.  [R. 39 at ¶ 28.]

The Court agrees with Plaintiffs in that it is appropriate for their oversight to cover a second removal period to ensure that Kentucky is in compliance with the NVRA moving forward.  [R. 55 at 18.]  In support, current Defendants, including Secretary Adams, do not oppose this extension and emphasize their determination to do whatever it takes to be in compliance with the Consent Judgment, while they are as transparent with Plaintiffs as possible. Therefore, the Court finds that an extension of the effect of the Consent Judgment until March 31, 2025, so as to include the November 2024 general federal election, is suitably tailored to address the breach of Defendants to ensure compliance with the Consent Judgment and NVRA moving forward in the future.

### III

Accordingly, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** that Judicial Watch's Motion to Modify and Enforce the Consent Judgement **[R. 45]** is **GRANTED IN PART.** The terms of the Consent Judgment [R. 39] are **EXTENDED** through March 31, 2025, on which date the agreement will terminate automatically unless the parties mutually agree to extend it or the Court determines that Defendants have not achieved substantial compliance with its terms.

This the 9th day of September, 2020.

Gregory F. Van Tatenhove
United States District Judge